## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| **JABARI STAFFORD** ) | |
| 6491 Woodbine Ave. ) | |
| Philadelphia, PA ) | |
| *Plaintiff,* ) | |
| v. ) | |
| ) | |
| **THE GEORGE WASHINGTON** ) | Case: 1:18−cv−02789   Jury Demand |
| **UNIVERSITY** ) | Assigned To : Cooper, Christopher R. |
| 2121 I (Eye) Street, NW ) | Assign. Date : 11/26/2018 |
| Washington, DC 20052 ) | Description: Pro Se Gen. Civil  F Deck |
| and ) | |
| **PATRICK NERO** ) | |
| GWU Athletic Director ) | |
| 12953 Centre Park Cir Apt 217 ) | |
| Herndon, VA 20171 ) | |
| and ) | |
| **NICOLE EARLY** ) | |
| GWU Asst. Athletic Director ) | |
| 2121 I (Eye) Street, NW ) | |
| Washington, DC 20052 ) | |
| and ) | |
| **GREGORY A. MUNOZ** ) | |
| GWU Head Tennis Coach ) | |
| 1515 Lincoln Cir ) | |
| McKean VA 22102 ) | |
| and ) | |
| **DAVID MACPHERSON** ) | |
| GWU Head Tennis Coach ) | |
| 2121 I (Eye) Street, NW ) | |
| Washington, DC 20052 ) | |
| and ) | |
| **JOHN DOES, 1-10** ) | |
| (Addresses and actual identities to ) | |
| be provided upon discovery) ) | |
| *Defendants.* ) | |

NOV 26 2018

## COMPLAINT FOR DECLARATORY, INJUNCTIVE AND COMPENSATORY RELIEF

COMES NOW the Plaintiff, Jabari Stafford, and acting pro se, complains of the Defendants as follows:

## NATURE OF THE ACTION

1.      Plaintiff (hereinafter "Plaintiff"), an African-American male, brings this action against Defendants, the George Washington University ("GWU"), and various agents, servants, workmen ad/or employees thereof, under the D.C. Human Rights Act (DCHRA), D.C. Code Ann. §§ 2.1401.01 et seq., Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 1981. of the Civil Rights Act of 1866, as amended, and for breach of contract, negligent infliction of emotional distress and negligent retention.

2.      As a student at GWU and member of the men's tennis team, Plaintiff was subjected to severe racial discrimination, defamation of character, grave emotional distress and conspiracy by the coaches, administration and by his fellow student athletes on the GWU tennis team.  At all times relevant to this action, GWU failed to remedy the racial discrimination perpetrated on Plaintiff while he attended the university, despite GWU's knowledge of the discrimination and harassment.

3.      As a result of the Defendants' actions, Plaintiff underwent severe emotional distress and depression throughout his time at GWU which stalled his promising tennis career and prevented him from obtaining his Bachelor's Degree on time.  To this day, Plaintiff continues to experience severe emotional distress and professional repercussions as a result of Defendant's actions.

## PARTIES

4.      Plaintiff is an African American individual residing in Philadelphia PA. Plaintiff was previously enrolled in George Washington University's undergraduate program from

2

September 2014 to December 2017. Plaintiff was a member of the GWU men's tennis team and one of two African Americans on the team during his tenure.

5.      Defendant, the George Washington University ("GWU") is an educational institution located in Washington, DC. The school, established in 1821, confers both graduate and undergraduate degrees and receives federal funding.

6.      Defendant, PATRICK NERO is an adult individual at all relevant times acting as an agent, servant, workman and/or employee of GWU, in the position of "Athletic Director," residing at 12953 Centre Park Cir Apt 217 Herndon, VA 20171

7.      Defendant, NICOLE EARLY, is an adult individual at all relevant times acting as an agent, servant, workman and/or employee of GWU, in the position of "Assistant Athletic Director," who can be served with summons and process at GWU, at the above-captioned address.

8.      Defendant, GREGORY A. MUNOZ, is an adult individual at all relevant times acting as an agent, servant, workman and/or employee of GWU, in the position of "Head Tennis Coach," at all relevant times residing at the above-captioned address, 1515 Lincoln Cir,, McKean VA 22102.

9.      Defendant, NICOLE EARLY, is an adult individual at all relevant times acting as an agent, servant, workman and/or employee of GWU, in the position of "Assistant Athletic Director," who can be served with summons and process at GWU, at the above-captioned address.

10.     Defendant, DAVID MACPHERSON, is an adult individual at all relevant times acting as an agent, servant, workman and/or employee of GWU, in the position of "Head Tennis

Coach," at all relevant times who can be served with summons and process at GWU, at the above-captioned address.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1367.

12.     This Court also has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 (Diversity) because the parties are citizens of different States and the amount at issue in the litigation is greater than $75,000, exclusive of interest and costs.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to the claims occurred in the District of Columbia and because, at all relevant times, Defendant GWU was doing business in the District of Columbia.

## FACTS RELEVANT TO ALL CLAIMS

14.     For as many years as he can remember, Plaintiff dreamed of playing tennis professionally.  Since he was a child, Plaintiff trained hours upon hours to make his dream a reality.  His parents made significant sacrifices, financial and otherwise, to educate their son and help him establish himself as a preeminent tennis player.  It was also Plaintiff's dream to obtain a business degree so that he could one day take over his father's businesses.

15.     When it came time for Plaintiff to attend college, choosing the right school was extremely important because the experience, training and prestige of the program would help Plantiff get to the next level in his tennis career.

16.     Plaintiff and his family researched GWU and its tennis team in making the decision regarding which school was best suited for Plaintiff both academically and

professionally.  Plaintiff and his father met with Greg Munoz, the tennis coach at the time,

regarding what Plaintiff could expect as a member of the school's tennis team.  Mr. Munoz told

him about all of the great players who came out of GWU who went on to have successful careers

in tennis.  Plaintiff was excited about the educational and athletic opportunities that GWU

offered.  Plaintiff understood that if he worked hard, his efforts would be rewarded at GWU and

that his experience at the school would open doors to a promising tennis career.

    **17.**    Plaintiff's father told Coach Munoz that if there were any issues of any sort

pertaining to Plaintiff's behavior or performance at GWU to let him know so he could handle

them with Plaintiff in the most professional way possible.  Munoz appreciated Plaintiff's father's

support for his program and his commitment to Plaintiff's contributions towards the tennis team.

However, Munoz had other plans of keeping the parents separate from his program and being in

sole control of the physical and mental development of his players.

    **18.**    Plaintiff enrolled at the University as a freshman in September 2014, two weeks

into the Fall season.  Plaintiff and two other players of color, one Persian American and one

African American were called into Coach Munoz's office.  At the start of the meeting, Coach

Munoz asked Plaintiff and the other players what they all had in common.  Plaintiff and the other

players were perplexed.  Coach Munoz told them that they were all Americans and that

American players have failed him extensively in the past.  He went on to talk about how all of

the European players were superior and much more responsible compared to their American

counterparts.  Coach Munoz then threatened Plaintiff and the other players that if they did not get

off to a good start at the beginning of the year, he would severely punish them.  Munoz's threats

were aimed only at the non-White members of the team and were wholly unwarranted, especially

because Plaintiff and his fellow teammates had just started the Fall season.  In a GW organized

match, Coach Munoz was heard by players and their parents stating, "I hate Americans." Despite

one of the other players of color struggling with being a responsible student athlete, Plaintiff and

his Persian teammate had no minor or serious infractions. Plaintiff and the two other players of

color were subjected to constant threats which even included emails only directed to them and no

one else on the team.

19.     The bullying by the coaches of the tennis players who were of color was not

limited to Coach Munoz. Phillipe Oudshoorn, the GWU Men's Assistant Coach at the time, also

bullied another player who was of Persian descent. Oudshoorn would belittle this player, make

jokes that alluded to him being a terrorist and from the middle east, and make sexually charged

jokes designed to make the player uncomfortable and embarrassed of what Oudshoorn assumed

to be the player's religious upbringing. Munoz witnessed many of these exchanges and, upon

information and belief, Oudshoorn was never reprimanded or disciplined for his discriminatory

conduct. In fact, Munoz also took part in bullying this player including a physical altercation at

a GWU men's basketball game. At the end of Plaintiff's freshman year, one of the seniors stated

very clearly in the team's individual group chat that the coach's 'bullying' of the Persian player

had gone too far and admitted that him and his fellow teammates 'enjoyed' it often. The Persian

player was also excluded from the group chat and subjected to extensive bullying in which his

teammates would make fun of his mental state and created their own disease named after him.

The Persian player was kicked off of the team the first week of his sophomore year for unknown

reasons.

20.     In or around September 2014 on the way back from a tournament at the University

of Virginia, Coach Oudshoorn told Plaintiff a story about a Black tennis player on his university

team whom Oudshoorn and his teammates in college would verbally and physically abuse

because he was Black. Oudshoorn told Plaintiff that he and his teammates would constantly call

this person nigga" and make fun of the color of his skin, which, according to Oudhoorn, was

very dark. Oudshoorn laughed about how he and his teammates would "brainwash" their Black

teammate into making him "act" like a 'White' person, make him dress in preppy clothing and

try to force him into "thinking" like a 'White' person.

21.     Plaintiff's Persian teammate told Plaintiff during the fall that Oudshoorn had

caused him and the team to get into a van crash. Plaintiff's Persian teammate told Plaintiff how

startled he was. Plaintiff remembered how careless Oudshoorn drove the van and became very

frightened every time he got into the vehicle after hearing the news. Plaintiff's Persian teammate

told Plaintiff that this was reported to Munoz but no repercussions ever took place.

22.     Plaintiff's white teammates would often post racially insensitive jokes and rhetoric

on social media. For example, during Plaintiff's freshman year, Francisco Dias posted a racist

picture on Facebook, that Plaintiff still has, of a black version of SpongeBob that read, "Watch

Black SpongeBob on Niggalodeon." Coach Munoz was likely aware of these racist posting

because he was Facebook friends with the tennis players and he told the players that he

monitored social media postings because he wanted to make sure that his student-athletes

conducted themselves in a professional manner publicly. In other instances, later in Plaintiff's

tenure, various players would often make racist comments in the team group chats. Chris

Reynolds ("Reynolds"), a white male member of the team from England, referred to a black

person as a gorilla and referred to black poetry as "black shitty poetry". Chris Reynolds would

often spew very hateful rhetoric towards Jewish people. Plaintiff was witness to him saying "I'm

not racist but I hate Jewish people" and also calling another teammate in the group chat who was

very cautious of spending money a 'jew'. Christos Hadjigeorgiou and Dennis Afanasev would

often throw racial slurs in the group chat such as 'nig' and 'nigga' when Plaintiff was excluded from the group chat. Fernando Sala, a newcomer during Plaintiff's sophomore year, went on a rant in the group chat due to an American student not giving him the answers to questions on an exam he previously took. He stated "I hate Americans with all my heart!...Fucking Americans will not tell you the questions of an exam they took already...Fucking cunts".

23.     Even though most of the instances above happened throughout Plaintiff's tenure, there was still substantial overt racism during the first couple of months of his freshman year. These instances of overt racist behavior eviscerated Plaintiff's desire to participate in team activities and caused him to try to limit his interactions with his teammates as much as possible.

24.     In or around January 2015, the tennis team engaged in pre-season practices and activities to promote team bonding and to get ready for the upcoming tennis season. The team travelled together in a van driven by Coach Munoz to the Southeast Tennis and Learning Center, the team's indoor practice facility, in Southeast, D.C., a predominantly African American area of the city. Reynolds asked out loud, "Do they call black people "negroes" or "niggers" in America?" He started laughing. Plaintiff responded that Reynolds "couldn't say that." Coach Munoz, after overhearing this exchange, turned around and chastised Plaintiff for confronting Reynolds. He told Plaintiff that Reynolds was from another country and didn't understand what he was saying. Plaintiff was shocked that he was the focus of Munoz's ire and not Reynolds.

25.     A week after this incident, on January 18, 2015, Coach Munoz sent Plaintiff an email informing him that he was suspended from the tennis team "until further notice." Munoz's justifications for suspending Plaintiff was that Plaintiff had been disrespectful to his teammates, had anger issues, did not show pride in the University, was selfish because he did not support his

teammates in victory and in defeat and because he disrespected the tennis director at the Southeast Tennis and Learning Center.

26.    This was quite strange due to the fact that Plaintiff's father was in contact with Munoz occasionally just to check in. Plaintiff's father and Munoz would not have extensive conversations but Plaintiff's father was always under the assumption that Plaintiff was doing well due to Munoz always stating that there were no issues Plaintiff was experiencing.

27.    The team had not even played a single team match by this point. Munoz's purported justification for the suspension were false and pretext for discrimination. In fact, in many instances, the alleged misconduct Munoz cited were instances in which Plaintiff objected to his teammates and/or coaches racist conduct.

28.    Plaintiff attended a meeting with Munoz, Nicole Early, Assistant Athletic Director at the time, and his father to discuss his suspension. Coach Munoz explained his justifications for suspending Plaintiff. For example, Plaintiff was accused of disrespecting his fellow teammates even though Reynolds made blatant racist comments to Plaintiff in front of Munoz, which Munoz chastised Plaintiff for defending himself. Coach Munoz justifications for Plaintiff's disrespect to teammates were more stemmed at Plaintiff's social withdrawal from the team.

29.    Munoz viewed Plaintiff as the stereotypical and derogatory "Angry Black Male" and that any attempt by Plaintiff to stand up for himself would be viewed as aggressive behavior that would not be tolerated. During the fall season, Munoz would tell Plaintiff that he was big and strong and that his teammates were scared of him.

30.    With respect to Munoz's accusation that Plaintiff failed to show pride in the University, Munoz explained that when he asked Plaintiff his opinion regarding the GW men's

basketball team's chance for success that season, Plaintiff said that the team "sucked." Plaintiff never said that the team "sucked," or used words to that effect. Instead, Plaintiff offered a thoughtful analysis that the basketball team could use a better outside presence but that they still had a decent chance of success. But even if he had said that the team "sucked," that was not an indication of a lack of pride in the school or a basis for suspension.

31.     Munoz's justifications for Plaintiff's alleged disrespect to the director of the Southeast Tennis and Learning Center was supposedly one big misunderstanding. The director told Plaintiff's father that he did not disrespect him and that Plaintiff was just upset that he wasn't able to find his phone. The director ended up saying that it was completely blown out of proportion.

32.     Plaintiff's father asked if he could speak with Patrick Nero, who was the GWU Athletic Director at the time (he has since resigned) regarding the suspension. Early and Munoz responded that he could not speak with Mr. Nero because they were handling it. Plaintiff and his father brought up many concerns about overt racism during the meeting. However, Coach Munoz was very adamant that no such thing was involved and that Plaintiff needed to be punished for his behavior.

33.     After the meeting, Plaintiff's father tried to speak with Coach Munoz because he was understandably confused about the bases for the suspension. Coach Munoz refused to talk to him. Plaintiff's father then reached out to Nicole Early who declined to speak with him.

34.     Plaintiff's suspension was contrary to NCAA and GWU's internal policies and procedures because Plaintiff never committed any infraction that would be grounds for a suspension and because the University was required to afford Plaintiff due process prior to suspending him. At all times relevant to this case, Plaintiff complied with all rules and

regulations pertaining to his eligibility to play tennis and be a member of the GWU's tennis team. Upon information and belief, Defendant GWU was aware that its suspension of Plaintiff was discriminatory and contrary to its own policies regarding discipline, yet it took no action to rectify Plaintiff's unlawful suspension.

35.    Defendant's suspension of Plaintiff was also contrary to discipline the school issued to students outside of Plaintiff's protected class. For example, during Plaintiff's fall season, an underage white player was suspended for only a week based on an actual infraction of the school's alcohol policy which paled in comparison to Plaintiff's one-month suspension, which was not based on any school infraction.

36.    As a result of the discriminatory treatment Plaintiff was subjected to, including his unlawful suspension from the tennis team, Plaintiff became depressed and withdrawn. He sought treatment from a psychologist.

37.    Shortly after being suspended, an acquaintance of Plaintiff asked him if he was interested in joining his fraternity, which was considered by students to be a "White" fraternity due to its overwhelmingly Caucasian membership. Plaintiff was not interested in joining a fraternity and was certainly not in the frame of mind to socialize when he had just been kicked off of the tennis team on spurious grounds.

38.    Somehow the news got back to Munoz that Plaintiff was asked to join this "White" fraternity. Munoz called Plaintiff into his office and presented him with an ultimatum. He told Plaintiff that he would feel more "comfortable" reinstating him to the tennis team if he was able to become a member of the fraternity's upcoming pledge class. Plaintiff said that he was not interested in joining the fraternity. Munoz responded that Plaintiff had "major social

problems" and that he would not let Plaintiff back on the team until Plaintiff could prove to him that he could get accepted into this fraternity.

39.     Plaintiff was completely despondent. He did not know what to do. The whole point of attending GWU was to play on the tennis team and get a good education. Neither was happening at this point, so in an effort to get back onto the tennis team, Plaintiff went to the open house for this fraternity and shortly thereafter, was given a "bid" to pledge.

40.     Approximately a week later, Munoz called Plaintiff into his office because he had heard that Plaintiff received a bid to join the fraternity. Munoz appeared surprised that Plaintiff received a bid. But before Munoz would reinstate Plaintiff, he had two more conditions:   First Plaintiff would have to apologize to each of his teammates and ask for forgiveness for his purported disrespectful conduct towards them. Second, before Coach Munoz would formally reinstate Plaintiff, Munoz queried each team member regarding whether they felt comfortable with Plaintiff coming back on the team and if they even wanted Plaintiff back on the team. After Plaintiff went to Fletcher's room to apologize (for reasons unknown), in order to ruin Plaintiff's chances of coming back onto the team, he told Munoz that the apology was not sincere and that Plaintiff should not be let back on.

41.     Plaintiff felt demoralized and humiliated by the conditions that Munoz imposed on him. Requiring Plaintiff to apologize to his teammates was extremely difficult and humiliating for Plaintiff especially because he had not done anything wrong to any of his teammates and coaches who had used racial slurs and never suffered any consequences as a result of their discriminatory actions. Also, putting his fate in the hands of his teammates who had exhibited racist conduct toward him, immensely disturbed Plaintiff.

42.     Plaintiff was ultimately "reinstated" through hard efforts, however, this did not mean an end to the verbal abuse and discriminatory treatment by his coaches and teammates. In fact, the racist abuse continued along with a concerted effort by his coaches and teammates to alienate Plaintiff and make him feel less than human.

43.     For example, one of Plaintiff's White teammates, Danil Zelenkov, blatantly asked him while they were watching a match, "Were all of your ancestors' slaves at one point?"

44.     Zelenkov had had regular outbursts and uncontrolled behavior on the court that went completely unpunished.   For example, shortly after Plaintiff was reinstated, Zelenkov went into a rage during a match, breaking rackets and cursing at the referee.   Unlike Plaintiff, Zelenkov was never disciplined for his misconduct which led Plaintiff to feel further demoralized regarding why he had been suspended from the team.

45.     Plaintiff's father confronted Coach Munoz regarding why his son was suspended when his White teammate wasn't even disciplined for his disruptive and disrespectful behavior. Munoz responded that this individual was seeking "professional help," therefore disciplining him was unwarranted.

46.     During the spring season, Plaintiff's father and other parents were witness to serious racquet and verbal abuse from various players on the team.   Plaintiff's father would constantly bring these issues up with Munoz in which Munoz dismissed the severity of these offenses every time.   Reynolds and Zelenkov had serious emotional and anger issues.   Zelenkov was notorious for breaking racquets and disrespecting officials.   Reynolds would often spew hateful racist rhetoric towards his opponents and throw his racquet around in a violent manner when he would lose.

47.     As another apparent condition of his reinstatement, Plaintiff was excluded from the line-up and was only allowed to take a supporting role for the White players on the team. This included Plaintiff helping to warm up his white teammates prior to their matches and being required to cheer for them on the sidelines. Coach Munoz often tried to get Plaintiff and his Persian teammate to taunt other team members of opposing schools in order to overthrow their results.

48.     In or around March 2015, as a match was about to start and Plaintiff was finishing warming up one of his teammates, another teammate, Chris Reynolds ("Reynolds"), who is Caucasian, yelled at Plaintiff, "Get off the court, monkey!" Munoz was present and within distance to hear Reynolds make this overtly racist statement to Plaintiff, but Munoz did nothing about it.

49.     In or around April 2015, on a trip to Florida for a tournament during Spring Break, Plaintiff shared a room with one of his teammates, Cahit Kapukiran. That night, Kapukiran yelled "NIGGER!!" extremely loudly, purportedly so that Plaintiff's other teammates could hear it in the adjoining rooms. Plaintiff feared that if he said or did anything, Coach Munoz would accuse Plaintiff of being aggressive and kick him off the team again.

50.     During this same trip to Florida, the team went to an amusement park with the coaches. At the amusement park, Reynolds repeatedly made derogatory and racist remarks to Plaintiff including making "monkey" jokes and yelling at Plaintiff, 'Ha ha, you're black!' which was heard and smiled upon by another teammate, Christos Hadjigeorgiou.

51.     Towards the end of the 2015 academic year, the team played in a conference tournament in Ohio. Again, Munoz excluded Plaintiff from the lineup and playing in the tournament.

52.     During the tournament, Plaintiff's teammate, Francisco Dias, played a Black tennis player, who proved to be a challenge for Dias. At the end of the match, the team huddled up and Diaz yelled, "fucking porch monkey" or "fuck that porch monkey." Coach Munoz and Torrie Browning, GWU Associate Head Coach, an African-American female, were in the team huddle and heard Dias's statement. Coach Munoz looked back at Plaintiff and said, "You know, he doesn't really mean what he said. It's not a big deal." Plaintiff looked at Browning, but she said nothing.

53.     Coach Munoz would constantly work on every opportunity to defame Plaintiff and his Persian teammate's name. He often talked to the women's tennis team about both of them in negative ways and would have secret meetings and conversations with various teammates about their opinions on Plaintiff and his Persian teammate. This news would always get back to Plaintiff through a third party.

54.     Defendant fostered an environment that was conducive to blatant discriminatory conduct. Not only did Defendant condone discrimination, the University, through its coaching staff, perpetrated that racist conduct on Plaintiff by letting him know in no uncertain terms that he was inferior to his White teammates and ultimately, it was only his White teammates who mattered. As a result of overt racism, Plaintiff suffered from anxiety, extreme depression and severe mental anguish. His grades from his Spring Freshman year plummeted to well below a 2.0 grade point average.

55.     At the start of the next season, in September 2015, Coach Munoz purposefully excluded Plaintiff from the men's tennis team's picture, which was posted on the school's website and used for promotional materials at various tournaments.

56.     Defendant GWU regularly disregarded Plaintiff's success from the GW tennis team's website, but regularly promoted the White players' success.

57.     During the Spring of Plaintiff's sophomore year, a fitness coach, who previously worked at GWU, told Plaintiff that Coach Munoz had joked with him about having recruited a black tennis player for the team and referred to Plaintiff as his 'token black kid'.

58.     Plaintiff was also excluded from a group chat that consisted of the players.

59.     At the first individual tournament of the Fall 2015 season, Plaintiff won his first match. During his second match, Plaintiff heard Chris Reynolds yelling obscenities on the court like "faggot" and "cocksucker" so loudly that the entire audience could hear him.

60.     Plaintiff won the match and at the end, he yelled, "let's go!" Associate Head Coach Browning walked over to Plaintiff and said, "really (Plaintiff)?" Plaintiff could not figure out what he had done wrong. Browning called everyone into a huddle and started chastising Plaintiff for being too "passionate" and for not conducting himself in a professional manner.

61.     Plaintiff asked Browning why Reynolds was not reprimanded for his behavior for yelling homophobic slurs. Browning claimed that she reprimanded Reynolds, but this was false.

62.     During the huddle, and in front of Coach Browning, the assistant coach, Rafael Aita, and Plaintiff's teammates admitted to Plaintiff that they had wanted him to lose his match. Even though Plaintiff had previously been suspended for supposedly not showing enough team spirit, Coach Aita and the team were not disciplined despite telling Plaintiff that they wanted him to lose. Plaintiff was also the only one on the team that had a clean record of 2-0 that weekend; but this was never highlighted to the extent it should have been.

63.    At the start of preseason of the Spring 2016 semester, Plaintiff was doing a drill with Chris Reynolds that required both of the players to be on the same side of the net. Reynolds started yelling at Plaintiff. Both players approached each other in a confrontational manner.

64.    Munoz separated the players by grabbing Plaintiff and physically removing him from the area. He told Plaintiff that he was going to kick him off the team. Plaintiff asked, "for what?" Munoz began giving him examples, including that Plaintiff didn't say "good morning" to him in the morning, that he thought that Plaintiff believed he was "good looking," that Plaintiff interacted socially with his fraternity more than the tennis team. Plaintiff told Coach Munoz that he felt extremely uncomfortable due to all the racism on the team in which Munoz responded, "There is no racism on the team." He also asked Plaintiff whether he liked Donald Trump.

65.    A few days after this incident, Plaintiff and his teammates learned that Coach Munoz had been terminated. There were rumors swirling around that Munoz had a drinking problem and had several violent encounters with the police in a drunken state. Upon information and belief, the reasons for his termination did not pertain, at all, to his discriminatory treatment of Plaintiff. Coach Browning, who was previously the Assistant Head Coach, became the interim head coach. Coach Munoz, however, was still involved with the program. Plaintiff continuously received e-mails from Munoz and also saw Munoz walking around campus at various times. Therefore, under no doubt, was Munoz still influencing the program in his own way.

66.    Reynolds and Plaintiff's other teammates repeatedly harassed Plaintiff throughout his Sophomore season because of his race. For example, Fernando Sala, a white teammate, asked Plaintiff on numerous occasions how it was possible that Plaintiff was Black *and* that he

had money, as if the two were mutually incompatible.  Additionally, Sala, Reynolds and Hadjigeorgiou attempted numerous times to get Plaintiff to show them his penis because they wanted to see if it was true that Black men have large genitals.

67.     A month or two into the Spring 2016 season, Coach Aita told the team during practice that practice sets would be used to determine who would be in the lineup for matches. The team played each other for lineup positions and Plaintiff beat two white players, Reynolds and Christos, back to back, however the coach staff still excluded Plaintiff from the lineup.

68.     During Spring Break in March 2016, the team traveled to California for a team tournament. One night during the tournament, Coach Aita invited Plaintiff to his room the night before the match for a quick meeting.  Aita told Plaintiff that he would allow Plaintiff to play the next day in a doubles match, but only because he did a good job of supporting the team and cheering.  Plaintiff was disappointed that he was performing so well tennis wise and only getting a chance to play doubles.  However, he still took it as a positive and looked forward to match day.  Plaintiff then realized that this was a direct violation of the tennis team policies due to the fact that only the head coach is allowed to make the lineup.  Therefore, the assistant coach mishandled his position and breached the necessary policies.

69.     The next day, before his scheduled match, Plaintiff began warming up with his doubles partner. Right before the match was to start, the team huddled up as they normally did to psyche themselves up for the matches.  During the team huddle, Coach Browning gave the lineup and Plaintiff was not on it.  Plaintiff felt shocked and utterly dejected.  A white teammate took Plaintiff's place in the doubles match.

**70.**     After this tournament, on March 22, 2016, Plaintiff reached out to Defendant Early to complain about the tournament, the racist mistreatment he was subjected to and the lack of playing time. He relayed his concerns to her during their meeting on March 24, 2016.

**71.**     Assistant Director Early scheduled another meeting with Plaintiff, herself and Browning. In that meeting, Coach Browning explained that she had been excluding Plaintiff from the lineup the entire season because he 'hit the ball too hard', wasn't disciplined and wasn't a team player. These reasons make absolutely no sense due to the fact that a player's success is the basis for making a line up position. Plaintiff had had no infractions as well therefore his exclusion from the line up was extremely biased. Assistant Director Early later told Plaintiff to just let the season pass and wait for the next coach to arrive. Plaintiff raised the issues of discriminatory treatment during the meeting but his concerns were often ignored and reverted back to his own behavior of social withdrawal.

**72.**     Plaintiff's father was aware of the mistreatment of Plaintiff and was very adamant about having an open line of communication with Nicole Early, who he was instructed to talk to. Plaintiff's father tried to contact Nicole Early at various times in which she ignored the greater majority of his requests.

**73.**     At the end of the year after the A-10 championships, Plaintiff was never given any A-10 champion rings or any other paraphernalia as a result of GWU's success at the tournament. It wasn't until Plaintiff's senior year that the request of obtaining a ring was even acted upon. However, Plaintiff still never received anything even after he was dismissed from the school.

**74.**     In the Fall of 2016, Plaintiff became a junior and David Macpherson (white male) became the Head Coach of the GWU's men's tennis team. Unfortunately for Plaintiff, nothing

changed with respect to the discriminatory treatment and hostility he was subjected to by the Defendant.

75.     At the outset of the school year, Plaintiff noticed that he was not receiving any emails or notifications regarding team meetings or beginning of the year team events. Plaintiff's participation in some of these events was required in order for him to be eligible to play. Plaintiff waited a week to hear anything in which he was frantically trying to figure out what was going on. Plaintiff contacted Assistant Director Nicole Early to find out why he had not received any communications from the team. Torrie Browning was interim head coach during Plaintiff's sophomore year therefore she was responsible for sending out the required e-mails to each designated player. During Plaintiff's senior year, one of his younger teammates told Plaintiff that he overheard Rafael Aita telling Torrie Browning that she made a huge mistake and that she should've signed the waiver in order to formally release Plaintiff from the team. Plaintiff's teammate told him that Aita sounded extremely uneasy about Browning's mishandling of the situation as they realized they violated important procedures and policies. Plaintiff's teammate was under the impression that there was a plot between Plaintiff's teammates and the coaches to get Plaintiff kicked off the team in the most discrete way possible.

76.     Assistant Director Early directed Plaintiff to contact Coach Macpherson. When Plaintiff contacted Coach Macpherson to ask him about when practices would begin, the Coach responded that Plaintiff was not on the team, but that there would be tryouts the following semester and that he would consider bringing Plaintiff on the team at that time. This was shocking news to Plaintiff because he was already on the team and was never told otherwise, nor was there a basis to have removed him from the team. Interestingly, Plaintiff's name still

appeared on the roster. There were two other white male freshman players that were on the team that had seemingly replaced Plaintiff.

77.     Shortly thereafter, Plaintiff's father tried to speak to the President of the University but the President's office refused to take his request.  Helen Cannaday Saulny, the Vice Provost, called Plaintiff's father to set up a meeting.  Saulny brought Ed Scott, Senior Associate of Athletics, to the meeting with Plaintiff and his father.  During the meeting, Plaintiff and Plaintiff's father talked about all of the overt racism, the violation of various policies and procedures, the defamation of character and the emotional stress Plaintiff was experiencing. Saulny and Scott were mortified and could not understand how all of these things were happening simultaneously.  They were more confused with why nothing was being done and why Plaintiff was such an enormous target.  Both Saulny and Scott told Plaintiff and his father that Plaintiff was still on the team and assured them that Plaintiff had not done anything that warranted his suspension or removal.  They further indicated that Plaintiff would have had to have signed a waiver in order to be removed from the team.  Therefore, Plaintiff was excluded from the team illegally and the coaches were in direct violation of GWU athletic department and NCAA rules and regulations.

78.     Nevertheless, Coach Macpherson refused to allow Plaintiff to be on the team.  Ed Scott ended up setting up a tryout in front of Coach Macpherson.  Plaintiff and his father were again perplexed because Plaintiff was told directly in the meeting that he was still on the team. How was it possible for Plaintiff to physically be on the team but still have to tryout for the team? Due to Macpherson's busy schedule with due fact that he was rarely present with the team, it was tough to schedule a tryout.  Plaintiff did not have much option in this situation and decided again, to take this as a positive and execute the tryout to the best of his ability.  Plaintiff

had not been playing consistently due to the coach's mishandling of Plaintiff's placement on the team therefore Plaintiff had to postpone the tryout to an even later date (later than what Macpherson had planned due to his usual absent presence at GWU) in order to ultimately play his best tennis. Plaintiff was also left off of the team picture for the second year in a row.

79.     Shortly after his second "reinstatement," four of his White teammates, Chris Reynolds, Christos Hadjigerorgiou, Chris Fletcher and Dennis Afanasev, worked on a plan to provoke Plaintiff, including, but not limited to, making racist statements, in hope that Plaintiff would get into a physical altercation or do something that would get him kicked off of the team. Plaintiff was alerted by his South African teammate that before his tryout in front of Macpherson, there was a grand plot to overthrow the tryout so that Plaintiff would not be let back on the team. Plaintiff's teammate told Plaintiff that before he got onto the team, the other team members spewed the most hateful things about Plaintiff to him and other people in the university. Plaintiff's teammate showed Plaintiff messages in the team's individual group chat which is still present, Reynolds and Afanasev devising a plan to mess up Plaintiff's chances of playing good tennis before his tryout. Of the array of group messages contains Afansev asking the other players "Should I provoke Jabari?... Like tell him he ain't shit just to get him mad" and Reynolds telling him "Dennis. Don't be nice to him. Be professional. And kill him... 'we' are relying on you"

80.     In a private text message to one of Plaintiff's teammates who shared it in the private teammate group chat (which Plaintiff was not part of), Macpherson is shown stating and admitting that "Jabari was not officially taken off the team last year...He was respectful and genial today... He showed a lot of potential today in my opinion...If he takes the coaching well (which he did today) he could harness his power and become a dangerous player...You guys

22

have given me your opinion of Jabari" Directly after this message which was shared in the group chat, Reynolds tells everybody "Hey, guys conference call in Rome hall". Fernando, Hadjigeorgiou and other teammates co-conspired when and where they would meet to talk about Plaintiff's reinstatement.

81.    Afanasev repeatedly asked Plaintiff how it was possible that he was Black and had money. Afanasev would purposefully equate Black people as being poor. Plaintiff, teammates and other parents also witnessed Afanasev calling his black opponents "monkeys." Afanasev once joked to another teammate that he (Afansev) was "black like Jabari and I'm from Southeast [D.C.], the hood." Southeast D.C. is a predominantly African American section of the District of Columbia. During times when the coach would drive the team to practice, Afanasev would play rap music and anytime the word "nigga" was used in a song, he would yell "NIGGA!" in Plaintiff's ear. Plaintiff felt that he could not do anything about this racist treatment because of the risk that he would be thrown off the team again.

82.    Coach Macpherson almost never appeared with the team. Because he was never with the team, Plaintiff would be targeted by the assistant coaches and fellow teammates. During one instance, Plaintiff was getting ready for a practice set that would've been crucial to him playing in the lineup during spring break. Plaintiff began warming up while his opponent, Fernando, came late. Fernando started taunting Plaintiff and trying to provoke him so he would react aggressively and ruin his chances. Plaintiff told Rafael Aita numerous times in which Aita told Plaintiff to just play. During the set, Fernando continued with the taunting which was unsportsmanlike and disrespectful. Plaintiff pointed this out to Aita, who was present on the court, and told Plaintiff to just play again. Plaintiff lost the match due to the constant bickering and taunting. Plaintiff yelled at Aita and asked him how he could let this happen and why he

would never do anything to make it fair for everyone. Plaintiff gets a call from Macpherson who was contacted by Aita and told his side of the incident. Plaintiff told Macpherson about all of the conspiracies, racial discrimination and defamation of Plaintiff's character. Macpherson told Plaintiff that he would be more aware of these things and told him that he would ultimately handle everything. Macpherson sent an email to Plaintiff that he was suspended for one practice day and that other parties would be dealt with as well. Nobody else was given punishment besides Plaintiff.

83.     Plaintiff's father and Macpherson had an open line of communication and did communicate at various times. Macpherson appreciated Plaintiff's father's respect for him and his tennis program and never had any problems with Plaintiff's father overstepping his boundaries. Plaintiff's father had various conversations with Macpherson about a lot of the overt racism and unfair playing fields Plaintiff was experiencing. Plaintiff's father talked to Macpherson at the A-10 championships to talk about the unfair treatment of Plaintiff in which Macpherson appreciated because of the respect he showed. One of the issues that were brought up was why Plaintiff was not given an opportunity to compete in the same way everybody else was given. Plaintiff's junior season progression had been stalled due to the amount of pressure that was put on him to win the little amount of matches he was even allowed to play with such massive time periods in between them. The team ended up losing the A-10 championships, where various teammates, that took up positions that should've been rewarded to Plaintiff, performed extremely poorly. This was the first year that GWU had lost in a long time due to Macpherson's poor decision making. However, Plaintiff's father never had any conversations directly about playing time with any other the coaches during Plaintiff's tenure. If there were conversations, he only discussed even level playing fields.

84.     When Macpherson was present, Plaintiff would talk about these issues with
Macpherson on the GWU campus.  Macpherson would often compare Plaintiff with his father
and tell Plaintiff to 'man up and deal with it (the overt racism) like your father did'.  He was
trying to attribute his father's success in business to Plaintiff ultimately staying quiet about the
issues he was facing and trying to overcome these things that were weighing down on his
performance.  Macpherson was extremely aware of all of these instances but did absolutely
nothing to help Plaintiff's situation.

85.     Plaintiff also experienced defamation of character from his fellow teammate's
parents.  Fletcher's mother would berate Plaintiff's doubles partner for playing with Plaintiff.
Plaintiff's doubles partner told Plaintiff that Fletcher's mother asked, "Why are you playing with
(Plaintiff)…Does he control you?" Plaintiff remembers Fletcher's mother sitting directly behind
him during a match in the fall season of his senior year.

86.     David Macpherson was also extremely insensitive about the current political
climate.  Macpherson chose Trump's tennis facility in Virginia to practice at during the winter.
Due to the pretentious environment and the strong political opinions of its members, Plaintiff
would usually get questioned on how he got into GWU and whether he was on scholarship or
not.  This facility was 50 minutes away from campus and Plaintiff would usually be exhausted as
soon as he got home.  Coincidentally, this facility was closer to where Macpherson lived.
Macpherson always made decisions based on his needs in terms of when he showed up to
practice and where we practiced at.

87.     The effort to get Plaintiff kicked off of the tennis team continued in Fall of 2017,
Plaintiff's senior year.  One of Plaintiff's teammates, an Indian player, who was aware of (but
not a part of) the plot to remove him from the team, told Plaintiff that Reynolds referred to

Plaintiff as a "cotton picking nigger." This person also told Plaintiff that Reynolds had tried to get him to record Plaintiff doing or saying something negative that would result in Plaintiff's removal, but that he refused to go along with this plan.

88.     Plaintiff's family was verbally attacked and harassed at the GWU tennis courts by one of the GWU employees that worked in the tennis office and conducted tennis lessons to individuals who weren't on the team. Any GWU player on the tennis team is allowed to use the courts any time he or she pleases. However, the employee still approached my family and questioned why they were on the courts. The employee took out his phone in hopes to continue to provoke Plaintiff and his family so they would get caught retaliating on camera. Plaintiff and his father e-mailed Macpherson and told him about the incident. Macpherson apologized for what had transpired and told the employee to stay away from Plaintiff and respect him going forward. The employee did not directly belong to the GW men's tennis team but did work in the tennis department at GW alongside Macpherson.

89.     The Indian teammate (who is in a protected class) also informed Plaintiff that he had been sexually harassed and assaulted by Chris Reynolds on multiple occasions. He told Plaintiff that Reynolds would stick his finger up his anus on several occasions and that Reynolds would "sling" his genitals in his face. In one incident, Reynolds wiped toilet paper filled with excrement on this teammate's face. In another incident, Reynolds attempted to shove a traffic cone up his anus. Plaintiff's teammate told him that he was scared for his life and when he brought up these issues with the coaching staff; they ignored him. In another instance, this teammate told Plaintiff that Reynolds had physically assaulted him at a practice by slapping him in the face. The new assistant coach, Damien Farinola, soon became aware of what had transpired. The Indian player told Farinola that he was going to call the police. Farinola

prevented him from calling the police.  Upon information and belief, Reynolds' sexual assault

and harassment of this player, as well as his harassment of another one of Plaintiff's teammate,

was reported to the police, yet GWU took no action.  This teammate told Plaintiff that when

Macpherson finally heard the news, he wasn't shocked.  Instead of punishing this student and

going through the right legal procedures, he tried to get Reynolds to apologize to him.

     **90.**     As a result of Defendant's conduct, Plaintiff struggled with trying to deal with

overt racism, conspiracies to end Plaintiff's collegiate tennis career, unfair playing fields in

practice and defamation of Plaintiff's name throughout multiple occasions.  It became so grave

that Plaintiff was often worrying about his mental health and personal identity more than

spending time working on his tennis career and academic performance.  GWU academically

suspended Plaintiff for failure to maintain the required GPA.  Plaintiff went home to

Philadelphia and essentially shut his life down for several months.  He no longer cared about the

things he once enjoyed or was passionate about.  He lost his desire to play tennis at a

professional level and to achieve academic success.  He lost all of his confidence in his

relationships and in dealing with everyday life.  Not only was his tennis career significantly

affected by Defendant's actions, but he was also deprived of a college degree.

     **91.**     Despite Plaintiff and his father's numerous complaints regarding the blatant

racism he was subjected to by his coaches and teammates, GWU took no action to discipline

these individuals or otherwise rectify the systemic racism that was occurring on its tennis team.

     **92.**     The numerous acts of overt racism led to another player of color (not Plaintiff)

being physically and sexually assaulted by the same teammate that Plaintiff was complaining

about throughout his 3 ½ years at GWU.  The coaching administration (Farinola and

Macpherson) knew about the incident and did not take the right procedures towards handling the situation.

## INJURY TO PLAINTIFF

93.     As a result of Defendant's discriminatory conduct, Plaintiff has suffered, and in the future will continue to suffer, irreparable loss and injury, including, but not limited to, economic loss, humiliation, embarrassment, mental and emotional distress, and the deprivation of his rights to equal opportunities.

94.     Through Defendant GWUs actions, including the actions of its employees, agents, and/or representatives described above, Defendants acted intentionally, maliciously, oppressively and with willful, callous, wanton and reckless disregard for Plaintiff's rights.

## CLAIMS FOR RELIEF

### COUNT I
**Discrimination Under the District of Columbia Human Rights Act (DCHRA)**
**Against all Defendants**

95.     Plaintiff realleges and incorporates by reference all of the allegations set forth in the above paragraphs of this Complaint.

96.     The D.C. Human Rights Act (DCHRA), D.C. Code Ann. §§ 2.1401.01 et seq., aims to provide every individual with an equal opportunity to participate in "all aspects of life," including, but not limited to, access to education.

97.     Section 2-1402.21 makes it unlawful for an educational institution to "deny, restrict, or to abridge or condition the use of, or bar access to, any of its facilities and services to a person otherwise qualified, wholly or partially, for a discriminatory reason," based on the race,

color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, political affiliation, source of income, or disability.

**98.**   Plaintiff is African American and a member of a protected class.

**99.**   It is unlawful to coerce, threaten, retaliate against, or interfere with any person exercising his/her rights under the law and prohibits persons from requiring, requesting, or suggesting a person take such prohibited actions. In addition, it is unlawful to cause or coerce, or attempt to cause or coerce, any person to prevent such person from complying with the law. See id. at § 2-1402.61. Anyone who aids, abets, invites, compels, or coerces another to do any of these prohibited acts or attempts to do so, also violates the law. See id. at § 1-2526.

**100.**   Defendant, by committing the aforesaid acts, violated D.C. Code Ann. §§ 2.1401.01 et seq. in multiple respects.

WHEREFORE, Plaintiff respectfully prays that this Court enter appropriate judgment in Plaintiff's favor and against Defendants.

**COUNT II**
**Discrimination Under Title VI**
**Against all Defendants**

**101.**   Plaintiff realleges and incorporates by reference all of the allegations set forth in the above paragraphs of this Complaint.

**102.**   Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

**103.**   GWU is a program or activity that receives Federal financial assistance.

**104.** Defendants, by performing the aforesaid acts, engaged in intentional discrimination against Plaintiff with malice and/or with reckless indifference to his protected rights.

WHEREFORE, Plaintiff respectfully prays that this Court enter appropriate judgment in Plaintiff's favor and against Defendants.

## COUNT III
### Discrimination Under Section 1981 of the Civil Rights Act of 1866
### Against all Defendants

**105.** Plaintiff realleges and incorporates by reference all of the allegations set forth in the above paragraphs of this Complaint.

**106.** Section 1981, as amended by the Civil Rights Act of 1991, prohibits racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. 1981.

**107.** As described above, Defendants' violations of Plaintiff's constitutional rights because of his race is in violation of Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, et seq.

**108.** Defendants engaged in intentional discrimination against Plaintiff with malice and/or with reckless indifference to his federally protected rights when they performed the aforesaid acts on the basis of race.

WHEREFORE, Plaintiff respectfully prays that this Court enter appropriate judgment in Plaintiff's favor and against Defendants.

## COUNT IV
### Breach of Contract
### Against Defendant GWU

**109.**   Plaintiff realleges and incorporates by reference all of the allegations set forth in the above paragraphs of this Complaint.

**110.**   The relationship between a university and its students is contractual in nature. Plaintiff and GWU had a valid contract between the parties that was created when Plaintiff elected to attend GWU and participate on its tennis team.

**111.**   Under D.C. law, all contracts contain an implied covenant of good faith and fair dealing.

**112.**   In making the contract to attend GWU, there was an agreement as to all material terms and an intention of Plaintiff and GWU to be bound to those material terms.

**113.**   Plaintiff paid his tuition in full and otherwise adhered to all of the terms and conditions of the contract between himself and GWU.

**114.**   Defendant, conversely, breached the said contractual agreement in multiple respects, by its aforesaid conduct.

WHEREFORE, Plaintiff respectfully prays that this Court enter appropriate judgment in Plaintiff's favor and against Defendants.

## COUNT V
### Negligent Infliction of Emotional Distress
### Against All Defendants

**115.**   Plaintiff realleges and incorporates by reference all of the allegations set forth in the above paragraphs of this Complaint.

**116.**    Defendant GWU owed Plaintiff a duty to investigate and address the discriminatory conduct that was subjected to by the coaches, administration and players, which Plaintiff reported to multiple GWU officials.

**117.**    Defendant GWU owed Plaintiff a duty to act with reasonable care in furtherance of his wellbeing,

**118.**    Defendant GWU had the duty, authority, power and ability to intervene to prevent or prohibit the discrimination and retaliation described herein.

**119.**    GWU negligently failed to act to protect Plaintiff, thereby breaching its duty to him.

**120.**    As a result of its negligence, GWU stalled Plaintiff's tennis career, caused him not to graduate from the university with a degree and caused him severe emotional distress.

**121.**    Plaintiff was physically impacted as a result of GWU's negligence.  As a direct and proximate result of the discriminatory and unsafe educational environment created by Defendant's negligent response to the discriminatory conduct, Plaintiff suffered and will continue to suffer severe emotional distress.

**122.**    Defendant GWU's negligent conduct placed Plaintiff in the zone of immediate physical danger, causing him to fear for his own safety.  As a direct and proximate result of the harassing and unsafe educational environment created by Defendant's negligent response to the persistent discriminatory conduct, Plaintiff became fearful for his life and safety, which required him to seek medical treatment to cope with the stress of participating on the men's tennis team, attend school and live with the constant threat of physical and emotional violence.

**123.**    Defendant GWU had a special relationship with, or had undertaken a special obligation to Plaintiff of a nature that necessarily implicated Plaintiff's emotional wellbeing.

GWU had undertaken a special obligation to Plaintiff arising from the relationship between a student and his educational institution. Universities are dedicated to furthering the wellbeing of their students and its breach of its duty to protect its students from discrimination resulted in serious emotional harm to Plaintiff.

124. As a direct and proximate result of the discriminatory and unsafe educational environment created by Defendant's negligent response to the discriminatory conduct, Plaintiff was placed in immediate physical danger, causing him to fear for his life and severe emotional distress, as aforesaid.

WHEREFORE, Plaintiff respectfully prays that this Court enter appropriate judgment in Plaintiff's favor and against Defendants.

## COUNT VI
### Negligent Retention
### Against Defendant GWU

125. Plaintiff realleges and incorporates by reference all of the allegations set forth in the above paragraphs of this Complaint.

126. An employer breaches a duty to a plaintiff to use reasonable care in the retention of an employee which proximately caused harm to the plaintiff if that employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner and the employer failed to adequately supervise the employee.

127. Defendants Munoz, MacPherson, and Patrick Nero, are or were agents, servants, workmen or employees of GWU.

128. GWU knew of Munoz's discriminatory conduct toward Plaintiff, as well as past misconduct towards other students, including GWU's knowledge that Munoz improperly and

illegally suspended Plaintiff from the Men's tennis team, and illegally demanded that Plaintiff pledge for a predominantly White fraternity as a condition of reinstating him, expecting that Plaintiff would not be able to join the White fraternity.

**129.** Despite GWU's knowledge of Munoz's conduct, they failed to adequately supervise him.

**130.** Even after it was brought to GWU's attention that Munoz was discriminating against Plaintiff, GWU failed to take any action, including failing to investigate and address Plaintiff's allegations of discrimination.

**131.** Upon information and belief, Munoz had previously caused harm to other students who were the victims of discrimination and harassment by Reynolds and the other White tennis team members.

**132.** Upon information and belief, GWU is aware of several instances of harm that Munoz has inflicted upon them and GWU failed to take adequate measures to ensure that Munoz followed university procedures.

**133.** GWU has negligently retained Munoz and therefore caused harm to Plaintiff.

**134.** Similarly, Defendants knew of serious discriminatory conduct and other misconduct by other administrative personnel, such as Macpherson and Nero, but failed to properly supervise them, to the detriment and damage of students, including Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment against Defendants as follows:

a) Declaring that Defendants unlawfully discriminated against Plaintiff on the basis of race and retaliated against him in violation of  D.C. Code § 2-1401.01, *et seq.* and 42 U.S.C. § 1981, *et seq.*;

b) enter a permanent injunction directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c) award compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiff for the economic loss, humiliation, embarrassment, and mental and emotional distress caused by the conduct of Defendants alleged herein;

d) award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendants for their willful, wanton, and reckless conduct alleged herein and that would effectively deter Defendants from engaging in similar conduct in the future;

e) award Plaintiff reasonable attorneys' fees and costs incurred in this action;

f) order such other relief as this Court deems just and equitable.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Jabari Stafford

Date: November 21, 2018

35