**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **JABARI STAFFORD**, | |
| Plaintiff, | |
| v. | Case No. 18-cv-2789 (CRC) |
| **THE GEORGE WASHINGTON UNIVERSITY**, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

Jabari Stafford alleges that he was the victim of racial discrimination during his time as a walk-on tennis player at George Washington University. He brings a bevy of federal- and D.C.-law claims against the University, two of his former coaches, and two administrators in the athletics department. One of the individual Defendants, Associate Athletics Director Nicole Early, and the University (together, "GWU" or "the University") have moved to dismiss all of Stafford's claims. Stafford opposes dismissal and also seeks leave to amend his complaint. For the reasons that follow, the Court will grant in part and deny in part GWU's motion to dismiss and will grant in part and deny in part Stafford's motion for leave to file an amended complaint.

### I. Background

#### A. Factual History

As required on a motion to dismiss, the Court draws this factual background from the complaint, "assum[ing] the truth of all well-pleaded factual allegations." Sissel v. U.S. Dep't of Health & Human Servs., 760 F.3d 1, 4 (D.C. Cir. 2014). The facts presented here are taken almost exclusively from the proposed amended complaint, although at times the Court draws from the original complaint—in particular where it appears that Stafford has deleted facts that

may have been unfavorable to him.  See Hourani v. Mirtchev, 943 F. Supp. 2d 159, 171 (D.D.C. 2013) (stating that a plaintiff "may not plead facts in their amended complaint that contradict those in their original complaint" nor can a plaintiff "blatantly change[ ] his statement of facts in order to respond to" a motion to dismiss (internal quotation marks omitted)).  The Defendants strenuously contest many of the facts Stafford alleges.

Mr. Stafford, who is African-American, attended George Washington University ("GWU") from September 2014 until December 2017.  Proposed Amended Complaint ("Am. Compl."), ECF No. 11-6, ¶ 4.  Stafford chose to attend GWU after meeting with its then tennis coach Gregory Munoz and members of GWU's administration.  Id. ¶¶ 18, 21.  He joined the GWU tennis team in September 2014, "two weeks into the Fall season."  Id. ¶ 25.  He was one of two African Americans and one of three players of color (the other a Persian American) on the nine-person roster.  Id.

Shortly after joining the team, Stafford alleges that he began to observe and experience racist treatment.  Id. ¶¶ 26-29.  One week in, Munoz convened Stafford and the other players of color—who together were the only American players on the team—and threatened to punish them if they "did not get off to a good start."  Id. ¶ 26.  Soon thereafter, Stafford says Munoz announced that he "hate[d] Americans" and "subjected [non-white players] to constant threats which even included emails only directed to them and no one else on the team."  Id. ¶ 28.  Stafford says he also witnessed early on Munoz and an assistant coach "bull[y]" and "belittle" his Persian-American teammate.  Id. ¶ 29.  This teammate, Stafford says, "was kicked off the team the first week of his sophomore year for unknown reasons."  Id. ¶ 30.

Also "in or around September 2014," Stafford maintains the same assistant coach told him and the team "a story about a Black tennis player . . . whom [the coach] and his teammates

in college would verbally and physically abuse because he was black," including by calling him racial epithets and remarking on how dark his skin was.  Id. ¶ 31.  Stafford also heard from his teammate that the same assistant coach had once caused the team van to crash, and Stafford claims that the coach was such a "careless" driver that he "became very frightened every time he got into the vehicle after hearing the news."  Id. ¶ 32.

Though a time period is not specified,[1] Stafford says that his "white teammates would often post racially insensitive jokes and rhetoric on social media."  Id. ¶ 33.  Stafford recounts one incident that occurred his freshman year—so either the fall of 2014 or the spring of 2015—in which a teammate posted a "racist picture on Facebook . . . of a black version of [the cartoon character] Spongebob that read, "Watch Black Spongebob on Niggalodeon."  Id.  Stafford alleges that the head coach, Munoz, "was aware of these racist postings because he was Facebook friends with the tennis players and told the players that he monitored social media postings[.]"  Id.  Stafford claims that events like these "eviscerated [his] desire to participate in team activities and caused him to try to limit his interactions with his teammates as much as possible."  Id. ¶ 35.

"In other instances, later in [his] tenure," Stafford says "various players would often make racist comments in the team group chats."  Id. ¶ 34.  One teammate, whom Stafford names as a defendant in the proposed amended complaint, purportedly "referred to a black person as a gorilla and referred to black poetry as 'black shitty poetry.'"  Id.  Other teammates, Stafford

---

[1] The Court has done its best to present these facts in chronological order, but both the initial and the proposed amended complaint appear to periodically jump backward and forward in time, making such a presentation difficult.

alleges, "would often throw racial slurs in the group chat . . . when Plaintiff was excluded from [it]."  Id.

Once, in January 2015, Stafford confronted a teammate who he says used a racial slur while traveling to practice, and Munoz "chastised [Stafford]" for doing so.  Id. ¶ 36.  Stafford was suspended from the team a week later.  Id. ¶ 37.  In the amended complaint, Stafford says Munoz justified the suspension on the grounds that Stafford had been "disrespectful to his teammates," "had anger control issues, as well as profanity issues," and "was selfish" and did not support his teammates.  Id.  Stafford says these claims came out of left field, and that Munoz had only once before expressed disapproval of his behavior—namely, when Stafford reprimanded his teammate for using a racial slur.  Id. ¶ 38.  In the original complaint, however, Stafford said Munoz offered other, additional reasons for the suspension—including that Stafford "did not show pride in the University" and "disrespected the tennis director" at the team's practice facility.  Compl. ¶ 25.

Stafford and his father thereafter requested a meeting with then Athletics Director Patrick Nero to challenge his suspension.  Am. Compl. ¶ 41.  Although Nero declined the request, Stafford and his father did meet with Munoz and Associate Athletics Director Early.  Id. ¶ 42.  At that meeting, Stafford says Munoz "falsely denied the existence of any racial animus and repeated the 'anger control' and 'disrespecting teammates' pretexts from the aforementioned January 18, 2015 [suspension] email."  Id.  Stafford apparently asked to be reinstated at the meeting, but Early "did not order reinstatement of [Stafford], leaving the issue of whether, or not, [he] would get reinstated from the suspension entirely to the discretion of Defendant Munoz."  Id. ¶ 43.  Stafford maintains that this "grossly improper and unjustified suspension,"

caused him to become "depressed and withdrawn, which adversely affected his ability to perform academically."  Id. ¶ 49.

While his suspension remained in effect, Munoz allegedly "presented [Stafford] with an ultimatum": become a member of a "white fraternity" to prove his social skills had improved or face continued suspension.  Id. ¶ 51.  Despite having no interest in joining the fraternity, Stafford went through recruitment and received a bid to pledge the house.  Id. ¶ 52.  Munoz then added two further conditions to his reinstatement.  Stafford would have to apologize to his teammates for his "purported disrespectful conduct towards them" and his teammates would have to agree to lifting his suspension.  Id. ¶ 53.  Having to "apologize to his teammates was extremely difficult and humiliating for [Stafford] especially because he had not done anything wrong to any of his teammates and coaches who had used racial slurs and never suffered any consequences as a result of their discriminatory actions."  Id. ¶ 54.

Stafford's "hard efforts" nevertheless paid off, and he was reinstated after about a month-long suspension.  Id. ¶ 55.  According to Stafford, though, the "verbal abuse and discriminatory treatment" picked up where it left off.  Id.  Even worse, it escalated.  One representative example, Stafford alleges, was when a teammate asked him, "Were all of your ancestors' slaves at one point?"  Id. ¶ 59.  Stafford also observed "serious racquet and verbal abuse from various players on the team," id. ¶ 62, and yet, he says, they were never "disciplined for [their] disruptive and disrespectful behavior," id. ¶ 61.

Later in his freshman spring season, "[i]n or around March 2015," Stafford says a teammate yelled at him to "Get off the court, monkey!"  Id. ¶ 64.  Stafford alleges that Munoz overheard the remark but did nothing about it, and that he feared retribution by Munoz if he spoke up.  Id.  Then, in April 2015, during a training trip to Florida, Stafford says a teammate

yelled "N****R!" so loud that Stafford's teammates in the adjoining hotel rooms could hear it.
Id. ¶ 65.  Again, Stafford says he was worried that Munoz would accuse him of being an angry
teammate if he attempted to confront the racial abuse.  Id.  Harassment like this, carried out by
nearly all of Stafford's teammates, continued throughout the spring 2015 season.  See id. ¶¶ 66–
69.  Stafford claims the abuse caused him to "suffer[ ] from anxiety, extreme depression and
severe mental anguish" and "adversely affected his academic performance," culminating in a
sub-2.0 grade point average.  Id. ¶ 71.

The mistreatment continued in the fall 2015 season of his sophomore year, Stafford says.
He was reprimanded by an assistant coach for yelling in celebration after winning a match.  Id. ¶
77.  His teammates allegedly piled on, telling Stafford they were cheering for him to lose the
match—and yet they faced no discipline from the coaching staff.  Id. ¶ 79.

The intra-team squabbling came to a head at the beginning of the spring 2016 season,
when Stafford and a teammate got into a shouting match and "approached each other in a
confrontational manner."  Id. ¶ 81.  Munoz allegedly "separated the players by grabbing
[Stafford] and physically removing him from the area," at which point he told Stafford he would
"kick him off the team."  Id. ¶ 82.  Asked why, Munoz allegedly gave various reasons, including
that Stafford did not greet him in the morning, that Stafford thought he was too good looking,
and that Stafford was more interested in his fraternity than in the team.  Id.  When Stafford told
Munoz that "all the racism on the team" made him feel "extremely uncomfortable," Munoz
apparently responded flatly that there was no racism on the team—and then asked Stafford
"whether he liked Donald Trump."  Id.

Stafford recounts other examples of the "repeated[ ] harass[ment]" he faced throughout
his sophomore season, spanning 2015 to 2016.  He tells of a time when a white teammate asked

him "how it was possible that [Stafford] was Black *and* that he had money, as if the two were mutually incompatible." Id. ¶ 83. He also says that his teammates on numerous occasions made racially stereotypical references to his genitals. Id. In addition to these episodes, Stafford says the coaching staff gave him poor slots in the lineup, or did not play him at all, for no legitimate reason. See id. ¶¶ 84-87.

In March 2016, Stafford says he again approached members of the GWU athletics department, namely Early, to discuss "the racist mistreatment he was subjected to and the lack of playing time." Id. ¶ 87. Early arranged a meeting with Stafford and an assistant coach—by this time Munoz was no longer the team's head coach—at which the assistant coach said Stafford did not play much because he hit the ball too hard, was undisciplined, and was not a team player. Id. ¶ 88. Stafford denies all these allegations as "pretext for his marginalization." Id. When Stafford's father on various occasions tried to follow up with Early, she "mostly refused to communicate with him." Id. ¶ 89.

The fall 2016 season, Stafford's junior year, saw a new head coach, David Macpherson, take the reins. "Unfortunately for [Stafford,]" he says, "the rolling snowball that had started early in his freshman year had by now escalated into a veritable avalanche of racism[.]" Id. ¶ 92. Stafford realized at the beginning of the school year that he was not receiving team communications, id. ¶ 93, and he soon learned from Macpherson the reason why: he was no longer a member of the team, id. ¶ 94. Searching for an explanation, Stafford's father attempted to meet with the athletics department, which refused his request for a meeting. Id. ¶ 95.

Stafford and his father did ultimately meet with a vice provost at the University and an athletics department representative. Id. ¶ 96. After they "talked about all of the overt racism, the violation of various policies and procedures, the defamation of character and the emotional

distress and severe mental anguish" Stafford was suffering, Stafford says the school officials "were mortified" and "confused with why nothing was being done and why [Stafford] was such an enormous target." Id. They also told Stafford that he was still on the team and could not be removed from the team without having signed a waiver to that effect. Id.

Macpherson, however, did not budge—at least not right away. He instead set up a tryout for Stafford, through which he could earn his way back on the team. Id. ¶ 97. Stafford, although frustrated with having to go through this process, apparently did well enough to earn his reinstatement. Id. ¶ 98. Stafford's reinstatement came over his teammates' protestations. He says that in a private text message from Macpherson to one team member—which was later shared in a "private teammate group chat" that Stafford was not a part of—Macpherson acknowledged the team's "opinion" of Stafford, but said that Stafford "showed a lot of potential" and had the ability to "become a dangerous player." Id. ¶ 101.

Now back on the team, Stafford says his teammates "worked on a plan to provoke" him by "making racist statements, in hope that [Stafford] would get into a physical altercation or do something that would get him kicked off of the team." Id. ¶ 100. He alleges, for example, that as soon as his teammates got word of his reinstatement, they arranged a meeting through a group chat to "coordinate their attacks and kick their racial hatred and harassment into high-gear to try and undermine [Stafford's] reinstatement." Id. ¶ 103. One teammate continued to say that he was perplexed by the combination of Stafford's race and the fact that he "had money." Id. ¶ 104. The same teammate would also yell the n-word when it was said in a rap song to which the team was listening. Id. Stafford continued to feel that "he could not do anything about this racist treatment because of the risk that he would be thrown off the team again." Id.

At some unspecified time—apparently in the spring of 2017—Stafford played a practice match to determine his position in the team's lineup. <u>Id.</u> ¶ 106. His opponent "started taunting [him] and trying to provoke him so he would react aggressively and ruin his chances." <u>Id.</u> Stafford ultimately "lost the match due to the constant bickering and taunting," and then yelled at the assistant coach for not intervening. <u>Id.</u> When Macpherson heard of the episode, he called Stafford, at which point Stafford says he "told Macpherson about all of the conspiracies, racial discrimination and defamation of [his] character." <u>Id.</u> Macpherson allegedly told Stafford that he would "try to be more aware of these things" and would "ultimately handle everything." <u>Id.</u> Macpherson later emailed Stafford to inform him that he would be suspended for the next practice. <u>Id.</u> Stafford says no one else was ever punished. <u>Id.</u> Stafford maintains that the suspension and the "stronger, more intense high-gear harassment devastated [his] spirit and undermined his ability to perform academically," causing his Spring 2017 grade point average to fall below 2.0. <u>Id.</u> ¶ 107.

The "high-gear hatred and harassment" purportedly continued in the fall of 2017, Stafford's senior year. <u>Id.</u> ¶ 108. An Indian teammate told him that another teammate had called Stafford a "cotton picking n****r," and asked him to record Stafford "doing or saying something negative" to get him kicked off the team. <u>Id.</u> The Indian teammate also reported to Stafford that he "had been sexually harassed and assaulted by" another teammate on multiple occasions. <u>Id.</u> ¶110. Stafford says the coaching staff ignored these issues when they were brought to their attention. <u>Id.</u> Stafford also alleges that around this time his family "was verbally attacked and harassed" by an unidentified GWU employee. <u>Id.</u> GWU's alleged failure to adequately address issues like these, Stafford insists, caused him to "suffer severe anguish and distress," culminating in yet another sub-2.0 grade point average for the fall 2017 semester. <u>Id.</u> ¶ 112.

Because Stafford had compiled a sub-2.0 GPA in two consecutive semesters, and three semesters overall, the University suspended him in January 2018.  Id. ¶ 113.  When Stafford met with an academic advisor to prepare an appeal of his suspension, the advisor "was insistent that the appeal should only contain contrite acceptance of personal responsibility" rather than discuss the "trauma caused by the racially hostile atmosphere" that Stafford mentioned to her.  Id. ¶ 114. The University denied Stafford's appeal.  Id. ¶ 115.

B.  Procedural History

Stafford filed suit on November 26, 2018, naming as defendants the University, Nero, Early, Munoz, Macpherson, and "John Does 1–10," ostensibly various of Stafford's teammates. He brought six claims: Count I alleges all Defendants discriminated against him on the basis of race in violation of the District of Columbia Human Rights Act ("DCHRA") D.C. Code Ann. § 2.1401.01 *et seq.*; Count II alleges the same in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; Count III alleges the same in violation of Section 1981 of the Civil Rights Act of 1991; Count IV alleges a breach of contract claim against only the University; Count V alleges negligent infliction of emotional distress against all Defendants; and Count VI alleges negligent retention against only the University.  Compl. ¶¶ 95–134.

GWU and Early moved to dismiss the complaint in its entirety on January 22, 2019.  See ECF No. 4.  Stafford responded on March 17, 2019 by filing a combined motion for leave to amend his complaint and "response to Defendant's motion for dismissal of complaint."  See ECF No. 10.  In his proposed amended complaint, Stafford names a teammate as a defendant, but does not otherwise add to or subtract any of the six claims in his original complaint.  See ECF No. 11-6 (red-lined copy of proposed amended complaint).  GWU and Early opposed Stafford's motion for leave to amend his complaint, and the matter is now ripe for the Court's resolution.

## II.  Legal Standards

Federal Rule of Civil Procedure 15(a) gives courts discretion whether to grant leave to amend a complaint.  Leave "should be freely given in the absence of undue delay, bad faith, undue prejudice to the opposing party, repeated failures to cure deficiencies, or futility."  Richardson v. United States, 193 F.3d 545, 548–49 (D.C. Cir. 1999).  A proposed amended complaint is futile if it would not survive a motion to dismiss.  When making that assessment, courts apply the same standards as they would to review such a motion.  See In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 215–16 (D.C. Cir. 2010) (citations omitted).

The standard applicable here is Federal Rule of Civil Procedure 12(b)(6).  "To survive a motion to dismiss [under 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  In evaluating a Rule 12(b)(6) motion to dismiss, a court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation and quotation marks omitted).  A court need not, however, accept inferences drawn by the plaintiff that are unsupported by facts alleged in the complaint, nor must a court accept a plaintiff's legal conclusions.  See Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).

"A [complaint] filed *pro se* is to be liberally construed[,] and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."  Abdelfattah v. U.S. Dep't of Homeland Sec., 787 F.3d 524, 533 (D.C. Cir. 2015)

(internal citation and quotation marks omitted).[2] "Even still, a *pro se* complaint 'must plead factual matter that permits the court to infer more than the mere possibility of misconduct.'" Id. (quoting Jones v. Horne, 634 F.3d 588, 596 (D.C. Cir. 2011) (internal quotation marks omitted)). Taking these legal standards together, then, the Court will ask whether Stafford, assuming the truth of the allegations in his proposed amended complaint, has stated a claim to relief that is plausible on its face. If he has not, leave to file the amended complaint will be denied as futile, and the case will be dismissed.

## III. Analysis

As an initial matter, GWU contends the whole complaint should be dismissed due to Stafford's "shotgun" style of pleading, referencing the complaint's practice of incorporating by reference all preceding paragraphs and counts of the complaint. Memorandum in Support of Defendants George Washington University and Nicole Early's Motion to Dismiss ("MTD"), ECF No. 4-1, at 6. This pleading practice, GWU says, makes it impossible to tell which factual allegations Stafford uses to support a particular legal claim. Id. Although the Court grants that the complaint is hardly a picture of clarity, it is important to note that Stafford is proceeding *pro se*, and that he therefore warrants a bit more leeway in his attempt to comply with federal court pleading standards than would a represented litigant. At any rate, as will follow, other grounds for dismissal exist, making it unnecessary to decide the motion to dismiss on this ground.

---

[2] GWU questions whether Stafford is truly representing himself in this case. It points to metadata from electronic versions of his pleadings suggesting that they were prepared by someone working in a law firm. The Court declines, at this juncture, to conduct a factual inquiry into this issue. It will, however, address it with Mr. Stafford at the next in-court scheduling conference.

A.  Counts I and II: DCHRA and Title VI Claims

With respect to the DCHRA and Title VI discrimination claims, Compl. ¶¶ 95–104; Am.

Compl ¶¶ 121–131, GWU contends that Stafford has failed to state a claim under which relief

can be granted, MTD at 7; see Fed. R. Civ. P. 12(b)(6).  The Court will start with the DCHRA

and then move to Title VI.

*1.  DCHRA*

The D.C. Human Rights Act ("DCHRA") prohibits discrimination on the basis of race by

"an educational institution" with respect to "the use of, or access to, any of its facilities, services,

programs, or benefits of any program or activity to any person otherwise qualified."  D.C. Code

§ 2-1402.41(a).  To establish a DCHRA claim, a plaintiff must show he "was subject to an

adverse action motivated by [race] discrimination."  See Carter-Frost v. District of Columbia,

305 F. Supp. 3d 60, 67 (D.D.C. 2018).  Such claims must be brought within the one-year statute

of limitations.  D.C. Code § 2-1403.16(a).  "This one-year period begins to run at the time the

plaintiff is made aware of the allegedly discriminatory act."  Di Lella v. Univ. of D.C. David A.

Clarke Sch. of Law, 570 F. Supp. 2d 1, 6 (D.D.C. 2008).

This presents a problem for Stafford's DCHRA claim.  Because Stafford filed suit on

November 26, 2018, he must allege a discriminatory adverse action that occurred on or after

November 26, 2017.  That period corresponds to allegations made in paragraph 108 and after in

the proposed amended complaint,[3] which cover roughly Stafford's last month on the team before

his second, and final, academic suspension.  Though Stafford often fails to provide exact (or

---

[3] The Defendants' motion to dismiss cited the paragraph numbers in the original complaint, but the Court often substitutes the corresponding paragraph numbers in the proposed amended complaint for ease of analysis.

even approximate) dates, he does allege in paragraph 108 that "[t]he high-gear hatred and harassment . . . continued into the Fall semester of 2017," so it is reasonable to assume that the subsequent paragraphs apply to events within—or at least close to within—the limitations period.

But the allegations in following paragraphs nonetheless fail to highlight a discriminatory adverse action that can serve as a predicate for a DCHRA claim. Paragraph 108 alleges that a teammate called Stafford a racial slur and that the same teammate tried to devise a plan to get Stafford removed from the team. Paragraph 109 describes how "one of the GWU employees that worked in the tennis office"—but who is not named as a defendant in the suit—"verbally attacked and harassed" Stafford and his family during a practice session. Paragraph 110 details the alleged harassment and sexual assault of one of Stafford's teammates by the same teammate referenced in paragraph 108. And paragraph 113, finally, explains that GWU "academically suspended" Stafford for "completing two consecutive semesters with a grade point average of less than 2.0 and/or completing any three semesters with a lower than 2.0 GPA." These allegations are not sufficient. Paragraphs 108 and 110 complain about the conduct of a teammate, not the school or the individual Defendants; Paragraph 109, meanwhile, fails to allege facts suggesting the employee's alleged harassment of Stafford and his family had anything to do with race; and paragraph 113, although it does identify an adverse action taken by least some of the named Defendants, attributes the suspension to academic performance, not racial animus.

To be sure, Stafford does allege that, while his academic suspension may have been warranted given his grades, his poor academic performance was the "result of Defendant's conduct," including the allowance of "unfettered racial discrimination," which left Stafford "unable to perform academically[.]" Id. ¶ 112. Stafford appears to have amended his complaint,

at least in part, to emphasize this theory, alleging that he was persuaded by a GWU academic advisor to accept responsibility in his appeal rather than "to appeal on the basis of the trauma caused by the racially hostile atmosphere condoned by Defendant GWU." Id. ¶ 114. Just the same, it remains Stafford's burden to anchor his DCHRA claim in some discriminatory adverse action committed by the Defendants post-November 2017, and the suspension cannot be it because Stafford himself offers a benign, non-discriminatory reason for that suspension. According to Stafford's own narrative of events, the school did not take either adverse action— suspending him or denying his appeal—*because* of his race. See Carter-Frost, 305 F. Supp. 3d at 67 (explaining that DCHRA plaintiff must plead that he "was subject to an adverse action motivated by [race] discrimination").

That also explains why, to the extent Stafford has attempted to plead a DCHRA retaliation claim, his complaint fails to do so. Stafford cannot show either that he engaged in protected activity (like reporting alleged discrimination) or that there was a causal connection between his engaging in protected activity and his suspension (since he admits it was for poor academic performance, and any role the University may have played in that poor performance occurred outside the limitations period), and the failure to show either precludes a viable retaliation claim. Kimmel v. Gallaudet Univ., 639 F. Supp. 2d 34, 44 (D.D.C. 2009).

Therefore, to the extent Count I alleges that GWU directly discriminated against him— rather than allowed harassment by his teammates and others to go unchecked, about which the Court will say more later—that claim is dismissed.

### 2. *Title VI*

Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance." 42 U.S.C. § 2000d. A private right of action exists under Title VI

only for intentional discrimination. Kimmel, 639 F. Supp. 2d at 42 (citing Alexander v.

Sandoval, 532 U.S. 275, 280 (2001)).

Title VI does not set a statute of limitations, which means the Court must apply the local

statute of limitations for a similar injury. See Wilson v. Garcia, 471 U.S. 261, 266–67 (1985)

("When Congress has not established a time limitation for a federal cause of action, the settled

practice has been to adopt a local time limitation as federal law if it is not inconsistent with

federal law or policy to do so."); Mwabira-Simera v. Howard Univ., 692 F. Supp. 2d 65, 71

(D.D.C. 2010) ("Where a federal statute does not specify a period of limitation after which a

claim is time-barred, federal law requires applying the local statute of limitation for the most-

analogous injury."). GWU cites a case from this district for the proposition that, "[u]nder D.C.

law, a violation of a federal anti-discrimination law is subject to the three-year limitation period

applicable to a claim for personal injury." Mwabira-Simera, 692 F. Supp. 2d at 71 (citing D.C.

Code 12-301(8)). That indeed appears to be the prevailing practice in this Circuit. See, e.g.,

Hajjar-Nejad v. George Washington Univ., 873 F. Supp. 2d 1, 15 (D.D.C. 2012) ("In this Circuit,

the statute of limitations for Title VI claims is three years."); Richards v. Duke Univ., 480 F.

Supp. 2d 222, 238 (D.D.C. 2007) ("In the District of Columbia, a personal injury action has a

three-year statute of limitations and therefore, a Title VI or Title IX claim also has a three-year

statute of limitations in the District of Columbia.").

The Court pauses for a moment to consider the wisdom of this practice. Until recently,

the prevailing trend was also to apply the three-year personal injury limitations period to federal

Rehabilitation Act claims. See, e.g., Adams v. District of Columbia, 740 F. Supp. 2d 173, 184

(D.D.C. 2010); Long v. Howard Univ., 512 F. Supp. 2d 1, 12 (D.D.C. 2007).  Just last year, however, this Court concluded that the one-year statute of limitations applicable to DCHRA claims should apply to Rehabilitation Act claims.  See Congress v. District of Columbia, 324 F. Supp. 3d 164, 171–73 (D.D.C. 2018).  That reevaluation was premised in large part on the District of Columbia Court of Appeals' decision in Jaiyeola v. District of Columbia, 40 A.3d 356 (D.C. 2012), which reasoned persuasively that the Rehabilitation Act and DCHRA's "shared purpose" of eliminating discrimination against individuals with disabilities made them much more analogous than the Rehabilitation Act was to a generic personal injury suit, id. at 367.  Although it was true that the DCHRA banned discrimination on other bases like race and gender, the D.C. Court of Appeals concluded that those differences in scope do not outweigh the fact that both statutes directly proscribe disability discrimination.  Id. at 365–66.  Recognizing the deference owed to interpretations of D.C. law by that jurisdiction's highest court, this Court reached the same conclusion.  Congress, 324 F. Supp. 3d at 172.  And it was not the first federal court in this district to do so.  See Ware v. Hyatt Corp., No. CV 12-0395, 2013 WL 12321372, at *15 (D.D.C. Mar. 27, 2013).

The reasoning of Jaiyeola (and Congress and Ware) would seem to apply with equal force to Title VI.  Although Title VI prohibits exclusively racial discrimination in programs receiving federal assistance, while racial discrimination is only one of many forms of discrimination prohibited by the DCHRA, both statutes at their core share the same "purpose, rights, and remedies," i.e., the elimination of racial discrimination.  Congress, 324 F. Supp. 3d at 172.  Title VI is thus a closer cousin to the DCHRA than it is to D.C.'s general personal injury statute, which "cover[s] a much wider swath of injuries, often including conduct that involves no discrimination whatsoever."  Id.  That means the one-year statute of limitations applicable to

DCHRA claims might well govern Stafford's Title VI claim, not the three-year personal injury limitations period.

Except GWU has not taken that position. A statute of limitations defense is an affirmative defense, meaning that it is waived unless a defendant timely raises it. Because it is GWU's burden to raise the defense in the first instance, and because it has asked the Court to apply the three-year limitations period—even though the one-year period would better serve its interests—the Court will do so. The Court recognizes that it may seem strange to apply a statute of limitations it has just concluded is probably incorrect. But GWU had good reason—namely, a slew of district courts applying the three-year limitations period—for believing it should apply, and it would work a hardship on Stafford to apply the shorter period, given that he has never had an opportunity to argue the contrary. Accordingly, Stafford must tether his Title VI intentional discrimination claim to events that occurred on or after November 26, 2015, or late in the fall season of his sophomore year, which appears to correspond to paragraph 72 and later in the amended complaint.

Stafford does allege that GWU "receives federal funding," Am. Compl. ¶ 5, so the question becomes whether he has adequately alleged that GWU intentionally discriminated against him. Stafford must actually allege two things to do so: first, that he suffered some sufficiently adverse action, and second, that the adverse action was taken because of his race. See Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008) ("[T]he two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's [protected characteristic.]"); Delbert v. Duncan, No. 13-5135, 2013 WL 6222987, at *1 (D.C. Cir. Nov. 14, 2013) (per curiam) (dismissing Title VI claim because it "lacked any factual allegations linking the claimed adverse actions to his race").

In spelling out his Title VI claim, Stafford alleges broadly that GWU's "aforesaid conduct" constituted intentional discrimination, id. ¶ 131, but he does not pinpoint which of the dozens of events detailed in the complaint qualify. As the Court explained above, many of Stafford's allegations concern the actions of his teammates, and his January 2018 academic suspension (and subsequent appeal denial) cannot serve as the basis for an intentional discrimination claim because Stafford himself admits he was suspended because of his poor academic performance, not the color of his skin. See Baloch, 550 F.3d at 1198 (discrimination claim must link adverse action to discriminatory animus). Elsewhere, Stafford complains of various times he was not chosen to play in a match or was given less desirable positions in the team's lineup, like having to play doubles, despite having beaten two of the team's white players in practice matches. See, e.g., Am. Compl. ¶¶ 84–89. But the Court concludes that allegations like these cannot plausibly support an allegation of intentional discrimination, even under the forgiving 12(b)(6) standard. If they could, that would mean any athlete unhappy with playing time could plead an adequate Title VI so long as his coach slotted an (allegedly inferior) teammate of another race ahead of him. That cannot be enough, especially where, like here, the plaintiff makes no allegation that the coaches involved made any reference to the player's race in making the decision and instead offered benign, non-discriminatory reasons for the decision. See id. ¶ 88. And even had Stafford given more reason to suspect race was a factor in the lineup decisions, the Court remains doubtful that a lack of playing time on an athletic team would amount to the sort of adverse action that can sustain a Title VI claim.

The Court likewise concludes that the one-day practice suspension Stafford received in late 2016 or early 2017 cannot sustain an intentional discrimination claim. For one thing, as with Stafford's grievances about playing time, it strikes the Court that being held out of one practice

is not an adverse action that, even if taken for discriminatory reasons, Title VI would guard against. The analysis might be different, as the Court will soon explore in more detail, if Stafford had been removed from the team rather than told to sit out a single practice—but that is not what happened in this instance. For another, it seems a stretch to infer that the one-day punishment had anything to do with racial discrimination. By Stafford's own account, it stemmed from a dispute Stafford had with a teammate in a practice match, which ended with Stafford yelling at an assistant coach. Id. ¶ 106. Before Macpherson handed down the suspension, Stafford says he told Macpherson "about all of the conspiracies, racial discrimination and defamation of [his] character." Id. Macpherson then told Stafford "he would be more aware of these things" and "handle everything." Id. Ultimately, however, Stafford says his one-day suspension was the only punishment Macpherson doled out for the practice spat. Id. From that, Stafford asks the Court to draw the inference that his suspension was caused by intentional discrimination. But given the plaintiff's own explanation of events—that his suspension immediately followed a short skirmish with a teammate and his yelling at an assistant coach— the Court is unwilling, even at the motion-to-dismiss stage, to draw the inference Stafford requests.

There remains one allegation, however, that warrants closer inspection: Stafford's temporary removal from the tennis team in the fall of 2016. GWU contends that this event, too, was not severe enough to constitute an adverse action that is actionable under Title VI. MTD at 11–12. It cites Hajjar-Nejad v. George Washington Univ., 37 F. Supp. 3d 90, 128 (D.D.C. 2014), for the proposition that the standard for adverse action under Title VI is the same as that required by Title VII, which is met only when an employee "experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment

opportunities such that a reasonable trier of fact could find objectively tangible harm," <u>Czekalski v. LaHood</u>, 589 F.3d 449, 457 (D.C. Cir. 2009) (citation omitted).  GWU says Stafford's brief suspension did not rise to this level, especially since Stafford was not a scholarship athlete and hence enjoyed "no right or guarantee to even remain on the tennis team."  MTD at 12.

The Court disagrees.  Under Title VI, a plaintiff must allege that he was "excluded from participation in, . . . denied the benefits of, or . . . subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Case law is sparse on what qualifies as an adverse action under Title VI.  GWU urges the Court to apply the Title VII standard for employment discrimination, although the portion of <u>Hajjar-Nejad</u> it cites as support for this position seems instead to import the Title VII adverse-action standard to a Section 1981 claim.[4]  Yet even if that standard also applies in the Title VI context, Stafford has adequately pled that he suffered an adverse action.  <u>Hajjar-Nejad</u> said a complained-of action must have "significantly changed [plaintiff's] status as a student or materially altered the terms, conditions, or privileges [plaintiff] enjoyed as a student."  37 F. Supp. 3d at 129.  Stafford's removal from

_____

[4] In the section of <u>Hajjar-Nejad</u> cited by GWU, the court explicitly said it was construing the plaintiff's claims as Section 1981 claims and that "Title VII jurisprudence provides guidance in interpreting *Section 1981*."  37 F. Supp. 3d at 128 (emphasis added).  Nowhere in that portion of the opinion did the Court discuss the standard for an adverse action in the context of a Title VI claim.  <u>See</u> <u>id.</u> at 127–29.  To be sure, earlier in <u>Hajjar-Nejad</u>, the court did say that "[d]iscriminaton claims pursuant to Title VI and Section 1981 are analyzed under the same standards as claims brought pursuant to Title VII of the Civil Rights Act."  <u>Id.</u> at 124.  The "standards" to which the court was referring, however, were those that require *either* direct evidence of discrimination or resort to the <u>McDonnell-Douglas</u> burden-shifting framework, not the substantive standard for determining whether a plaintiff has complained of a sufficiently severe adverse action.  Indeed, all the cases cited by the <u>Hajjar-Nejad</u> court for the "same standards" comment dealt with the decisional framework for a discrimination claim, not the standard for determining what counts as an adverse action and how that might differ between Title VI, Title VII, and Section 1981.  <u>Id.</u> (citing cases).

the tennis team for an extended period of time clears that bar.  <u>See</u> Am. Compl. ¶¶ 93–95.  The suspension "significantly changed [Stafford's] status as a student," <u>id.</u>; indeed, he went from being a student-*athlete* to merely a *student*.  And the suspension "materially altered the . . . privileges [Stafford] enjoyed as a student," <u>id.</u>, because he, at least for a while, could no longer participate on the tennis team.

GWU's reliance on the University's Student Athlete Handbook statement that participation in its athletic programs is "considered a privilege rather than a right" is somewhat of a red herring.  <u>See</u> MTD, Ex. B.  It does not matter whether Stafford was a scholarship athlete, or whether certain procedures had to be followed to remove him from the team; what matters is that he once enjoyed the privilege of playing on the team, and that privilege was taken from him. <u>Hajjar-Nejad</u>, 37 F. Supp. 3d at 129 (stating that an adverse action is one that changes "status as a student or materially altered the . . . privileges he enjoyed as a student").  GWU's insistence on some vague right-versus-privilege distinction is inconsistent with the text of Title VI, which protects generally against "exclu[sion] from participation in," the "deni[al] of benefits of," or "discrimination under" any program receiving federal assistance.  42 U.S.C. § 2000d.  And it is inconsistent with the case law the University cites for support, which directs courts to ask whether any discrimination "changed [a plaintiff's] status as a student or materially altered the terms, conditions, or *privileges* he enjoyed as a student."  <u>Hajjar-Nejad</u>, 37 F. Supp. 3d at 129 (emphasis added).   Stafford's alleged removal from the team satisfies both of those formulations.

What's more, the suspension is easily distinguished from events the <u>Hajjar-Nejad</u> court found insufficiently adverse—like *verbal statements* by medical school deans that did not formally alter the plaintiff's status as a student.  <u>Id.</u> at 129 ("These statements, standing alone,

did not cause objectively tangible harm, and indeed caused no harm, other than perhaps humiliation, anger, and embarrassment." (internal quotation marks omitted)).  Temporary or not, Stafford's removal from the team, beyond causing him "humiliation, anger, and embarrassment," also "materially altered the terms, conditions, or privileges he enjoyed as a student."  Id.  And finally, the fact that Stafford was given the right to play his way back onto the team does not obviate the harm caused by the initial removal, as GWU suggests.  MTD at 11–12.  That would be akin to holding that one could not bring a Title VII claim for a discriminatory termination so long as the employer offered the employee a chance to re-apply for his old job; that is not the law.  In sum, then, the Court concludes that Stafford has alleged at least two adverse actions that can serve as the predicate for his intentional discrimination claim.

Of course, Stafford still must plausibly allege that his suspension was motivated by discriminatory animus.  See Hajjar-Nejad, 37 F. Supp. 3d (explaining that materially adverse actions must be taken "for reasons related to Plaintiff's race" to establish discrimination claim).  Has his complaint done so?  Stafford notes that Macpherson had just been named the head coach, meaning all of his previous allegations regarding mistreatment—allegedly owing to Stafford's race—should not be imputed to Macpherson.  Am. Compl. ¶ 91.  When he discusses his conversation with Macpherson, he alleges only that Macpherson informed him he would have to try out, and he fails to allege that this decision was motivated by discriminatory animus.  Id. ¶ 94.  The closest Stafford comes to alleging that this decision had some discriminatory motivation is when he alleges, in his original complaint, that "[t]here were two other white male freshman players that were on the team that had seemingly replaced Plaintiff."  Compl. ¶ 76.  Stafford's proposed amended complaint deletes this allegation, but at any rate, it would not be enough—especially given that other, non-discriminatory explanations for the decision abound, including

the fact that Stafford apparently did not play in any of the team's matches during the prior spring season, a decision made by the team's interim head coach Torrie Browning. Am. Compl. ¶¶ 84–89. Moreover, other of Stafford's allegations, suggest that Macpherson was actually on Stafford's side throughout this ordeal. While his teammates allegedly waged a private campaign to ensure he was not reinstated, Macpherson thought Stafford had the potential to "become a dangerous player" and brought him back on board, despite acknowledging other players' negative "opinion" of Stafford. Id. ¶ 101. Stafford has thus failed to plead facts that plausibly suggest Macpherson removed him from the team, or required him to try out for the team, because he was black.

For all these reasons, to the extent Stafford's Title VI claim turns on an intentionally discriminatory action taken by one of the Defendants themselves, the Court will dismiss the claim.[5]

### 3. Hostile Environment under Title VI

As it turns out, the only viable discrimination claim Stafford may have is one he did not explicitly plead: that GWU created a hostile educational environment, or at least allowed one to persist. When it comes to complaining about specific instances of discriminatory treatment *by the Defendants*, Stafford's complaint suffers from one principal shortcoming: much of the harassment he documents concerns racial abuse and antagonism by his *teammates* rather than the University and its employees that Stafford names as defendants in the suit. But that characteristic of his complaint is a feature, not a flaw, of a hostile environment claim.

---

[5] It is also worth noting that, to the extent Stafford intended to sue Early in her individual capacity for a Title VI violation, that claim fails because the "text of Title VI . . . precludes liability against . . . individuals." Mwabira-Simera, 692 F. Supp. 2d at 70 (quotation marks omitted).

The Supreme Court has held, in the Title IX context, that an intentional discrimination claim against a school can be premised on the actions of fellow students, so long as the plaintiff can show that school officials were "deliberately indifferent to known acts" of harassment. Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 641 (1999). Although Davis "dealt with sex-based peer harassment under Title IX, 'Congress modeled Title IX after Title VI . . . and passed Title IX with the explicit understanding that it would be interpreted as Title VI was.'" Fennell v. Marion Indep. Sch. Dist., 804 F.3d 398, 408 (5th Cir. 2015) (quoting Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 258 (2009)) (internal citation omitted). Indeed, "[e]xcept for the substitution of the word 'sex' in Title IX to replace the words 'race, color, or national origin' in Title VI, the two statutes use identical language to describe the benefited class." Cannon v. Univ. of Chicago, 441 U.S. 677, 694–95 (1979). Thus, there is every reason to think that the "analytical framework" employed by the Supreme Court in Davis should be applied to cases alleging race-based peer harassment under Title VI, which is precisely what the Fifth Circuit (in Fennell) and at least two other courts of appeals have done. Id.; see Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 317 (3d Cir. 2014); Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cty., OK, 334 F.3d 928, 934 (10th Cir. 2003).[6] Although the D.C. Circuit has not yet passed on this question, the Court is persuaded by Fennell, Blunt, and Bryant and follows the path they have charted. Thus, Stafford can plausibly plead an adequate intentional discrimination claim

---

[6] While this Court uses the label "hostile environment" or "hostile educational environment," hostile environment claims in the educational context are often labeled "peer harassment" claims, owing to the Supreme Court's use of that label in Davis, 526 U.S. at 648. This Court prefers "hostile environment," because the fact of peer harassment is not the linchpin of liability; the fact of school officials allowing such harassment to continue unchecked, thereby creating a hostile environment for students, is.

notwithstanding the complaint's persistent focus on individuals neither named as defendants in the case nor employed by the University.

Much of Stafford's complaint focuses on the behavior of his teammates and coaches who are not named as defendants in this suit, and his real grievance appears to be that this conduct went unchecked by the head coaches and athletics department personnel he does name as defendants. For example, he alleges that, in his freshman fall season, he and the other persons of color on the tennis team "were subjected to constant threats" by Munoz not directed at the other players. Am. Compl. ¶ 28. He complains of persistent "bullying by the coaches of the tennis players who were of color," id. ¶ 29, and details specific incidents of racial insensitivity and hostility, id. ¶¶ 29–34. Stafford complains of more of the same in his freshman spring season. See, e.g., id. ¶ 62–69 (alleging that the racist abuse continued and detailing specific instances). The beat goes on like this up until Stafford's final suspension from the University in January 2018.

The University's inaction only made matters worse, in Stafford's telling. In paragraph 70, for example, Stafford alleges that "GWU, through the non-responsiveness of its Athletic Department, specifically Defendants Nero and Defendant Early, fostered an environment that was conducive to blatant discriminatory conduct." Later, Stafford alleges that "Defendant GWU, working in concert with and by through all other Defendants . . . subject[ed] Plaintiff to withering and debilitating discriminatory harassment." Id. ¶ 126; see id. ¶ 131 (using exact same language in amending Title VI claim). This "subjected to" language is exactly what the Supreme Court in Davis said was sufficient to spell out a hostile environment discrimination claim in the Title IX context, and there is no reason to think that the principles in Davis should not apply with equal force under Title VI. See 526 U.S. at 643 (finding no difference between a school

engaging in "discrimination" versus "subjecting students to discrimination" (internal quotation marks omitted)).  And while Stafford had already alleged in his original complaint that the University took no action to curb the racial abuse he was allegedly enduring, he now alleges that GWU in fact took affirmative actions "which caused the misconduct to exacerbate and become more frequent and intense."  Am. Compl. ¶ 117.

Stafford's theory is plain: even if the defendants themselves were not committing the discriminatory acts, they should have intervened to put a stop to them—but instead stood idle or took actions that only encouraged further abuse.  See, e.g., id. ¶ 70 (inaction by Early), ¶ 84 (inaction by Macpherson).  These are the hallmarks of a hostile environment claim, notwithstanding Stafford's failure to use those exact words.  And the failure to explicitly plead a hostile environment claim does not categorically bar this Court from construing Stafford's complaint to include one.  As the D.C. Circuit has recognized, a complaint which alleges "discrimination . . . in principle includes a hostile work environment theory."  Steele v. Schafer, 535 F.3d 689, 694 (D.C. Cir. 2008).

It is especially apparent that a discrimination claim encompasses a hostile environment theory when a plaintiff alleges "constructive discharge," i.e., that the environment was so bad that, although not formally terminated from a position, the plaintiff had no choice but to leave. Id. (noting that a constructive discharge claims is often premised on a hostile work environment). Like Steele, except in the educational rather than employment context, the complaint in this case sketches a constructive discharge claim.  See Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004) (discussing constructive discharge doctrine).  Starting in his freshman year, Stafford says the "substantial overt racism during the first couple of months . . . eviscerated [his] desire to participate in team activities and caused him to try to limit his interactions with his teammates as

much as possible." Am. Compl. ¶ 35.  He says his first suspension from the team, in the winter of 2015, resulted from his objection to a teammate's use of the "n-word." Id. ¶ 38.  He says his grades plummeted his freshman year because the "overt racism" caused him "anxiety, extreme depression and severe mental anguish." Id. ¶ 71.  And while his final discharge from the team was due to his persistently low grades, Stafford again says he struggled only because of the "severe anguish and distress" caused by the years-long racial harassment. Id. ¶ 112.  So while Stafford admits his poor grades merited an academic suspension, he says they were the direct result of Defendants having allowed a racially hostile environment to fester over several years. This makes his theory analogous to constructive discharge, a quintessential hostile environment claim.

A further reason to construe Stafford's amended complaint as raising a hostile environment claim is that GWU has already done so.  The court in Steele found it significant that the defendant's summary judgment briefing addressed the hostile work environment issue despite the complaint's failure to allege that claim, suggesting the defendant was at least put on notice of plaintiff's probable intent to raise one.  535 F.3d at 694.  Here, although GWU did not address a potential hostile work environment claim in its motion to dismiss, it argues at length against such a claim in its opposition to Stafford's motion for leave to file an amended complaint.  See Opp. at 13-17.  Thus, while the D.C. Circuit has expressed some concern about construing a complaint to raise a claim that it has not explicitly raised when defendants have not detected such a claim, that concern is not implicated here.  See Reshard v. LaHood, 443 F. App'x 568, 570 (D.C. Cir. 2011) (judgment) ("Significantly, neither Reshard nor DOT addressed or even acknowledged a hostile work environment claim . . . .").  Finally, because "this opinion comes early in these proceedings, in a denial of a . . . motion to dismiss," GWU will have "many

opportunities left to defend itself against such a claim." Bing v. Architect of the Capitol, 300 F. Supp. 3d 53, 59 (D.D.C. 2017) (construing complaint to include hostile work environment claim even though it stated such a claim less clearly than plaintiffs did in Steele). Given these similarities with Steele, and in an abundance of caution in light of Stafford's *pro se* status, the Court will construe Stafford's complaint as raising a hostile environment claim.

That Stafford has pled such a claim, however, does not necessarily mean the claim can survive GWU's Rule 12(b)(6) motion. Stafford still must show that he has adequately stated a right to relief under the high bar that has been set for student-on-student harassment claims under Title VI. "When a Title [VI] discrimination claim is based on peer [racial] harassment, a funding recipient is liable in damages only if it is deliberately indifferent to peer [racial] harassment of which it has 'actual knowledge' and 'that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" Wells v. Hense, 235 F. Supp. 3d 1, 7 (D.D.C. 2017) (quoting Davis, 526 U.S. at 650). "'Deliberate indifference' in this context exists 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances,'" id. (quoting Davis, 526 U.S. at 648), and where such indifference "cause[s] students to undergo harassment or make them liable or vulnerable to it," id. at 7–8 (quoting Davis, 526 U.S. at 645).

GWU contends that Stafford has failed to plead both that the University was deliberately indifferent and that the harassment he suffered was sufficiently severe and pervasive. The Court begins with the closer question: whether Stafford has alleged facts that show the University was deliberately indifferent to the racial harassment he was enduring. GWU insists that Stafford cannot show that the University's response to the alleged harassment was "clearly unreasonable in light of the known circumstances." Reply in Support of Motion to Dismiss ("Reply"), ECF

No. 13, at 14 (quoting Davis, 526 U.S. at 648). Although Stafford alleges that he and his father met with members of the coaching staff and athletics department to communicate their concerns, GWU says the broad allegations "about racism or similarly vague and generalized descriptions" that were relayed to school officials were not concrete enough to put the onus on the school to remedy the problem. Id. at 14–15. GWU further notes that Stafford "does not allege that he ever filed a formal complaint against any of his teammates or his coaches," and argues that even if he had, "requiring Defendants to take disciplinary action in this circumstances would infringe the considerable deference that is owed to educational institutions' decisions regarding discipline[.]" Id. at 15.

By the Court's count, Stafford details six instances in which he (and his father) informed GWU officials about the alleged racial harassment he was enduring. The first came in the spring semester of 2015 after Stafford was suspended from the team for, according to him, chastising a teammate who had used a racial slur. See Am. Compl. ¶¶ 36–38. Stafford and his father met with then coach Munoz and Early to discuss the suspension. Id. ¶ 42. Stafford does not specify what he or his father related to Munoz and Early, but he does say that Munoz "falsely denied the existence of any racial animus." Id. Stafford also notes that Early did not order that he be reinstated to the team and instead left that decision to the discretion of Munoz. Id. ¶ 43.

Meetings two and three happened in quick succession in March 2016. First, after an assistant coach—who was bridging the gap between the tenures of Munoz and Macpherson—left Stafford out of the lineup at a tournament, Stafford "reached out to Defendant Early to complain about the tournament, the racist mistreatment he was subjected to and the lack of playing time." Id. ¶ 87. Early then scheduled a follow-up meeting with Stafford and the assistant coach, who offered tennis- and team-related reasons for why Stafford did not play. Id. ¶ 88. Although

Stafford says he "raised the issues of discriminatory treatment during the meeting," he says those concerns were "ignored." Id. Instead, Early purportedly told Stafford to "just let the season pass and wait for the next coach to arrive." Id. Stafford further alleges that, around this time, his father "tried to contact Defendant Early at various times, but she mostly refused to communicate with him." Id. ¶ 89.

The fourth meeting occurred shortly after Stafford realized he was being treated as if he had been removed from the team at the beginning of the 2016 season. Stafford and his father met with a vice provost and an athletics department official. Id. ¶ 96. After they "talked about all of the overt racism, the violation of various policies and procedures, the defamation of character and the emotional distress and severe mental anguish" Stafford was suffering, Stafford says the school officials "were mortified" and "confused with why nothing was being done and why [Stafford] was such an enormous target." Id. But Stafford was not immediately reinstated to the team following this meeting; he had to try out in front of the new coach, Macpherson. Id. ¶ 97. And the racist harassment, according to Stafford, only intensified after his reinstatement. See id. ¶¶ 100–06.

The fifth interaction, in spring 2016, was between only Stafford and Macpherson, right after Stafford had lost a practice match and yelled at a teammate. Id. ¶ 106. Stafford allegedly told Macpherson "about all of the conspiracies, racial discrimination and defamation of [his] character," and Macpherson responded that he would "try to be more aware of these things" and would "handle everything." Id. Macpherson suspended Stafford for one practice but did not discipline other players, according to Stafford. Id.

The sixth and final meeting between Stafford and a member of the University occurred when Stafford met with an academic advisor to appeal his academic suspension in January 2018.

At that meeting, Stafford "informed the advisor that the above-described circumstances"—referencing the longstanding racial harassment—"undermined his ability to perform academically, but the advisor was insistent that the appeal should only contain contrite acceptance of personal responsibility for the poor grades and not any effort to appeal on the basis of the trauma caused by the racially hostile atmosphere condoned by Defendant GWU." Id. ¶ 114. The University denied Stafford's appeal, and his contact with the school ceased. Id. ¶ 115.

Did these interactions put GWU on notice that Stafford felt he was enduring serious racial harassment, and was the University's response to the allegations clearly unreasonable? Given the legal standard guiding the inquiry, the answer is yes. If the Court, as it must, takes Stafford's factual allegations as true and draws all reasonable inferences in his favor, that means his allegations of overt racial harassment by several teammates are true, see, e.g., id. ¶¶ 62–69 (detailing teammates' harassment); that he in fact reported these incidents to his coaches and to GWU athletic administrators, see supra 26–28 (recounting these reports); and that neither his coaches nor the athletics department took any steps to investigate or curtail the abuse that was occurring, Am. Compl. ¶ 117 (alleging that University "took no action to discipline" the other players). This is enough to plausibly allege that the University was deliberately indifferent to Stafford's plight. For "where a university has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior"; and where it does not take that reasonable action, "such university has failed to act reasonably in light of the known circumstances." Cavalier v. Catholic Univ. of Am., 306 F. Supp. 3d 9, 34 (D.D.C. 2018) (internal quotation marks and alteration omitted).

That leaves GWU's argument that the harassment allegations are not sufficiently severe and pervasive to support a hostile environment claim. Here, Stafford must allege facts showing

harassment "so severe, pervasive, and objectively offensive that it effectively bar[red] [his] access to an educational opportunity or benefit." Davis, 526 U.S. at 633. In making this assessment, the Court notes "that the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991) (considering hostile work environment claim under Title VII). Thus, "[a]n egregious, yet isolated, incident" might effectively bar Stafford from an educational opportunity or benefit, but so too might pervasive, though less severe, incidents of harassment. Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div., 512 F.3d 157, 163 (5th Cir. 2007) (considering hostile work environment claim under Title VII).

GWU begins by attacking Stafford's allegations as too isolated and sporadic to support a hostile environment claim. It argues that the Court can consider only those racial incidents occurring within the applicable limitations periods—*i.e.*, between spring 2016 and December 2017. Reply at 15–16. And because there were "long gaps between" those incidents, GWU says they were not pervasive enough to satisfy the standard set forth in Davis. Id. at 16.

This argument misses the mark. The Supreme Court, while discussing a traditional hostile work environment claim under Title VII, has explained that courts can consider events falling outside the limitations period "so long as all acts which constitute the claim are part of the same unlawful practice and at least one act falls within the time period." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002). At least one court in this district has reasoned persuasively that this so-called "continuing violation" rule should apply to a hostile educational environment claim under Title IX. See Cavalier, 306 F. Supp. 3d at 43. And as this Court explained earlier, there is no meaningful difference—besides the nature of the protected characteristic—between hostile environment claims under Title IX and Title VI. See supra 22.

Thus, if the continuing violation doctrine applies under Title IX as it does under Title VII, then it ought to apply just the same under Title VI. A brief refresher on Morgan's reasoning confirms that there is nothing exceptional about hostile environment claims under Title VII that renders the continuing violation doctrine an ill fit for other contexts. Morgan's holding was premised on the fact that hostile environment claims "are different in kind from discrete acts," since, by "[t]heir very nature," they "involve[ ] repeated conduct." 536 U.S. at 115. Because such conduct does not ordinarily "occur on any particular day" but rather "over a series of day or perhaps years," id., courts must be permitted to consider acts outside the limitations period to properly assess such claims, so long as at least one act in the series falls within the limitations period, id. at 118–19. Here, as in Morgan and Cavalier, Stafford complains of repeated harassment over a period of years; thus, as in those cases, the Court will consider every act of racial harassment that Stafford alleges, dating all the way back to his freshman year in 2014.

Stafford has identified roughly a dozen specific racially charged incidents—including his teammates posting racist social media messages, Am. Compl. ¶ 33, calling Stafford a "monkey," id. ¶ 64, and making racialized insinuations about the size of his genitals, id. ¶ 83. And Stafford at various points indicate those events are merely illustrative, not exhaustive. See, e.g., id. ¶ 62 (alleging a teammate would "often spew hateful racist rhetoric towards his opponents"); id. ¶ 83 (alleging teammates "repeatedly harassed" Stafford and providing "example[s]").

GWU counters that some of these incidents did not involve Stafford, or at least were not directed at him. As a result, it says the Court should not consider them in assessing the pervasiveness of the harassment. But the D.C. Circuit has roundly rejected this line of argument in the Title VII hostile-work-environment context, for reasons that would seem to apply with equal force here. In reversing a district court judge's decision to exclude evidence of harassment

of a Title VII plaintiff's co-workers, the D.C. Circuit explained: "Even a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive." Vinson v. Taylor, 753 F.2d 141, 146 (D.C. Cir. 1985), aff'd and remanded sub nom. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57 (1986). Accordingly, when Stafford alleges that he witnessed a teammate "spew[ing] hateful racist rhetoric towards his opponents," Am. Compl. ¶ 62, or heard another teammate yelling the n-word whenever it came on in a rap song in the team van, id. ¶ 104, the Court must consider them as "directly relevant to the question whether [they] created an environment violative of Title [VI]." Vinson, 753 F.2d at 146. With these principles in mind, then, the alleged racial harassment appears far more pervasive than GWU lets on. See Reply at 16 (characterizing allegations as "isolated incidents" with "long gaps between alleged incidents").

Shifting from the number of incidents to their severity, GWU insists Stafford has described only "distasteful, offensive, juvenile behavior and jokes," rather than the sort of overwhelming and debilitating harassment that previous cases have deemed sufficient. Reply at 16. The Court does not share GWU's relatively tame view of the allegations. While some of the incidents appear more benign than bigoted, the reverse is true of many of Stafford's allegations. The white players' alleged use of the n-word—whether directed *at* Stafford or simply in his presence—could understandably anger Stafford and cause him to feel isolated from the team. See, e.g., Am. Compl. ¶¶ 65, 104, 108 (alleging use of n-word by three different teammates). The frequent use of racial slurs in the team's group text chat—from which Stafford was excluded, but whose messages were relayed to him—would tend to further exacerbate Stafford's sense of alienation. See id. ¶ 34 (alleging a teammate described a black person as a "gorilla" and referred to a piece of poetry as "black shitty poetry"). So, too, would the repeated expressions of

35

surprise that Stafford could somehow be both black and wealthy.  See id. ¶¶ 83, 104 (alleging that teammates made the comment "as if the two were mutually incompatible").  And as the Court's recitation of the facts alleged in Stafford's complaint makes clear, see supra 2–10, Stafford cites plenty more incidents like these.  Given that the Court must draw all inferences from the facts alleged by Stafford in his favor, it has little trouble inferring that incidents like these could have had a profound impact on Stafford, notwithstanding GWU's description of them as merely "distasteful" or "offensive."  The Court is mindful of Davis's caution that "simple acts of teasing and name-calling among [students]," even where such comments target a protected characteristic, are ordinarily insufficient to satisfy the severe, pervasive, and objectively offensive standard.  526 U.S. at 652.  But the Court concludes, as did the Fifth Circuit in Fennell, "that repeatedly being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, [and] being shamed and humiliated on the basis of one's race is harassment far beyond normal schoolyard teasing and bullying."  804 F.3d at 409 (internal quotation marks and alteration omitted).

The University further maintains that Stafford must (but did not) allege that the harassment caused him to feel "threatened on account of his race."  Reply at 17.  This argument rests on the dubious premise that Stafford must allege he felt physically unsafe to adequately plead a hostile environment claim.  But the Court is aware of nothing in Title VI or the case law that commands such a showing.  True, Davis did say that the "most obvious example of student-on-student sexual harassment" involves "students physically threaten[ing]" other students.  526 U.S. at 650.  Yet Davis never said that physical threats are the *only* type of peer harassment that can substantiate a hostile educational environment claim.  That is for good reason.  The central question is whether Stafford has plausibly alleged that the harassment he endured "effectively

bar[red] [his] access to an educational opportunity or benefit." Id. at 633. Exactly *how* the harassment had that effect—whether by fear for his physical safety, humiliation, a sense of alienation, or some amalgam of these—is beside the point.

Be that as it may, GWU still insists that Stafford "has not plausibly alleged that the incidents he describes barred him from an educational opportunity or benefit." Reply at 17. The Court disagrees. Stafford at multiple points in the complaint alleges that his academic (and tennis) performance suffered as a direct result of the pervasive harassment carried out by his teammates. See, e.g., Am. Compl. ¶ 71 (alleging that the racist abuse caused him to "suffer[ ] from anxiety, extreme depression and severe mental anguish" which "adversely affected his academic performance," culminating in a sub-2.0 grade point average). So while GWU contends that Stafford cannot attribute his suspension from the University to anything but his own academic failures, Stafford has in fact alleged that his academic struggles were the product of the prolonged and intensive racism he experienced. This type of allegation parallels one Judge Moss found sufficient at the pleadings stage in Cavalier, in which a Title IX plaintiff alleged that a university's failure to "take her rape seriously and [to] give her a hearing interfered with her coursework and her role on the . . . lacrosse team." 306 F. Supp. 3d at 32 (internal quotation marks omitted) (alteration in original).

An astute reader may ask how the Court can, on the one hand, dismiss the academic suspension as irrelevant to a discrete discrimination claim and, on the other hand, find that it is a crucial event for Stafford's hostile educational environment claim. To adequately plead a discrete discrimination claim under either the DCHRA or Title VI, a plaintiff must plausibly allege that a particular adverse action was motivated by racial animus. See Hejjar-Nejad, 37 F. Supp. 3d at 129–142 (examining whether each of several discrete adverse actions were motivated

by discriminatory animus); <u>Delbert</u>, 2013 WL 6222987, at *1 (affirming dismissal of Title VI claim "because appellant's complaint lacked any factual allegations linking the claimed adverse actions to his race"). Stafford could not plausibly allege that with respect to his academic suspension, because he admitted he was suspended for his bad grades; nowhere does he allege that the University's academic administrators made that decision because Stafford was black. But the pleading burden on Stafford is different for his hostile educational environment claim: he need not allege that he was suspended for being black; he need only allege that he suffered such intense racial hostility that he was effectively denied the opportunity to succeed academically—and the academic suspension goes directly to that.

Although an allegation that peer harassment caused a student to struggle academically might suffice in some cases, GWU urges the Court to discount Stafford's allegation here, arguing that it simply is not plausible that the harassment Stafford alleges caused his poor academic performance. It points to Stafford's GWU and high school transcripts, which "demonstrate that [Stafford] has long struggled with academics, including early in his time at the University." Reply at 17. This argument is unavailing at the motion to dismiss stage of the case. Stafford has alleged that the racial harassment began early in his freshman year at GWU, and given that the Court must accept his factual allegations as true and draw all reasonable inferences from those facts, it is plausible that such harassment, if it actually occurred, could have seriously affected his academic performance. That Stafford was not a model student in high school does not necessarily mean he could not have succeeded in college. In sum, then, the Court concludes that Stafford has alleged enough to plead a viable hostile environment claim under Title VI.

This conclusion, however, should not be taken as any endorsement of the strength of Stafford's claims. When this case reaches the summary judgment stage, it will remain Stafford's

burden to produce evidence corroborating his alleged harassment, establishing a connection between GWU's actions and his academic struggles, and showing that the school knew of whatever harassment he may have been enduring and yet remained deliberately indifferent to it. The decision to let one of Stafford's claims proceed today is not any indication of what the evidence will show tomorrow.

    B.  <u>Contract Claims: Counts III and IV</u>

       Stafford alleges in Count III that GWU violated 42 U.S.C. § 1981, which prohibits racial discrimination in the making and performance of contracts, Am. Compl. ¶¶ 132–135, and in Count IV that GWU breached its contract with him under D.C. law, <u>id.</u> ¶¶ 136–142. These claims fail for the same reason, so the Court will address them together.

       Under 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts," which "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." "To establish a claim under § 1981, a plaintiff must show that (1) [he is a member] of a racial minority [group]; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute." <u>Mitchell v. DCX, Inc.</u>, 274 F. Supp. 2d 33, 44–45 (D.D.C. 2003) (citation omitted and first alteration added). A breach of contract claim under D.C. law has four elements: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." <u>Ihebereme v. Capital One, N.A.</u>, 730 F. Supp. 2d 40, 47 (D.D.C. 2010) (citation and quotation marks omitted).

Before either of Stafford's contract-based claims can get off the ground, he has to identify an underlying contract. While Stafford does not identify a written contract between him and GWU, the "general rule [is] 'that the relationship between a university and its students is contractual in nature.'" Manago v. District of Columbia, 934 A.2d 925, 927 (D.C. 2007) (quoting Basch v. George Washington University, 370 A.2d 1364, 1366 (D.C. 1977)). "The University offers an education on certain terms—tuition, attendance, behavior under the Code, etc.—and a student accepts and performs his part of the contract accordingly." Doe v. George Washington Univ., 321 F. Supp. 3d 118, 123 (D.D.C. 2018). Even so, a "plaintiff must nevertheless 'allege sufficient facts to demonstrate . . . the terms of the contract'" that was allegedly breached. Mosby-Nickens v. Howard Univ., 864 F. Supp. 2d 93, 98 (D.D.C. 2012) (quoting Manago, 934 A.2d at 927). Stafford does not do that.

While there is little doubt that Stafford entered into a contract of sorts when he paid tuition to GWU in return for the chance to earn a degree there, Stafford's complaint focuses entirely on his experiences with the tennis team.[7] But as GWU points out, Stafford "has not alleged that the University promised him anything regarding his participation on the tennis team," that he "received a scholarship" for playing on the team, that "his acceptance to the University was conditioned on him playing tennis," or "that he was guaranteed a spot on the

---

[7] To be sure, Stafford also complains about his academic suspension from the University in January 2018, but as the Court has already explained, that cannot serve as the basis for either contract claim because Stafford has admitted that the suspension was due to his poor grades, not some other illicit reason. While his poor academic performance might have been caused by GWU, as Stafford alleges, that does not mean the academic suspension itself was the breach of some contract term (which, in any event, Stafford does not identify). Indeed, his academic suspension is completely consistent with the Agreement of Expectation Stafford signed in September 2017, which states that a student's failure to meet the University's "academic requirements may result in suspension from the University." MTD, Ex. G.

team while he was enrolled at the University." MTD at 14. And although Stafford alleges in his amended complaint that Munoz "made multiple representations to [Stafford] about GWU as a school in general, its Athletic Department, and its tennis team in particular, upon which [he] justifiably relied in making the decision to join the team and attend Defendant GWU," Am. Compl. ¶ 19, he fails to allege what any of those "multiple representations" were, or how GWU violated them. See, e.g., id. ¶ 21 (alluding to "promises made by Defendant GWU through Defendant Munoz" but not explaining what those promises were); id. ¶ 27 (alleging that racism he experienced was a "breach [of] the binding promises made to Plaintiff during recruitment" but not describing those promises). The exhibit Stafford attaches to his amended complaint—a short email from Munoz to Stafford asking whether he had received his acceptance letter from the University and informing Stafford of the team's recent success—does not provide any further detail on the "representations" and "promises" Munoz made to Stafford. See ECF No. 11-3.

Nor does Stafford's dismissal from the tennis team appear to violate any provision in GWU's Student Athlete Handbook (assuming that could create a contract) which, as explained above, makes clear that participation in a sport is a "privilege rather than a right." MTD, Ex. B. Perhaps the University violated some provision of the Code of Student Conduct, but Stafford has not suggested which provision that may be, instead stating in general terms that a contract "was created when Plaintiff accepted the offer to attend Defendant GWU as a member of its tennis team," Am. Compl. ¶ 137, and that "there was an agreement of all material terms," id. ¶ 139. That is plainly insufficient, even under the permissive gaze courts cast upon *pro se* complaints. See Mosby-Nickens, 864 F. Supp. 2d at 98 (stating that plaintiffs must allege facts establishing the terms of the contract); Manago, 934 A.2d at 927 (affirming dismissal of contract claim because plaintiff "fail[ed] to allege sufficient facts to demonstrate either the terms of the contract

or reason to think it was breached"); see also Ford v. Suntrust Mortg., 282 F. Supp. 3d 227, 233

(D.D.C. 2017) (dismissing contract claim because plaintiff failed to provide "fundamental facts,"

including the "specific contract terms" allegedly breached).[8]

Accordingly, the Court will dismiss Stafford's contract claims in Counts III and IV.

## C. Negligence Claims: Counts V and VI

In Count V, Stafford alleges that GWU negligently caused him emotional distress. Am.

Compl. ¶¶ 143–151. In Count VI, he alleges that GWU negligently supervised and retained

coach Munoz and negligently supervised coach Macpherson and then-athletics director Nero. Id.

¶¶ 152–156.

### 1. Negligent Infliction of Emotional Distress

D.C. law permits recovery for emotional distress damages under either the "zone of

danger" or "special relationship" test. See Hedgepeth v. Whitman Walker Clinic, 22 A.3d 789,

796–799 (D.C. 2011). The "zone of danger" theory allows "recovery for mental distress if the

defendant's actions caused the plaintiff to be in danger of physical injury and if, as a result, the

plaintiff feared for his own safety." Id. at 796 (citation and internal quotation marks omitted).

The "special relationship" test is met where a

> plaintiff can show that (1) the defendant has a relationship with the plaintiff, or
> has undertaken an obligation to the plaintiff, of a nature that necessarily

---

[8] Stafford's reference to the "implied covenant of good faith and fair dealing" with respect to his D.C. contract claim, Compl. ¶ 111, does not cure the failure to identify specific contract terms. As GWU contends, the covenant is only enforceable in relation to the contract's material terms; it does not exist in a vacuum. See Allworth v. Howard Univ., 890 A.2d 194, 201 (D.C. 2006) (explaining that covenant requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (citation and quotation marks omitted)). Because Stafford fails to identify what "fruits" he was entitled to receive under the contract, the covenant of good faith and fair dealing has no application.

implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff.

Id. at 810–11.

Ordinarily, an NIED claim is subject to a three-year statute of limitations. D.C. Code § 12-301(8); Rendall-Speranza v. Nassim, 107 F.3d 913, 920 (D.C. Cir. 1997). "However, a claim for emotional distress that is intertwined with any of the causes of action for which a period of limitation is specifically provided . . . is subject to the limitation period for the intertwined claim." Rendall-Speranza, 107 F.3d at 920 (internal quotation marks omitted). "Here, plaintiff's emotional distress claim is based on the exact same conduct that forms the basis of [his] DCHRA claims; therefore, the claims are intertwined, and the emotional distress claim assumes the DCHRA claims' one-year statute of limitations period." Munoz v. Bd. of Trustees of Univ. of D.C., 590 F. Supp. 2d 21, 26–27 (D.D.C. 2008); see, e.g., Compl. ¶ 124 ("As a direct and proximate result of the discriminatory and unsafe educational environment created by Defendant's negligent response to the discriminatory conduct . . . ."). As with Stafford's DCHRA discrimination claim, that means the complained-of negligent conduct must have occurred on or after November 26, 2017, which corresponds to paragraph 108 and later in the amended complaint.

Stafford alleges that GWU is liable under either the "zone of danger" or "special relationship" theory. As for the former, he says that "GWU's negligent conduct placed [him] in the zone of immediate physical danger, causing him to fear for his own safety," and that the racist treatment he endured caused him to "live with the constant threat of physical and emotional violence." Am. Compl. ¶ 149. As for the latter, he says "GWU had a special relationship with, or had undertaken a special obligation to [him] of a nature that necessarily

implicated [his] emotional wellbeing," namely the "relationship between a student and his educational institution." Id. ¶ 150. The Court addresses each theory in turn.

To plead a viable zone-of-danger NIED claim, Stafford "must show 'that [he] actually feared for [his] safety as a result of [the defendant's] conduct." Hollis v. Rosa Mexicano DC, LLC, 582 F. Supp. 2d 22, 27 (D.D.C. 2008) (quoting Jane W. v. Pres. & Dirs. of Georgetown Coll., 863 A.2d 821, 826 (D.C. 2004)) (first two alterations added). Here, however, Stafford has "has not alleged that [ ]he was ever in any zone of physical danger caused by an act of [a] defendant where [ ]he had reason to fear h[is] safety." Hollis, 582 F. Supp. 2d at 27. The Court can find no event in the complaint that suggests a named defendant or other representative of GWU created a dangerous situation that caused Stafford to fear for his safety. Stafford does say that an assistant coach was such a "careless" driver that he "became very frightened" any time he rode in the team van with him, Am. Compl. ¶ 32, but those rides appear confined to 2014, and thus fall outside either the three- or one-year statute of limitations that applies to his NIED claim. Even if some of these rides occurred within the limitations period, they still would not suffice; although Stafford relates a story of a near-crash told by a teammate, he does not cite any close encounter that he personally experienced that caused him persistent emotional distress. Nor do the alleged assaults suffered by Stafford's Indian teammate suffice, because Stafford does not allege that he was present for those assaults or that such assaults were threatened against him. Id. ¶ 110.

Stafford's special-relationship theory fares no better. Stafford "cannot identify any relevant authority establishing that a student's relationship with a university is the type of special relationship that necessarily implicates her emotional well-being." Cavalier, 306 F. Supp. 3d at 39. Nor can the Court locate such an authority. In Hedgepeth, the D.C. Court of Appeals

identified some archetypal special relationships—including psychiatrist-patient, doctor-patient, funeral home-deceased family, and those appointed as guardians for children or the elderly—but those are all markedly more personal and intimate relationships than that between a university and one of its thousands of students.  See 22 A.3d at 813–15.  Moreover, the Court finds particularly instructive the D.C. Court of Appeals' decision in Sibley v. St. Albans School, 134 A.3d 789, 798 (D.C. 2016), which held that "[t]he relationship between a student and his school . . . is not enough, without more, to impose the predicate duty of care for a claim of negligent infliction of emotional distress."  If Sibley imposed no such duty on a 4–12 grade school—where adolescent students are left in the care of the school for up to a dozen hours each day—it would appear flatly inconsistent with D.C. law for this Court to impose that duty on a university— where adult students are in class for only a dozen hours each week.

It is true that courts in this district have sometimes found that a university has a duty to protect a student's emotional well-being, but that is only where a court found the "more" that was lacking in Sibley.  For example, in Cavalier, a rape victim's NIED claim survived a motion to dismiss because the university "affirmatively represent[ed] to [her] that a no-contact order was in place" and that "it would take the necessary steps to enforce it[.]"  306 F. Supp. 3d at 40 (D.D.C. 2018) (expressly declining to decide whether "university-student relationship, on its own" would suffice to create an NIED duty).  A similar representation to protect Stafford's emotional well-being is absent here.  While Stafford alleges that he at various times told GWU employees about the abuse he was suffering, those employees either disclaimed any intent to remedy the alleged abuse, Am. Compl. ¶ 42 (Munoz denying Stafford's racism claim); id. ¶ 88 (Early "ignor[ing]" Stafford's report of discriminatory treatment), or made only vague assurances that they would intervene, id. ¶ 106 (Macpherson allegedly telling Stafford "he would

be more aware of these things" and "would ultimately handle everything").[9]  These are far from

the unequivocal assurance the university gave a victim of rape that it would enforce the no-

contact order against her attacker.

Other of Stafford's proposed amendments do not cure these infirmities.  Rather than

pleading facts that would support recovery under either the zone-of-danger or special-

relationship theory, Stafford instead attempts to buttress his allegations of emotional distress—

but that only serves to highlight that his NIED claim would fail for a separate reason.  For

example, Stafford claims that he has suffered "significant mental anguish, emotional distress,

depression and other physical and mental ailments."  Id. ¶ 119.  But even assuming the existence

of a duty from which an NIED claim could rise, such a claim would nevertheless fail for

inadequate injury allegations.  As this Court has held previously, allegations of "mental distress"

are not enough, Bonner v. S-Fer Int'l, Inc., 207 F. Supp. 3d 19, 26 (D.D.C. 2016), and the Court

need not credit Stafford's vague and conclusory allusions to "other physical and mental

ailments," Grandison v. Wackenhut Servs., Inc., 514 F. Supp. 2d 12, 18 (D.D.C. 2007) (rejecting

plaintiff's reliance on "mere labels and conclusions" under more permissive, pre-Twombly

pleading standards (internal quotation marks omitted)).

For all these reasons, Stafford's NIED claim fails, and the Court will dismiss Count V.

### 2.  Negligent Retention and Supervision

Stafford's final claim, in Count VI, is against the university for negligent retention and

supervision of Munoz (who seems the primary target), Macpherson, and Nero.  "D.C. case law

---

[9] The Macpherson allegation concerns the time Stafford got into a dispute with a teammate at practice.  But Macpherson did, it seems, "handle" the situation, just not in the way Stafford wanted: he suspended Stafford for a day and allegedly did not dole out punishment to any other member of the team.  Am. Compl. ¶ 106.

does not appear to distinguish between negligent supervision and negligent retention." Thorp v. District of Columbia, 319 F. Supp. 3d 1, 21 (D.D.C. 2016) (quoting Islar v. Whole Foods Mkt. Grp., Inc., 217 F. Supp. 3d 261, 265 n.1 (D.D.C. 2016)); see Roe v. Wilson, 365 F. Supp. 3d 71, 86 n.9 (D.D.C. 2019). "To invoke [either] theory of liability it is incumbent upon a party to show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." Giles v. Shell Oil Corp., 487 A.2d 610, 613 (D.C. 1985).

GWU offers a host of reasons why these claims should fail, see MTD at 27–30, but the most obvious one is that Stafford cannot establish the necessary tortious conduct by any of Munoz, Macpherson, or Nero. "[A] common law claim of negligent supervision may be predicated only on common law causes of action or duties otherwise imposed by the common law. . . . To hold otherwise would be to impose liability on employers for failing to prevent a harm that is not a cognizable injury under the common law." Tridico v. District of Columbia, 130 F. Supp. 3d 17, 31 (D.D.C. 2015) (internal quotation marks omitted); see also Griffin v. Acacia Life Ins. Co., 925 A.2d 564, 576 (D.C. 2007) ("[W]e conclude that a common law claim of negligent supervision may be predicated only on common law causes of action or duties otherwise imposed by the common law."). As the foregoing analysis demonstrates, however, Stafford has failed to adequately plead *any* of his common-law actions against *any* of the individual defendants. Because he is unable to show independent tortious conduct by Munoz, Macpherson, or Nero, he cannot maintain a claim against the University for negligently retaining or supervising those individuals. See Islar, 217 F. Supp. 3d at 268 (dismissing negligent

supervision and retention claims where plaintiff could not identify a "predicate claim under <u>Griffin</u> that would permit him to recover on a negligent supervision or retention theory").

        D.  <u>Demand for Punitive Damages</u>

Because the Court has dismissed each Count in the complaint except for a hostile environment claim under Title VI, the Court need only consider whether punitive damages are recoverable as an incident to such a claim. They are not. <u>Barnes v. Gorman</u>, 536 U.S. 181, 189 (2002) ("[P]unitive damages may not be awarded in private suits brought under Title VI[.]"). Accordingly, the Court will dismiss Stafford's demand for punitive damages.

**IV.  Conclusion**

For the foregoing reasons, the Court will deny Stafford leave to file an amended complaint with respect to Counts I, III, IV, V, and VI, as amendment would be futile, and it will dismiss those same counts. The Court will, however, grant Stafford leave to file an amended complaint with respect to Count II and permit that Count, to the extent it contains a hostile environment claim, to proceed. A separate Order shall accompany this Memorandum Opinion.

 

 

                                              _____

                                              CHRISTOPHER R. COOPER
                                              United States District Judge

Date:  <u>June 5, 2019</u>