**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JABARI STAFFORD,<br><br>                  Plaintiff,<br><br>v.<br><br>THE GEORGE WASHINGTON<br>UNIVERSITY,<br><br>                  Defendant. | Case No. 1:18-cv-02789-CRC<br><br>**ORAL HEARING REQUESTED** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
<u>DEFENDANT'S MOTION FOR CASE-TERMINATING SANCTIONS</u>**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... ii

I. INTRODUCTION ...................................................................................................... 1

II. BACKGROUND AND PROCEDURAL HISTORY ................................................. 2

III. RELEVANT FACTS ............................................................................................... 3

    A.   Plaintiff Pressures Witnesses to Prepare Statements in Connection with This
        Case .................................................................................................................. 3

    B.   Plaintiff Attempts to Bribe Wills Tutecky into Providing a Statement
        Discussing Topics Handpicked by Plaintiff ..................................................... 4

    C.   Plaintiff Threatens Amlan Sahoo with "Evidence Against" Him, and with
        Withdrawal of Favors Plaintiff Had Previously Given Him ............................ 8

    D.   Plaintiff Coaches Blake Morton on the Contents of His Statement and Attempts
        to Ensure Their Communications are Not Discoverable ............................... 11

    E.   Plaintiff and Mr. Stafford Behave Inappropriately at Mr. Stafford's Deposition ........ 12

    F.   Plaintiff and Mr. Stafford Behave Inappropriately at Plaintiff's Deposition ............... 15

IV. ARGUMENT ......................................................................................................... 16

    A.   Dismissal of This Case Is Warranted Because Plaintiff Bribed and Intimidated
        Witnesses and Influenced the Contents of Their Statements ......................... 17

    B.   Plaintiff and Plaintiff's Father also Have Engaged in Disruptive Behavior at
        Their Depositions, Which Weighs Further in Favor of Terminating Sanctions ........... 22

    C.   A Lesser Sanction Will Not Sufficiently Punish Plaintiff and Deter Him from
        Engaging in Similar Misconduct in the Future ............................................... 24

    D.   If the Court Does Not Dismiss This Case, It Should Preclude Plaintiff from
        Introducing Any Testimony, Information or Documents from Messrs. Tutecky,
        Sahoo, and Morton, and from Introducing any Testimony from Plaintiff and his
        Father ............................................................................................................. 26

V. CONCLUSION ....................................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**

*Chambers v. NASCO, Inc.,*
  501 U.S. 32 (1991) ...................................................................................................16, 21, 22

*Derzack v. Cty. of Allegheny,*
  173 F.R.D. 400 (W.D. Pa. 1996) ......................................................................................25

*Emerson v. Dart,*
  900 F.3d 469 (7th Cir. 2018) ......................................................................................17, 20

*Lee v. Sass,*
  No. 04-70550, 2006 WL 799176 (E.D. Mich. Mar. 29, 2006) ................................................17

*Link v. Wabash R. Co.,*
  370 U.S. 626 (1962) .........................................................................................................16

*Ramirez v. T&H LeMont, Inc.,*
  845 F.3d 772 (7th Cir. 2016) .............................................................................................17

*Shepherd v. Am. Broad. Cos.,*
  62 F.3d 1469 (D.C. Cir. 1995) ...........................................................................................16

*Sprint Sols., Inc. v. Fils-Amie,*
  83 F. Supp. 3d 1290 (S.D. Fla. 2015) ...........................................................................22, 23

*Webb v. District of Columbia,*
  146 F.3d 964 (D.C. Cir. 1998) .......................................................................................16, 17

*Xyngular Corp. v. Schenkel,*
  200 F. Supp. 3d 1273 (D. Utah 2016) ................................................................................27

*Young v. Office of U.S. Senate Sergeant at Arms,*
  217 F.R.D. 61 (D.D.C. 2003) ..................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 26(c)(1) ........................................................................................................26

Fed. R. Evid. 403 .................................................................................................................27

# I.
# INTRODUCTION

"Thank u my guy!! . . . I told you **when I get that bag [of money] . . . I['ll] split it with u**."

Plaintiff Jabari Stafford made this offer to a witness who was providing him with a statement and helping him pressure another witness to provide a statement.  This is just one of many egregious written communications reflecting bribes and intimidation of witnesses detailed in this Motion.  Plaintiff has engaged in a pattern of misconduct that threatens the truth-seeking function of discovery and demonstrates his disregard for the integrity of the judicial process.  Since the initiation of this action, Plaintiff has offered bribes to two witnesses, intimidated one, directed the contents of three witness statements, interfered with the deposition of his father, and condoned the obscene and disruptive conduct of his father during his father's deposition.  It also appears that "paralegal" Kevin Hall may have engaged in the unauthorized practice of law, with support from Plaintiff and financial backing from Plaintiff's father—which Plaintiff's father falsely denied while under oath at his deposition.

This pattern of misconduct reveals Plaintiff's flagrant disregard for the value that the discovery process places on candor, and indicates that Plaintiff is willing to subvert the truth in order to advance his prospects of winning this case.  Given these facts, allowing Plaintiff to continue prosecuting this action would cause severe harm to the University and the fairness of these proceedings.  For these reasons and those set forth in greater detail below, the University requests that the Court sanction Plaintiff by terminating this case, or, in the alternative, barring Plaintiff from introducing any documents and testimony from the relevant witnesses in support of Plaintiff's position at the summary judgment stage of this action or at trial.

## II.
## BACKGROUND AND PROCEDURAL HISTORY

On November 26, 2018, Plaintiff filed this lawsuit against the University and several current and former University employees, alleging six counts, including claims of discrimination, breach of contract, and negligence. *See* ECF 1 ¶¶ 95–134. The University moved to dismiss, and Plaintiff moved to amend his Complaint. *See* ECF 4 and 11. On June 5, 2019, the Court issued an Order and Memorandum Opinion dismissing Plaintiff's contract-based claims, his negligence claims, and all but one of his statutory discrimination claims. The Court granted Plaintiff leave to amend with respect to the single remaining statutory discrimination claim against the University. ECF 15 and 16.

The University filed its Answer on June 19, 2019, ECF 17, and served Plaintiff with discovery requests on July 18, 2019. Plaintiff served responses to these initial discovery requests on August 19, 2019. On August 14, 2019, Plaintiff filed a motion requesting leave to amend the Complaint a second time. *See* ECF 27. On September 17, 2019, the Court issued a Memorandum Opinion and Order, granting Plaintiff leave to file a Second Amended Complaint ("SAC") that made non-substantive changes to the First Amended Complaint. ECF 32. On October 1, 2019, the University filed its Answer to the SAC. ECF 34. On October 24, 2019, at this Court's direction, Plaintiff re-filed his Second Amended Complaint with corrections to conform with the Court's September 17 Order. ECF 41. On October 28, 2019, the University took Plaintiff's deposition; the following day, the University deposed Plaintiff's father, Tom Stafford.[1] Plaintiff's counsel also informed the University that he intends to subpoena William ("Wills") Tutecky and Blake Morton for depositions.

---

[1] For the avoidance of doubt, references in this motion to "Mr. Stafford" are to Tom Stafford, not Plaintiff.

## III.
## RELEVANT FACTS

On October 4, 2019, after the University objected to, among other things, Plaintiff's initial incomplete production of text messages in response to its document requests, Plaintiff served a supplemental document production on the University.  That production contained, among other documents, a Microsoft Excel workbook with over 6,700 entries showing communications— including text and WhatsApp messages—to and from Plaintiff (the "Text Message Log").  The Text Message Log includes communications in 2019 between Plaintiff and three of his former teammates.[2]  These communications reflect improper attempts by Plaintiff to cajole his former teammates into providing favorable witness statements, including through blatant attempts at bribery, intimidation, and coaching on the contents of the statements.

### A.       Plaintiff Pressures Witnesses to Prepare Statements in Connection with This Case

Plaintiff sent several communications in the June–July 2019 timeframe, indicating he was attempting to gather statements from former teammates Wills Tutecky, Amlan Sahoo, and Blake Morton in time for the scheduling conference in this action, which occurred on July 31, 2019. Plaintiff told Mr. Morton on June 24, 2019, for example, that "I have until July 31st to get all the stamens [sic] together, so there is no rush I just want all my statements to be in depth and chronicle every last inch of these corrupt coaches and administration."  Ex. A at line 6319.  Similarly, Plaintiff told Mr. Tutecky on July 9 that he "just need[ed] a small statement so I can have going into my conference on the 31st."  Ex. A at line 6446.  Two days earlier, in commenting to Mr. Tutecky regarding changes that he believed were necessary to Mr. Tutecky's statement, Plaintiff

---

[2]  The portions of the Text Message Log including the relevant communications are attached hereto at Exhibit A.

said: "The judge will look at a lot of the things you said [in the statement] and will find them 'frivolous' as he stated with a lot of the allegations I threw at them."  Ex. A at line 6409.

Plaintiff's overarching goal in gathering the witness statements was to make use of them in the proceedings pending before this Court.  Plaintiff admitted as much in his deposition.[3]  *See* Ex. B at 325:8-9 (Plaintiff testifying that he "realized how important [Mr. Sahoo's] statement was going to be" for Plaintiff's position before this Court); Ex. B at 309:14-15 (Plaintiff testifying that he was gathering the statements in advance of the July 31 scheduling conference because he "wanted to be ready").

**B.    Plaintiff Attempts to Bribe Wills Tutecky into Providing a Statement Discussing Topics Handpicked by Plaintiff**

Plaintiff's communications with Mr. Tutecky reflect blatant attempts to bribe Mr. Tutecky into providing Plaintiff with a favorable statement.  After Mr. Tutecky sent Plaintiff a first draft of his statement, Plaintiff wrote to him on June 23: "Thank you bro for the document. I will look at tomorrow in it's [sic] entirety ***to make it juicer*** [sic].  I want you to go in and talk about Nicole early and how she knew of everything that went on with me and you.  I want you to talk more in TIMELINE in terms of everything you experienced from the moment you got there to the end and WHY you decided to transfer."  Ex. A at line 6314 (emphasis added).  The next day, Plaintiff again texted Mr. Tutecky regarding the contents of his statement, writing: "Like it would be good if you could put this document in a date format and make it more of a story more than anything instead of bullet points and summary."  Ex. A at line 6316.  After Mr. Tutecky sent Plaintiff another draft of his statement, Plaintiff texted on July 7 that "[i]t looks really good.  We might have to shorten

---

[3]  Cited excerpts from the transcript of Plaintiff's deposition are attached hereto at Exhibit B. The University has redacted from Exhibit B personally identifying information and confidential personal information.

it and highlight the important things.  The judge will look at a lot of things you said and will find

them 'frivolous' as he stated with a lot of the allegations I threw at them."  Ex. A at line 6408.

Plaintiff then told Mr. Tutecky he would follow up the next day with additional feedback, but that

he believed "the first paragraph" of the statement was "awesome."  Ex. A at lines 6411–6415.  Mr.

Tutecky responded by asking, "How did I do overall?  Better than the first one?"  Ex. A at lines

6416–6417.  Plaintiff responded:  "Yes, I like when you talked about how [student name redacted]

and Nero and all of them weren't doing anything."  Ex. A at line 6418.

On July 9, 2019, Plaintiff texted Mr. Tutecky "the main things needed to be talked about"

in Mr. Tutecky's statement.  Ex. A at line 6436.  He then sent Mr. Tutecky the following list:

> 1. Meeting with Nicole.
> 2. Constant racism and harassment [sic] from players with Mac and Damien knowing about it.
> 3. The racism that happened with me and what you saw and how all the officials knew about what was going on.
> 4. Macpherson never being there and leaving [student name redacted] to terrorize the people of color.

Ex. A at line 6441.  Mr. Tutecky responded by writing, "Speak from the 'Light-skin perspective,'"

to which Plaintiff replied, "Let's start with that."  Ex. A at lines 6442–6443.  Plaintiff also provided

Mr. Tutecky with detailed feedback on the draft, telling him that he "[l]oved 'Speak from the

"Light-skin perspective,"'" and that he should "[k]eep the first paragraph" and "[k]eep the last

paragraph where you talk about Nero."  Ex. A at lines 6445, 6447, 6451.  Plaintiff also told Mr.

Tutecky: "That was unbelievable . . . When you said . . . You weren't black how does it relate to

you."  Ex. A at lines 6456–6458.  Later that day, Plaintiff told Mr. Tutecky: "You don't need to

make [the statement] super lengthy just solid . . . Appreciate all your help bro . . . Your [sic] a real

g . . . ***Trust when I'm successful you will. E [sic] rewarded***."  Ex. A at lines 6465–6468 (emphasis

added).  When asked about this statement at his deposition, Plaintiff testified that "I've had talks

with [Mr. Tutecky] about bringing him on my [tennis] team, you know, as like – you know, just someone on the part of my team." Ex. B at 316:14-17.

When asked at his deposition about the list of topics he sent Mr. Tutecky for inclusion in his statement, Plaintiff explained that Mr. Tutecky "wasn't completely aware of exactly what the lawsuit entailed and . . . the things that were important and the things that I wanted to zero in on." Ex. B at 312:20–313:1.  Plaintiff also testified that Mr. Tutecky "sent me a couple drafts" and that "I told him, you know, what works and what doesn't work." Ex. B at 337:16-20.

On July 11, Mr. Tutecky texted Plaintiff and reported that he had "***exaggerated all the racism*** and I spoke from a 'light skin perspective' . . . ***Just like you said***." Ex. A at lines 6499–6500 (emphasis added).  Plaintiff responded: "My brother . . . When I'm successful with this ***I got you with a weekend in New York everything paid for vip everything***." Ex. A at lines 6502–6503 (emphasis added).  When questioned at his deposition regarding this offer of a "VIP" trip, Plaintiff testified that "basically I was saying . . . you've been a strong supporter of me overall, I appreciate . . . all the help that you've given to me in the case as well." Ex. B at 310:9-12.  Plaintiff also explained that Mr. Tutecky's reference to "exaggerat[ing] all the racism" allegedly referred to Plaintiff's own instruction to Mr. Tutecky not to

> sugarcoat the racism.  Like, you know, talk about that stuff.  You know, talk about the things you endured.  Because he was never subjected to racism—that's what he told me, he was never subjected to racism until he got to GW.  So, you know, I told him . . . don't shy away from . . . talking about the racism and . . . all these things that happened to you.  This is important.

Ex. B at 319:8-18.

Plaintiff also wrote to Mr. Tutecky:  "U remember when I said I'm gonna be big one day . . . I can get u big too." Ex. A at lines 6526–6527.  Plaintiff then told Mr. Tutecky he was planning on shooting a documentary, and that "[a]ll you need is exposure/ publicity." Ex. A at

lines 6543–6544.  Mr. Tutecky responded: "We gon be legends," to which Plaintiff replied "Ex. Higher ranking, lawsuit."  Ex. A at lines 6546–6547.

Plaintiff also offered Mr. Tutecky a bribe in exchange for Mr. Tutecky's assistance in contacting Mr. Sahoo on Plaintiff's behalf.  On July 16, 2019, Plaintiff instructed Mr. Tutecky to tell Mr. Sahoo "your [sic] pissed and you're not gonna talk to him anymore if he doesn't contact me . . . I just neee [sic] this fuck to contact me . . . I need his fucking statement . . . That's all . . . I hate to use you as third party."  Ex. A at lines 6656–6662.  Mr. Tutecky responded: "All good bro . . . I got u . . . Just how we started… from Day 1 . . . He [Mr. Sahoo] is saying that he will call u at 4."  Ex. A at lines 6664–6667.  Plaintiff responded, "Thank u my guy!! . . . I told you **when I get that bag . . . I split it with u**."  Ex. A at lines 6669, 6671–6672 (emphasis added).  Plaintiff admitted at his deposition that "that bag" referred to a bag of money.  Ex. B at 331:7-14.  He further testified that "this lawsuit has been very long and I've also been dealing with trying to become a professional tennis player.  So along with everything that he's done for me, you know, I always wanted to sort of show my appreciation to him and, you know, keep it going."  Ex. B at 332:20–333:3.

The day after Plaintiff offered to split "that bag" of money with Mr. Tutecky, Mr. Tutecky sent him a revised statement.  The new draft included several edits, apparently in response to Plaintiff's earlier feedback.  For example, Mr. Tutecky added a paragraph detailing Mr. Tutecky's experience being harassed by another teammate, as well as additional, specific events concerning purported racism on the tennis team.  *See* Stafford000454–55.  The draft added that "[t]he tennis team was a very hostile environment, which included blatant racism, slander, bullying, and harassment from the coaching staff and players," a statement that clearly echoes Plaintiff's hostile environment allegations in this action.  *See id.* at Stafford000455.

While the Text Message Log does not contain communications after July 18, 2019 (although the University has requested them), emails produced by Plaintiff indicate that Mr. Tutecky sent Plaintiff three additional drafts of his statement, on July 22, August 18, and August 19, respectively. These drafts made substantive edits, such as adding several paragraphs listing "Specific Names/Outside Sources," in which Mr. Tutecky detailed additional instances of students "defaming" Plaintiff. Stafford001814, at Stafford001818. The August drafts added, among other things, a statement regarding purported "white supremacist" leanings by a former assistant coach of the tennis team, *see* Stafford000464, at Stafford000469, and references to an alleged meeting between Mr. Tutecky and former Athletic Director Patrick Nero, at which Mr. Nero supposedly asked questions that made Mr. Tutecky uncomfortable, *see* Stafford000714, at Stafford000721.

**C.     Plaintiff Threatens Amlan Sahoo with "Evidence Against" Him, and with Withdrawal of Favors Plaintiff Had Previously Given Him**

Plaintiff intimidated Mr. Sahoo into providing him with a witness statement. On June 14, 2019, Plaintiff told Mr. Sahoo: "I'm glad we cleared everything up yesterday. But please for love of everything and for the 100th time, stop being sneaky and stop lying to me about things that are going on. We work well when we're in agreement with each other. Just be 100 with me I don't care what comes up, I got you." Ex. A at line 6299. On June 20, Plaintiff texted Mr. Sahoo: "Formal statement by Sunday. Essay format, professional." Ex. A at line 6306. On June 23, Plaintiff asked, "Yo is your statement ready?" Ex. A at line 6313. On July 4, Plaintiff again followed up and wrote: "I expect your witness statement by this weekend." Ex. A at line 6360. The same day, he wrote: "I don't have time for a call, just please do your statement by Saturday so I don't have to subpoena. I've already sent a subpoena to mike Lonergan [sic]." Ex. A at line 6365. On July 7, Plaintiff contacted Mr. Sahoo again and wrote, "Ok dude I'm going to have to

subpoena you.  I will have my lawyer find your address." Ex. A at line 6379.  Plaintiff admitted

that, at this time, he "didn't have a lawyer.  I was, you know, probably referring to, you know, just

myself, just people I was, you know, working with." Ex. B at 344:8-10.  Plaintiff clarified he was

referring to "a paralegal," i.e., Kevin Hall.  Ex. B at 344:15-19.

Mr. Sahoo eventually responded on July 7, noting that "I wasn't ignoring I will send it to

you today." Ex. A at line 6383.  Plaintiff responded and said: "Just send me it and you won't have

to hear anything else from me. . . . You looked me in the face you told me you would have it ready

by yesterday . . . . So please send me it today (not rushed, a clear concise statement)." Ex. A at

lines 6384–6385.  Mr. Sahoo did not respond, and on July 8, Plaintiff texted him again, saying:

"Actually never mind. Expect a subpoena . . . . *I have evidence against you by the way*." Ex. A

at lines 6421–6422 (emphasis added).  Mr. Sahoo responded: "Sending it….", Ex. A at line 6423,

to which Plaintiff responded: "Still gonna send a subpoena . . . So then you're forced to comply

within a period of time." Ex. A at lines 6424–6425.

Plaintiff also threatened and intimidated Mr. Sahoo via Mr. Tutecky.  On July 11, Plaintiff

texted Mr. Tutecky: "BTW this nigga Amlan still hasn't picked up or hit me up." Ex. A at line

6505.  On July 16, Plaintiff told Mr. Tutecky to "[m]essage Amlan . . . And say this . . . 'Why

haven't you sent your statement to Jabari?'  Don't say anything else." Ex. A at lines 6563–6566.

Plaintiff further directed Mr. Tutecky: "And when he responds don't respond to him just let me

know." Ex. A at line 6568.  On July 16, Plaintiff texted Mr. Tutecky again with two additional

messages to send to Mr. Sahoo, the first of which read, "'Amlan, you will be subpoenaed within

the next few days or weeks.  Your story is also going to be in the WS along with your name.'" Ex.

A at line 6585.[4]  The second message read: "'You should probably contact Jabari because he's

trying to help you and to this [sic] the right way.'"  Ex. A at line 6587.  Plaintiff also remarked on

Mr. Sahoo's unresponsiveness to the texts, stating that "I'm gonna go to college park when I get

back . . . And catch [Mr. Sahoo] when he's not expecting t [sic] . . . Catch a nigga slippin."  Ex. A

at lines 6604–6608.  Plaintiff also instructed Mr. Tutecky to tell Mr. Sahoo, "'Jabari has received

over 20 pieces of key evidence from you.  He has your police reports.  If you try to be untruthful,

he will present that information.'"  Ex. A at line 6622–6623.  Plaintiff testified at his deposition

that Mr. Sahoo "was not answering his phone" at this time and "was still sort of talking to the

opposition."  Ex. B at 327:11-14.  Plaintiff, accordingly,

> was . . . getting a little concerned whether he was relaying information, you know,
> elsewhere . . . . So . . . it was basically just, you know, to tell [him] . . . if you're
> going to be untruthful or, you know, if you're going to try to, you know, play both
> sides, you know, you need to remember that you sent me all of this information.
> And this could be a major problem if you try and deviate from, you know, the
> energy that you've given me.

Ex. B at 327:16–328:9.  Plaintiff clarified that the "opposition" he was referring to included

"multiple former teammates" and "you guys," referring to the University and its counsel.  Ex. B

at 328:12-17.

As noted above, on July 16, 2019, Plaintiff instructed Mr. Tutecky to tell Mr. Sahoo "your

[sic] pissed and you're not gonna talk to him anymore if he doesn't contact me . . . I just neee [sic]

this fuck to contact me . . . I need his fucking statement . . . That's all . . . I hate to use you as third

party."  Ex. A at lines 6656–6662.  Later on July 16, Plaintiff told Mr. Tutecky that he had spoken

to Mr. Sahoo and had "ripped in . . . . Man I [g]ave him the truth."  Ex. A at lines 6684, 6686–

6687.  Mr. Sahoo later told Plaintiff he needed "a little more time" on the statement.  "I will finish

---

[4]  At his deposition, Plaintiff testified that by "WS" he actually meant *Washington Post*."  Ex.
B at 325:16–326:9.

it tonight I'm already working on it.  You will see it by tomorrow morning but I will have it done TONIGHT."  Ex. A at line 6693.  When asked at his deposition if he gave Mr. Sahoo comments on Mr. Sahoo's witness statement, Plaintiff testified that "I probably did.  I probably told him that, you know, some of the things in the statement were good."  Ex. B at 347:5-7.  Plaintiff also testified that Mr. Sahoo "always called me for advice and he wanted to also train with me when he got out of the school.  And he did actually come to Philadelphia for a couple of days to train with me." Ex. B at 334:22–335:3.  When Plaintiff spoke with Mr. Sahoo about his statement, he made clear to him that, in light of "the amount of time and advice that I've given him throughout the years," Plaintiff expected Mr. Sahoo "to just be forthright with me going forward and . . . [not] bullshit me anymore" by continuing to withhold his statement from Plaintiff.  Ex. B at 335:8–336:9. Plaintiff also testified that, at this time, he and Mr. Sahoo were discussing splitting training and accommodation costs if they were to train together, and that Plaintiff still believed Mr. Sahoo was avoiding giving Plaintiff his statement.  *See* Ex. B at 340:9-12, 341:13-18, 342:1-10.

**D.    Plaintiff Coaches Blake Morton on the Contents of His Statement and Attempts to Ensure Their Communications are Not Discoverable**

Plaintiff sought a statement from Mr. Morton and coached him on its contents.   On February 14, 2019, Plaintiff wrote to Mr. Morton: "Hey Blake I recently filed a lawsuit against Various members of the athletic department and [student name redacted].  I heard you left GW on your own terms due to racism; you were not asked to leave.  Is this true?"  Ex. A at line 6242. Mr. Morton asked what Plaintiff needed from him, and Plaintiff responded: "Just wanted to get my witness list together.  You were present amongst some of the things that happened.  Such as when Greg brought us all in and asked us what we all have in common which was being Americans."  Ex. A at line 6244.   After Plaintiff explained the lawsuit, Mr. Morton wrote, "Whatever you need I gotchu."  Ex. A at lines 6245–6246.  Plaintiff responded: "Send me your #

*we should talk over phone so there's no trail*." Ex. A at line 6247 (emphasis added). Plaintiff

explained that he was advised to avoid creating a "trail" by his father and Kevin Hall, the

"paralegal" with whom he was working. Ex. B at 349:15–351:8. On June 23, Plaintiff wrote to

Mr. Morton: "Hey man hope you haven't forgotten about your formal statement. If you could send

that in by tonight or tomorrow morning that would be great." Ex. A at line 6311. After Mr. Morton

sent his statement, Plaintiff responded with feedback, writing:

> The statement was perfect by the way. If you could when you get the chance, just
> talk in depth about the meeting me you and [student name redacted] had where he
> talked about how he hated Americans. If you could also maybe talk about any
> 'racism' you experienced ( I knew you brought up the whole genitalia thing) and
> that's perfect but if there were any instances of real racism you knew of that would
> be perfect. If you could talk more in depth about that group chat about opinions of
> me that would be great too.

Ex. A at line 6318. At his deposition, Plaintiff acknowledged that he "instructed [Mr. Morton],

Hey, man, you know, don't hold back on any racism that you might have experienced. You know,

that's important. You should put that in the statement." Ex. B at 355:5-9.

**E.      Plaintiff and Mr. Stafford Behave Inappropriately at Mr. Stafford's Deposition**

On October 29, 2019, the University deposed Mr. Stafford. Plaintiff attended

Mr. Stafford's deposition and behaved disruptively throughout the proceedings. When

Mr. Stafford was asked whether Plaintiff missed the tennis team photo session because he had

been late in returning to campus for the start of the school year, Plaintiff audibly said "that's not

true." Ex. D at Video 2 13:26:42–13:31:29.[5] When Mr. Stafford was asked whether, as stated in

Plaintiff's appeal of his academic suspension, Mr. Stafford and his wife had marital problems, Mr.

Stafford became enraged, and Plaintiff rose from his seat, gestured with his arms, and told him to

---

[5]  Cited excerpts of the video of Mr. Stafford's deposition are available on a DVD which the
University will file with the Clerk's Office following the electronic filing of this Memorandum
of Points and Authorities.

calm down.  Plaintiff and his father also laughed audibly at several points during the deposition—

for example, when Mr. Stafford was asked whether Torrie Browning had been named the A-10's

Coach of the Year.  Ex. D at Video 2 13:25:07–13:26:42.  Plaintiff also laughed aloud when

Plaintiff's father was asked whether he had conversations with Ms. Early in which he was "not

totally accurate," Ex. D at Video 1 10:41:56–10:43:02; when Plaintiff's father stated that a former

coach had asked Plaintiff's father, "What, do you want to bang my wife or something?"  Ex. D at

Video 1 11:04:04–11:05:30; and when Plaintiff's father referred to a University employee as a

"gatekeeper," Ex. D at Video 1 11:06:40–11:08:55.

Mr. Stafford himself also engaged in obstructionist and often obscene behavior during his

deposition[6] that by his own admission was "[n]ot at all" professional.  Ex. C at 273:13-16; Ex. D

at Video 3 16:17:17–16:18:14.  He screamed at counsel throughout the deposition, often cursing,

mocking counsel and witnesses, and using obscenities.  *See, e.g.*, Ex. C at 198:8-12 ("Didn't I just

tell you it was a false statement that I never had any marital problems?  Didn't I just tell you that?

Can somebody get some hearing aides [sic] so this guy can hear."); Ex. C at 199:5-7 ("What do

you mean, why did I go there?  It's a fucking hotel and I needed a place to stay."); Ex. D at Video

1 12:15:12–12:16:50 (testimony by Mr. Stafford including a mocking impression of Nicole Early).

He also deliberately refused to provide relevant information, often taunting counsel and lying in

the process.  For example, off the record, Mr. Stafford stated that he had remembered the first

name of a "Mr. Lightfoot."  When the University's counsel asked him to wait to provide the name

until the deposition was back on the record, Mr. Stafford refused.  Once back on the record, the

University's counsel asked Mr. Stafford to provide the name, and he testified falsely: "I don't

---

[6]  Cited excerpts from the transcript of Mr. Stafford's deposition are attached hereto at Exhibit
C.  The University has redacted from Exhibit C personally identifying information and
confidential personal information.

remember."  Counsel for Plaintiff had to make a statement on the record about Mr. Lightfoot's first name.  Ex. C at 107:17–108:8; Ex. D at Video 2: 12:27:39–12:28:00.  When counsel asked about Mr. Stafford's bank statements showing a stay at the Four Seasons in Baltimore (which Plaintiff had produced as evidence of "damages"), Mr. Stafford replied, "What do you mean, why did I go there?  It's a fucking hotel and I needed a place to stay."  Ex. C at 199:5-7; Ex. D at Video 3 14:38:30–14:39:50.  When asked whether he told Nicole Early that he thought Coach Browning was jealous of Plaintiff because he was "rich and good looking," Mr. Stafford engaged in an extended monologue, telling the University's counsel that "[y]ou are not going to get me to say some damaging bullshit so you can use it on me later on."  Ex. C at 101:3–102:13; Ex. D at Video 1 12:15:12–12:16:50.

When asked about payments he had made to "paralegal" Kevin Hall, Mr. Stafford initially denied that he had made any payments related to Mr. Hall's work on this case.  Ex. C at 192:1-12. When confronted with the fact that Mr. Hall had sent an email with the subject "Re: my pay for work on GWU case" in which he referred to payment received from Mr. Stafford, Stafford000724, Mr. Stafford shouted,

> You don't determine what I give people in my life.  You don't determine how I deal with people in my life who are friends of mine or whatever.  Who the hell do you think you are? . . . I am not going to answer your question.  Because it's the same bullshit you've been trying to get out of me for the last five or ten minutes. It's none of your business.  And you can put that in the record.

Ex. C at 208:7-20; Ex. D at Video 3 15:06:05–15:10:05.  In the same exchange, Mr. Stafford referred to the University's counsel as a "chump."  Ex. C at 209:16.  When asked about the marital problems Plaintiff cited in his appeal of his academic suspension as a reason for his poor academic performance, Plaintiff's father yelled, "You know, that's a slippery slope for you.  That's something that you don't need to go down because that's personal."  Ex. C at 196:20-22; Ex. D at Video 3 14:35:27–14:38:26.  When asked a follow-up question about whether he was involved

with Plaintiff's academic appeal, he shouted, "Let's not get too involved in that kind of shit because that's my family and that is personal shit.  You are not going to go down that road with me.  That ain't got nothing to do with a hostile environment.  Don't play those games with me, man."  Ex. C at 197:7-13; Ex. D at Video 3 14:35:27–14:38:26.

**F.       Plaintiff and Mr. Stafford Behave Inappropriately at Plaintiff's Deposition**

Plaintiff's conduct at his own deposition was patently inappropriate.  He laughed at some of the same questions that elicited laughter from his father, such as a question regarding a text message in which Plaintiff referred to Mr. Sahoo as "a fuck" and said "I need his fucking statement."  Ex. B at 329:13–330:9.  Moreover, when Plaintiff was asked for the basis of his statement that the entire GW athletics department knew about a former coach's supposed drug and alcohol use, Plaintiff paused and looked at his father for direction.  Ex. B at 33:12-16.

Mr. Stafford also conducted himself inappropriately at Plaintiff's deposition.  At the outset of the deposition, the University's counsel noted the University's objection to Mr. Stafford's presence at the deposition, to which Mr. Stafford responded by laughing audibly.  The University's counsel had to ask Plaintiff's counsel to instruct Mr. Stafford not to make comments during the deposition.  Ex. B at 8:8-17.  Mr. Stafford's behavior continued throughout the deposition, and included additional audible laughter in response to the University's counsel's lines of questioning. At one point, counsel for the University noted this for the record and asked Plaintiff's counsel to instruct Mr. Stafford to refrain from this behavior.  Mr. Stafford responded by falsely claiming that he "was coughing."  Ex. B at 213:22–214:6.  Several of Mr. Stafford's outbursts came amid questioning about some of the most sensitive subjects and documents in this case.  *See, e.g.*, Ex. B at 329:13–330:9 (questions regarding text messages Plaintiff sent to Mr. Tutecky, stating that Plaintiff "nee[ded] this fuck [Mr. Sahoo] to contact me . . . . I need his fucking statement"); Ex. B at 364:7-10 (questions regarding Plaintiff referring to a teammate on Facebook as a "pussy").  At

another point in the proceedings, the University's counsel asked Plaintiff to state the source of certain information about which he had testified.  Plaintiff paused and looked at Mr. Stafford for direction.  When counsel for the University noted this on the record, Plaintiff's father audibly stated, "He wasn't looking at me," when this was patently untrue.  Ex. B at 33:12-17.

## IV.
## ARGUMENT

Courts have inherent power to impose sanctions for abusive litigation practices undertaken in bad faith, based on "'the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"  *Chambers v. NASCO, Inc*., 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)).  This power includes the power to dismiss a case where there is clear and convincing evidence that "fraudulent or bad faith misconduct occurred" and "a lesser sanction 'would not sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits.'"  *Young v. Office of U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 65 (D.D.C. 2003) (quoting *Shepherd v. Am. Broad. Cos*., 62 F.3d 1469, 1472 (D.C. Cir. 1995)).  Where a "party's 'entire course of conduct throughout the lawsuit evidence[s] bad faith and an attempt to perpetrate a fraud on the court,' the conduct is sanctionable under the inherent power of the court."  *Young*, 217 F.R.D. at 66 (citing *Chambers*, 501 U.S. at 50–51).

The D.C. Circuit has identified three "possible (although not mandatory) justifications for dismissal as a sanction for misconduct."  *Young*, 217 F.R.D. at 65 (citing *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998)).  Dismissal sanctions are appropriate where "(1) the other party has been 'so prejudiced by the misconduct that it would be unfair to require [the party] to proceed further in the case,' (2) the party's misconduct has put 'an intolerable burden' on the court by requiring the court to modify its own docket and operations in order to accommodate

the delay, or (3) the court finds it necessary 'to sanction conduct that is disrespectful to the court

and to deter similar misconduct in the future.'" *Young*, 217 F.R.D. at 65–66 (quoting *Webb*, 146

F.3d at 971). Here, Plaintiff and his father have engaged in conduct not only meriting terminating

sanctions, but necessitating them.

## A.   Dismissal of This Case Is Warranted Because Plaintiff Bribed and Intimidated Witnesses and Influenced the Contents of Their Statements

Witness tampering justifies terminating sanctions. *See Young*, 217 F.R.D. at 67–69. In

*Young*, the court determined that the plaintiff's brother offered bribes to one potential witness to

testify on the plaintiff's behalf, and that the plaintiff herself asked another witness to offer

testimony regarding events of which he had no personal knowledge. *Id.* The court deemed this

conduct sufficient to merit dismissal of the case, concluding that the plaintiff's "attempt to

influence a witness to fabricate testimony, coupled with [the plaintiff's] complicity in the

attempted bribe of another witness, warrants the most serious sanction of dismissal." *Id.* at 69.

Other courts agree that witness tampering is serious misconduct justifying terminating

sanctions. For example, in *Ramirez v. T&H LeMont, Inc.*, 845 F.3d 772 (7th Cir. 2016), the court

affirmed the imposition of terminating sanctions against the plaintiff for bribing a witness in

exchange for false testimony. *Id.* at 781–82. As another court has explained, "[i]t is difficult to

contemplate a clearer or more abhorrent example of a litigant's attempt to abuse and subvert the

integrity of the judicial process than an effort to suborn perjury from a material witness." *Lee v.

Sass*, No. 04-70550, 2006 WL 799176 at *2 (E.D. Mich. Mar. 29, 2006) (granting terminating

sanctions). *See also Emerson v. Dart*, 900 F.3d 469, 473 (7th Cir. 2018) (affirming imposition of

terminating sanctions for witness tampering, and explaining that party's threat "was a bald effort

to 'keep witnesses from testifying' . . . and we have long held that 'witness tampering is among

the most grave abuses of the judicial process'") (citation omitted).

Here, Plaintiff offered bribes to Mr. Tutecky, intimidated and offered a bribe to Mr. Sahoo, and directed the contents of their statements and that of Mr. Morton, all in an effort to obtain favorable statements that Plaintiff believed would bolster his case before this Court.

In order to obtain a favorable statement from Mr. Tutecky, Plaintiff made numerous promises to Mr. Tutecky regarding the rewards he would receive for helping plaintiff with his case. He told Mr. Tutecky he could "trust" that when Plaintiff was "successful," Mr. Tutecky would be "rewarded." Ex. A at lines 6465–6468. Plaintiff promised Mr. Tutecky a "VIP" trip to New York when Plaintiff was "successful with this," a clear reference to this litigation. Ex. A at lines 6502–6503. And Plaintiff promised Mr. Tutecky that the two of them would split "that bag," referencing a bag of money, presumably to be obtained from this litigation. Ex. A at lines 6669, 6671–6672. Plaintiff admitted during his deposition that he had spoken with Mr. Tutecky about the possibility of giving him a position on Plaintiff's tennis team in light of "all the support" Mr. Tutecky has provided Plaintiff, "and especially when he sent that statement." Ex. B at 316:11-20. In conjunction with these bald offers of bribes to Mr. Tutecky, Plaintiff reviewed drafts of Mr. Tutecky's statement and overtly directed Mr. Tutecky as to the statement's contents. He instructed Mr. Tutecky to "exaggerate" the racism he had supposedly experienced. Ex. B at 307:10-19. He provided Mr. Tutecky with a list of topics his statement should address and instructed him on how to structure the statement and on which points to emphasize. Ex. A at lines 6436, 6441. At another point, Plaintiff said he would review Mr. Tutecky's draft statement to "make it juicer [sic]" and to ensure that this Court would not "find [Mr. Tutecky's statements] 'frivolous.'" Ex. A at lines 6314, 6408. Plaintiff's communications with Mr. Tutecky, and his testimony about them, evince a bald attempt to bribe Mr. Tutecky into offering information favorable to Plaintiff's case. The communications, moreover, reveal Mr. Tutecky to have been a

willing participant in this scheme: he sent Plaintiff multiple drafts of his statement, including drafts that incorporated Plaintiff's feedback and reflected an iterative accumulation of examples of the "hostile environment" that Plaintiff claims existed on the tennis team. Plaintiff's actions and Mr. Tutecky's receptiveness to them cast serious doubt on the accuracy of Mr. Tutecky's statement and of any testimony he may provide in this case.

Plaintiff's conduct concerning Mr. Sahoo was equally egregious. Plaintiff, both directly and through Mr. Tutecky, intimidated Mr. Sahoo into providing a statement favorable to Plaintiff in advance of the July 31 scheduling conference. Plaintiff instructed Mr. Tutecky to contact Mr. Sahoo, to tell him "your [sic] pissed," to threaten that "you're not gonna talk to him anymore if he doesn't contact me" and to threaten that Plaintiff would subpoena Mr. Sahoo if he did not send Plaintiff a statement. Ex. A at lines 6585, 6658. Plaintiff later communicated directly with Mr. Sahoo, threatening to subpoena him and claiming he had "evidence against" Mr. Sahoo. Ex. A at line 6422. Plaintiff also admitted in his deposition that he did not want Mr. Sahoo to provide assistance to the "opposition" in this action—including the University and its counsel. Ex. B at 327:10–328:17. Where Plaintiff offered Mr. Tutecky rewards, Plaintiff used intimidation and harassment to cajole Mr. Sahoo into supporting Plaintiff's position at the expense of the University's. After Plaintiff's efforts reached the point of threatening Mr. Sahoo with a subpoena, Mr. Sahoo finally sent Plaintiff a statement. This sequence of events strongly supports the inference that Mr. Sahoo drafted his statement—and shaped its contents—on the basis of Plaintiff's relentless harassment and threats. Mr. Sahoo was also very likely influenced by Plaintiff's threats to withdraw favors Plaintiff had given him up to that point. Plaintiff testified that Mr. Sahoo had wanted—and received—and opportunity to train with Plaintiff in Philadelphia, and "always called [Plaintiff] for advice." Ex. B at 334:22–335:3. When Plaintiff spoke with Mr.

Sahoo about his statement, he made clear to him that, in light of "the amount of time and advice that I've given him throughout the years," Plaintiff expected Mr. Sahoo "to just be forthright with me going forward and . . . [not] bullshit me anymore" by continuing to withhold his statement from Plaintiff.  Ex. B at 335:8–336:9.  Plaintiff's frustration with Mr. Sahoo's apparent reluctance to provide a statement was also motivated by the fact that Plaintiff and Mr. Sahoo had been discussing training together and sharing training expenses.  *See* Ex. B at 340:9-12, 341:13-18, 342:1-10.

Plaintiff's communications with Mr. Morton, while less extensive, are no less sanctionable. They evidence a clear attempt to influence the content of Mr. Morton's statement, as well as consciousness by Plaintiff that he was engaging in illicit activity.  Plaintiff told Mr. Morton that the two of them "should talk over phone so there's no trail," Ex. A at line 6247, and later fed Mr. Morton information to use in his statement about "the meeting me you and [student name redacted] had where he talked about how he hated Americans," Ex. A at line 6318.

Plaintiff's misconduct towards Messrs. Tutecky, Sahoo, and Morton is as severe, if not more so, than the misconduct *Young* and *Emerson* courts determined warranted terminating sanctions.  The plaintiff in *Young* attempted "to influence a witness to fabricate testimony" and was complicit "in the attempted bribe of another witness." *Young*, 217 F.R.D. at 69.  The court in *Emerson* recognized that "bald efforts" at witness tampering merit terminating sanctions because they are "among the most grave abuses of the judicial process."  900 F.3d at 473 (citation and internal quotation marks removed).  Here, Plaintiff offered bribes to two witnesses, harassed and intimidated a witness, and knowingly directed the content of statements by three witnesses.  When questioned regarding his conduct, Plaintiff either admitted to it or provided weak, non-credible explanations for it.  Plaintiff's conduct and testimony amount to clear and convincing evidence

that he engaged in witness tampering in an effort to bolster his position before this Court. Indeed, the reliability of the statements Messrs. Tutecky, Sahoo, and Morton provided to Plaintiff and any testimony they might offer—and of statements that any other witness may provide to Plaintiff during the balance of discovery in this case—is dubious at best in light of Plaintiff's egregious behavior. Plaintiff's conduct constitutes a blatant obstruction of the truth-seeking function of discovery, makes it impossible for the University to receive a fair trial, is "disrespectful to the court," and must be deterred through an imposition of terminating sanctions. *Young*, 217 F.R.D. at 65-66. Such an outcome is well within this Court's inherent powers to order remedies for litigation conduct undertaken in bad faith—as Plaintiff's conduct here so clearly was. *See Chambers*, 501 U.S. at 43; *Young*, 217 F.R.D. at 65.

Any attempt by Plaintiff to downplay his conduct concerning these three witnesses must fall flat in light of Plaintiff's own deposition testimony. Far from providing credible alternate explanations for the relevant text messages, Plaintiff essentially admitted that he was trying to convince all three individuals to provide information favorable to his case. Regarding Mr. Tutecky in particular, Plaintiff admitted that Mr. Tutecky's assistance with the statement was, at the very least, one of the reasons for which Plaintiff planned to reward him. Ex. B at 316:7-20. With regard to Mr. Sahoo, Plaintiff admitted that he had pressured Mr. Sahoo to provide a statement for fear that Mr. Sahoo was feeding information to "the opposition," which Plaintiff characterized as including the University and its counsel. Ex. B at 327:10–328:17. In short, Plaintiff has obstructed the truth-seeking function of discovery and admitted that he intended to influence the judicial process through his promises and threats to the relevant witnesses. Information that Plaintiff has gathered from Messrs. Tutecky, Sahoo, and Morton, and any testimony those individuals might

give in this case, have been irreversibly tainted by Plaintiff's actions.   The only remedy commensurate with this sullying of the judicial process is dismissal of this case with prejudice.

**B.      Plaintiff and Plaintiff's Father also Have Engaged in Disruptive Behavior at Their Depositions, Which Weighs Further in Favor of Terminating Sanctions**

Because a "party's 'entire course of conduct throughout the lawsuit'" is relevant to determining if it "'evidence[s] bad faith and an attempt to perpetrate a fraud on the court,'" courts also consider other types of conduct when determining whether to impose terminating sanctions. *Young*, 217 F.R.D. at 66 (quoting *Chambers*, 501 U.S. at 50–51).   Courts have found unruly or obstructionist conduct at a deposition to warrant terminating sanctions. *See, e.g.*, *Sprint Sols., Inc. v. Fils-Amie*, 83 F. Supp. 3d 1290, 1297 (S.D. Fla. 2015) (citing misconduct at depositions as support for granting motion for terminating sanctions).   In *Sprint Solutions*, the court noted that the defendant took a "disruptive approach" to his deposition, first by "fail[ing] to appear for his first scheduled deposition" and then by being "purposefully evasive" when the deposition did take place. *Id.* at 1296.   The defendant "responded that he did not recall or did not know the answers to an enormous number of questions, even when the questions referred to recent events or when such responses made no sense," and he "engaged in dilatory antics to sandbag [the plaintiff's] attorneys and run out the time for his deposition"—including "refus[ing] to look at certain exhibits." *Id.*   The defendant also "lied during his deposition." *Id.*   The court concluded that the defendant's behavior at his deposition contributed to a "finding of bad faith" sufficient to merit terminating sanctions. *Id*. at 1298.

Here, both Plaintiff and his father engaged in disruptive, evasive, and improper conduct at their depositions.   Plaintiff's conduct at Mr. Stafford's deposition involved numerous attempts to coach Mr. Stafford and influence his testimony.   For example, when the University's counsel asked Mr. Stafford whether Plaintiff returned to campus late on two separate occasions and therefore

22

missed the tennis team photo session, Plaintiff audibly said "that's not true." Ex. D at Video 2 13:26:42–13:31:29. When Mr. Stafford was asked whether, as stated in Plaintiff's appeal of his academic suspension, Mr. Stafford and his wife had experienced marital problems, Mr. Stafford became enraged, and Plaintiff rose from his seat, gestured with his arms, and told Mr. Stafford to calm down. Plaintiff also laughed audibly at several points during his father's deposition. *See, e.g.*, Ex. D at Video 2 13:25:07–13:26:42; Ex. D at Video 1 10:41:56–10:43:02; Ex. D at Video 1 11:04:04–11:05:30; Ex. D at Video 1 11:06:40–11:08:55. Plaintiff's conduct at his own deposition was equally objectionable, and included a blatant attempt to seek coaching from his father on how to answer what he apparently found to be a particularly difficult question. *See* Ex. B at 33:12-16.

Much like the defendant in *Sprint Solutions* who engaged in disruptive and evasive conduct during his deposition, Plaintiff here sought to disrupt and obstruct the truth-seeking function of *both* his and his father's depositions. Particularly when taken together with Plaintiff's bribery, intimidation, and coaching of Messrs. Tutecky, Sahoo, and Morton, Plaintiff's conduct warrants terminating sanctions.

Mr. Stafford's deposition conduct was also appalling. By his own admission, Mr. Stafford's conduct at his deposition was "[n]ot at all" professional. Ex. C at 273:13-16. He repeatedly yelled and shouted obscenities at counsel for the University throughout the deposition, and he combatively refused to answer counsel's questions. For example, while the parties were off the record, Mr. Stafford stated that he had remembered the first name of a "Mr. Lightfoot" regarding whom he had testified. When counsel for the University asked Mr. Stafford to wait to provide the name until the parties were back on the record in a few minutes, Mr. Stafford refused to do so. When the parties were back on the record, counsel for the University asked for the name, and Mr. Stafford testified that he did not remember. Plaintiff's counsel had to make a statement

on the record providing the name.  Ex. C at 107:17–108:8; Ex. D at Video 2: 12:27:39–12:28:00.

Other examples of Mr. Stafford's patently inappropriate behavior abound throughout the record of

the proceedings.  *See, e.g.*, Ex. C at 199:5-7, Ex. D at Video 3 14:38:30–14:39:50  (shouting and

using an obscenity in response to a simple question about a bank statement reflecting a stay at the

Four Seasons Hotel in Baltimore); Ex. C at 208:7-20, Ex. D at Video 3 15:06:05–15:10:05

(shouting obscenities and combatively refusing to answer a question by counsel for the University

regarding Mr. Stafford's payments to "paralegal" Kevin Hall).  Mr. Stafford's conduct at

Plaintiff's deposition was likewise egregious and included false statements, inappropriate laughter

and outbursts, and an apparent attempt to coach his son regarding a question about a former coach.

Plaintiff is complicit in Mr. Stafford's conduct at both of their depositions, for he took no steps to

prevent it and, if anything, enabled it with his own improper conduct.  Mr. Stafford's conduct only

compounds the pattern of obstructionist actions that Plaintiff himself has committed, and as such

supports the imposition of terminating sanctions.[7]

## C.  A Lesser Sanction Will Not Sufficiently Punish Plaintiff and Deter Him from Engaging in Similar Misconduct in the Future

"Coercing or seeking to obtain or manufacture false testimony 'strikes at the heart of the

judicial system.'"  *Young*, 217 F.R.D. at 71 (citation omitted).  This Court must, accordingly,

exercise the full extent of its inherent powers and dismiss this case.  Any sanction short of dismissal

would fail to fully remedy Plaintiff's misconduct and prevent it from recurring and would unfairly

prejudice the University, which has been denied its right to a fair proceeding.  Not only did Plaintiff

---

[7]  Plaintiff further subverted the judicial system by authorizing Mr. Hall—whom Plaintiff referred to as "my lawyer" as late as July 7, 2019, *see* Ex. B at 344:2-19—to engage in what may have been the unauthorized practice of law while Plaintiff represented to this Court that he was proceeding *pro se*.  Ex. C at 205:22–206:20.  And Mr. Stafford appears to have lied about making his payments to Mr. Hall for his work before ultimately shouting at counsel, "I am not going to answer your question. . . .  It's none of your business."  Ex. C at 208:15-19.

interfere with witnesses and depositions, he also discouraged witnesses from cooperating with the University.  *See* Ex. B at 327:10–328:17.  Monetary sanctions would be "inherently inadequate to remedy the harm to the public interest in preserving the integrity of the courts and in deterring future misconduct."  *Young*, 217 F.R.D. at 70 (citing *Derzack v. Cty. of Allegheny*, 173 F.R.D. 400, 417 (W.D. Pa. 1996)).   Moreover, monetary sanctions would permit Plaintiff to treat the consequences of his actions merely as a cost of doing business.  As the *Young* court recognized, "the imposition of monetary sanctions alone would suggest that money could cure litigation misconduct . . . including witness tampering and suborning perjury" and that "[t]o impose only a monetary sanction would be 'an open invitation to abuse the judicial process.'"  *Young*, 217 F.R.D. at 70 (citation omitted).  Here, Plaintiff has already flagrantly abused the judicial process by bribing, intimidating, and coaching witnesses, and by engaging in improper conduct at his deposition and permitting his father to engage in similar deposition conduct.  With his egregious conduct, Plaintiff has attempted to subordinate the truth-gathering function of the discovery process to Plaintiff's own desire to win this lawsuit.  Monetary sanctions would only encourage further abuses by Plaintiff by signaling to him that obstructive conduct will carry few real consequences so long as he can foot the bill.[8]

A protective order would also be inadequate here.  On one level, it would not sufficiently prevent further misconduct by Plaintiff, who has already demonstrated utter disregard for the integrity of the judicial process.  *See Young*, 217 F.R.D. at 70 (protective order inadequate where party who engaged in discovery misconduct acted in a way that made it "extremely unlikely that [she] would obey a protective order").  This concern is particularly salient here, given that Plaintiff

---

[8]  This risk is all too real given Plaintiff's father's assertion of his wealth during his deposition testimony.  *See* Ex. C at 201:6-13 ("I can care less what kind of money that Jabari makes in tennis because I got my own paper. . . . Do you want to know what paper means? . . . Money.").

intends to depose Messrs. Tutecky and Morton, and may attempt to depose Mr. Sahoo as well. He presumably will seek testimony from all three witnesses that is consistent with their procured statements. On another level, a protective order would not sufficiently punish Plaintiff for the misconduct in which he has already engaged. *See id.* Where "substantial harm already has resulted from plaintiff's misconduct . . . to the institutional integrity of the judicial process," a protective order is insufficient to remedy such discovery violations. *Id.* Here, a protective order would not cure the taint that Plaintiff's conduct has imbued in the witness statements themselves, as well as in his and his father's own testimony.

Issue-related sanctions—such as adverse evidentiary rulings or the taking of certain facts as established—would be inadequate here for similar reasons. *See Young*, 217 F.R.D. at 70 (rejecting issue-related sanctions and finding that "dismissal is the appropriate sanction where a party manufactures evidence which purports to corroborate its substantive claims" (citation and internal quotation marks omitted)). Here, a lesser sanction such as an adverse evidentiary ruling, though it may address concerns about the use of the tainted witness statements, would not remedy the untrustworthiness of any deposition testimony given by Messrs. Tutecky, Sahoo, and Morton, nor would it sufficiently punish Plaintiff for his grave misconduct. Terminating sanctions are the only outcome that will adequately remedy Plaintiff's misconduct and deter similar future misconduct.

**D.     If the Court Does Not Dismiss This Case, It Should Preclude Plaintiff from Introducing Any Testimony, Information or Documents from Messrs. Tutecky, Sahoo, and Morton, and from Introducing any Testimony from Plaintiff and his Father**

For the reasons set forth above, terminating sanctions are the most appropriate remedy for Plaintiff's misconduct in this case. Should this Court disagree, however, it should still issue a protective order pursuant to its authority under Federal Rule of Civil Procedure 26(c)(1) and its

26

inherent powers, and an order *in limine* pursuant to its authority under Federal Rule of Evidence 403. Should the Court issue these orders, the University respectfully requests that the orders bar Plaintiff from introducing (either in summary judgment briefing or at trial) any testimony, information, or documents obtained from Messrs. Tutecky, Sahoo and Morton. Plaintiff's misconduct is such that this Court can have little confidence in the trustworthiness of information that Plaintiff has elicited or will elicit from these witnesses. A protective order and an order *in limine* would at least reduce the risk that Plaintiff's blatant efforts to damage the integrity of the judicial system will unfairly skew the outcome of this case. *See Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1325 (D. Utah 2016) (granting protective order excluding certain evidence that was "improperly obtained," on the basis that the use of that evidence would prejudice the moving party). For similar reasons, the University respectfully requests that any protective order and order *in limine* this Court issues also bar Plaintiff from introducing the deposition testimony of Plaintiff and his father in seeking or opposing summary judgment, or at trial.

## V.
## CONCLUSION

For the foregoing reasons, the University respectfully requests that this Court impose case-terminating sanctions and dismiss Plaintiff's Second Amended Complaint with prejudice. In the alternative, should this Court decide that terminating sanctions are not appropriate, the University respectfully requests that the Court issue a protective order and an order *in limine* barring Plaintiff from introducing (either in summary judgment briefing or at trial) documents or testimony from Messrs. Tutecky, Sahoo, and Morton. The University further requests that the Court issue a protective order and an order *in limine* barring Plaintiff from introducing the deposition testimony of Plaintiff and Mr. Stafford in seeking or opposing summary judgment, or

at trial.  The University further requests that the Court order Plaintiff to pay the attorneys' fees and

costs incurred by Defendant in connection with this Motion.

Dated: November 5, 2019               Respectfully submitted,

/s/ *Jason C. Schwartz*
Jason C. Schwartz (DC Bar No. 465837)
Matthew P. Sappington (DC Bar No. 1616305)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:  202.955.8500
Facsimile:  202.530.9522
jschwartz@gibsondunn.com
msappington@gibsondunn.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I, Jason C. Schwartz, attorney for Defendant, hereby certify that on this 5th day of November, 2019, I caused the foregoing document and its attachments to be served via electronic mail on counsel for Plaintiff in the above-captioned matter.


/s/ *Jason C. Schwartz*
Jason C. Schwartz