## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JABARI STAFFORD,

                Plaintiff,

v.

THE GEORGE WASHINGTON
UNIVERSITY,

                Defendant.

Case No. 1:18-cv-02789-CRC

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## <u>DEFENDANT'S MOTION FOR CASE-TERMINATING SANCTIONS</u>

# TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** ................................................................. iii

**I. INTRODUCTION** ....................................................................... 1

**II. BACKGROUND AND PROCEDURAL HISTORY** ................................... 3

**III. RELEVANT FACTS** ................................................................. 6

    A.   Plaintiff Bribes Wills Tutecky Into Providing A Favorable Witness Statement ............ 6

    B.   Plaintiff And Tutecky Intimidate A Female Tennis Player In An Attempt To
Procure Favorable Testimony ................................................................. 8

    C.   Plaintiff and Tutecky Engage In "Blackmail" Of Amlan Sahoo ................................ 10

    D.   Forensic Analysis Of Tutecky's iPhone Reveals That All Of His July 2019 Text
Messages With Plaintiff Are Missing ......................................................... 15

    E.   Plaintiff Attempts To Ensure His Communications With Blake Morton Are Not
Discoverable ................................................................................... 15

    F.   Plaintiff And Mr. Stafford Behave Inappropriately At Mr. Stafford's Deposition....... 16

    G.   Plaintiff And Mr. Stafford Behave Inappropriately At Plaintiff's Deposition ............. 18

    H.   Plaintiff And His Counsel Violate This Court's No-Contact Order ............................ 19

**IV. ARGUMENT** ....................................................................... 21

    A.   This Case Must Be Dismissed Given Plaintiff's And His Attorney's Flagrant
Violations Of This Court's No-Contact Order................................................. 22

    B.   Dismissal Also Is Warranted Because Plaintiff Bribed and Intimidated
Witnesses ...................................................................................... 23

    C.   Dismissal Also Is Warranted Because Plaintiff And Tutecky Engaged In
Spoliation ...................................................................................... 27

    D.   Plaintiff And Plaintiff's Father Engaged In Disruptive Behavior At Their
Depositions, Which Weighs Further In Favor Of Case-Terminating Sanctions.......... 29

    E.   A Lesser Sanction Will Not Sufficiently Punish Plaintiff And Deter Him from
Engaging In Similar Misconduct In The Future ............................................. 31

F.   If The Court Does Not Dismiss This Case, It Should Sanction Plaintiff In
     Several Other Respects. ............................................................................... 34

**V. CONCLUSION**.................................................................................................. **35**

# TABLE OF AUTHORITIES

**Cases**

*Adorno v. Port Auth.*,
 258 F.R.D. 217 (S.D.N.Y. 2009) ............................................................................................28

*Borum v. Brentwood Village, LLC*,
 332 F.R.D. 38 (D.D.C. 2019)....................................................................................................28

*\*Chambers v. NASCO, Inc.*,
 501 U.S. 32 (1991).....................................................................................................21, 26, 29

*Clarke v. Wash. Metro. Area Transit Auth.*,
 904 F. Supp. 2d 11 (D.D.C. 2012) ..........................................................................................21

*Derzack v. Cty. of Allegheny*,
 173 F.R.D. 400 (W.D. Pa. 1996) ..............................................................................................32

*\*Emerson v. Dart*,
 900 F.3d 469 (7th Cir. 2018) .............................................................................................23, 26

*Lee v. Sass*,
 No. 04-70550, 2006 WL 799176 (E.D. Mich. Mar. 29, 2006) ...............................................24

*Leon v. IDX Systems Corp.*,
 464 F.3d 951 (9th Cir. 2006) ...................................................................................................28

*Link v. Wabash R. Co.*,
 370 U.S. 626 (1962).................................................................................................................21

*\*Milke v. City of Phoenix*,
 No. CV-15-00462, 2020 WL 6383252 (D. Ariz. Oct. 30, 2020).................................... *passim*

*Ramirez v. T&H LeMont, Inc.*,
 845 F.3d 772 (7th Cir. 2016) ...................................................................................................23

*Shepherd v. Am. Broad. Cos.*,
 62 F.3d 1469 (D.C. Cir. 1995)..................................................................................................21

*\*Sprint Sols., Inc. v. Fils-Amie*,
 83 F. Supp. 3d 1290 (S.D. Fla. 2015) ......................................................................................29

*\*Webb v. District of Columbia*,
 146 F.3d 964 (D.C. Cir. 1998).............................................................................................21, 22

*Xyngular Corp. v. Schenkel*,
    200 F. Supp. 3d 1273 (D. Utah 2016).........................................................................34

*\*Young v. Office of U.S. Senate Sergeant at Arms*,
    217 F.R.D. 61 (D.D.C. 2003)............................................................................. *passim*

**Rules**

Fed. R. Civ. P. 26(c)(1)..............................................................................................34

Fed. R. Evid. 403 .......................................................................................................34

## I.  INTRODUCTION

Almost a year ago, the University filed its original Motion for Case-Terminating Sanctions, based on then-available evidence that Plaintiff Jabari Stafford had attempted to bribe and intimidate several witnesses to support his case.  *See* ECF 46.  For example, after procuring a witness statement from his former University tennis teammate, William "Wills" Tutecky, Plaintiff assured Tutecky via text message, "Thank u my guy!! . . . I told you ***when I get that bag [of money] . . . I['ll] split it with u***."  ECF 47-2 (Ex. A to Mot.), at lines 6669, 6671–6672 (emphasis added).  When another former tennis teammate, Amlan Sahoo, proved less willing to assist Plaintiff's cause, Plaintiff threatened him, texting, "***I have evidence against you by the way***."  *Id.* at line 6422 (emphasis added).  At the November 18, 2019 hearing on the University's Motion, the Court explained that "the pro se status of the plaintiff when these texts were sent" counseled against the outright dismissal of this case.  ECF 50 (Nov. 18, 2019 Hr'g Tr.) at 40:16–21.  Nevertheless, the Court said that it was "inclined to impose some type of discovery-related sanctions, particularly with respect to [Plaintiff's behavior toward] Mr. Tutecky."  *Id.* at 40:19–21.  Ultimately, the Court held the University's Motion in abeyance so the parties could conduct additional discovery, including the depositions of Sahoo and Tutecky.  *See* Nov. 18, 2019 Minute Order.  Now that the additional discovery has been completed, Plaintiff's (and his counsel's) abuse of the judicial process has become even more evident in several respects—and case-terminating sanctions are even more justified.

*First*, Sahoo confirmed at deposition what Plaintiff's text messages on their face reveal: Plaintiff "***blackmailed***" him.  Ex. 1 (Sahoo Dep.) at 273:3–275:10 (emphasis added); 275:19–22 (same); 310:3–12 (same); 330:7–18 (same) 335:1–17 (same); 347:18–348:4 (same); 349:4–14 (same); 432:8–23 (same).  Sahoo recalled that Plaintiff and Tutecky commented on his Instagram

"That they ha[d] something against [him]," which they threatened to publicize if Sahoo refused to cooperate by providing Plaintiff with assistance in this lawsuit. *Id.* at 278:12–279:21. Sahoo testified that he was "scared" by Plaintiff's blackmail. *Id.* at 336:1.

*Second*, Plaintiff's post-July 2019 text messages with his former teammates—which this Court ordered Plaintiff to produce in January 2020, after rejecting his arguments that they were somehow protected by the attorney work-product doctrine, *see* ECF 57 (Jan. 14 Hr'g Tr.) at 31:10–14—prove that Plaintiff continued to engage in blackmail and witness intimidation, even after his July 2019 retention of counsel.  In August 2019, after Sahoo was unresponsive to Plaintiff's demands for documents and information related to this lawsuit, Plaintiff texted Tutecky, asking him: "***Do you have any thing [sic] on Amlan [Sahoo] that he wouldn't want to come out***.  Like a picture[,] video[,] or anything?"  Tutecky responded "[y]eah I got stuff on him," to which Plaintiff replied "[l]ike what . . . ***Gonna have to play it [r]ough now :(.***"  Ex. 2 at lines 720–25 (emphasis added).  The next day, Plaintiff wrote to Sahoo, "Yo I'm trying to get in touch with you dude ***they found something horrible on you I think it might come out publicly***."  Ex. 3 at line 55 (emphasis added).  These are the messages that Plaintiff refused to produce until ordered to do so.

*Third*—and perhaps most troublingly—Plaintiff and his counsel ***both*** violated this Court's no-contact Order with respect to Tutecky.  During the November 2019 hearing, the Court ordered that "neither party shall have any contact with Mr. Tutecky absent leave of Court," except to the extent necessary for deposition scheduling and logistics.  ECF 50 at 44:6–18.  Plaintiff's counsel asked whether the Order applied to counsel as well as the parties; the Court responded unequivocally: "Yes." *Id.* 44:11–15.  In violation of this clear directive from the Court, Plaintiff's counsel then had a lengthy telephone conference with Tutecky about the substance of his deposition testimony just two days before his October 21, 2020 deposition.  According to Tutecky,

the purpose of his pre-deposition call with Plaintiff's counsel was to ████████████

████████████   Ex. 4 (Tutecky Dep. Tr.) at 497:25–498:1.  And Plaintiff apparently spoke

to Tutecky as well—in December 2019, the month after the Court's Order.  *Id.* 482:2–11.

      These are just the latest examples of a documented pattern of misconduct by Plaintiff (and

now, his counsel).  Since the initiation of this action in November 2018, Plaintiff has offered bribes

to one witness, "blackmailed" a second, intimidated a third, and engaged in inappropriate conduct

during multiple depositions.  Plaintiff and his counsel both violated this Court's November 18,

2019 no-contact Order, and it appears that Plaintiff's "paralegal" Kevin Hall may have engaged in

the unauthorized practice of law, with support from Plaintiff and Plaintiff's father.

      This pattern of misconduct—which, again, has continued unabated since Plaintiff retained

counsel—reveals Plaintiff's disregard for the integrity of the judicial process and this Court's

direct Order.  Under these circumstances, allowing Plaintiff to continue prosecuting this action

would cause severe harm to the University.  For these reasons and those set forth in greater detail

below, the University requests that the Court sanction Plaintiff by terminating this case.  Should

the Court believe a lesser sanction is appropriate, the University requests in the alternative that the

Court bar Plaintiff from introducing documents or testimony from the relevant witnesses in support

of Plaintiff's position at the summary judgment stage of this action or at trial; that there be an

adverse inference against Plaintiff that these witnesses' testimony would not have supported his

case absent Plaintiff's improper interference; and that the University be awarded its costs incurred

in connection with investigating Plaintiff's misconduct and bringing it to the attention of the Court.

## II.  BACKGROUND AND PROCEDURAL HISTORY

      On November 26, 2018, Plaintiff filed this lawsuit against the University and several

current and former University employees, alleging six counts, including claims of discrimination,

breach of contract, and negligence.  *See* ECF 1 ¶¶ 95–134.  The University moved to dismiss, and

Plaintiff moved to amend his Complaint.  *See* ECF 4 and 11.  On June 5, 2019, the Court issued an Order and Memorandum Opinion, dismissing Plaintiff's contract-based claims, his negligence claims, and all but one of his statutory discrimination claims.  The Court granted Plaintiff leave to amend with respect to his single remaining discrimination claim under Title VI.  ECF 15 and 16.

On October 24, 2019, Plaintiff filed the operative Second Amended Complaint in this case. ECF 41.  The same month, Plaintiff also produced a Microsoft Excel workbook, reflecting over 6,700 electronic messages that he had sent or received, including SMS text messages and WhatsApp messages.  These messages—produced only after the University objected to Plaintiff's initial incomplete production of text messages in response to its document requests—reflect plainly improper attempts by Plaintiff to cajole his former University tennis teammates into providing favorable witness statements in connection with this case, including through attempts at bribery and intimidation.  ECF 47-2.  Shortly after the production of these text messages, the University took Plaintiff's deposition and the deposition of Plaintiff's father, Tom Stafford.[1]

On November 5, 2019, the University filed its original Motion for Case-Terminating Sanctions, based on Plaintiff's attempted witness intimidation and bribery, and Plaintiff's and his father's inappropriate conduct at deposition.  *See* ECF 46.  The Court held a hearing on the University's Motion on November 18, 2019.  After hearing the then-known evidence of Plaintiff's misconduct, the Court admonished Plaintiff, telling him, "this is federal court.  This is not television.  This isn't *Law & Order*.  It ain't *Suits*."  ECF 50 at 41:18–20.  The Court explained that "[t]he integrity of this process is paramount," and that based on the Court's initial review of Plaintiff's conduct, he had "tainted the evidentiary value of the evidence that [he] [was] seeking to develop in such a way that it's undermined the integrity of the process, and that [the Court] can't

---

[1]  References in this Motion to "Mr. Stafford" are to Tom Stafford.

4

tolerate." *Id.* at 41:21–42:6.  Nevertheless, the Court expressed some sympathy for the fact that Plaintiff's misconduct via text message had occurred prior to his retention of counsel.  *See id.* at 40:16–21.  Following the hearing, the Court ordered that the University's Motion be held in abeyance so the parties could obtain additional evidence.  *See* Nov. 18, 2019 Minute Order.

The University sought to obtain such additional evidence both from Plaintiff himself, and from third-party subpoenas for documents that it issued to Plaintiff's former tennis teammates Tutecky, Sahoo, and Blake Morton.  In December 2019, Plaintiff moved to quash the University's subpoenas—and resisted his own production of post-July 2019 communications with his former teammates—arguing that all communications that post-dated Plaintiff's July 18, 2019 retention of counsel were protected by the attorney work-product doctrine.  *See* ECF No. 53.  The Court rejected this argument, holding that even if the communications were protected as work-product, Plaintiff had waived that protection by disclosing the communications to his teammates, and, alternatively, that the University had shown a substantial need for the communications.  *See* ECF 57 at 31:10–14.  As the Court explained, "[t]he fact that the communications are sought as evidence of witness tampering . . . counsels in favor of disclosure." *Id.* at 32:13–16.  Plaintiff subsequently produced the post-July 2019 communications with his former teammates—which, in fact, do contain substantial additional evidence of witness tampering, as described below.

Like Plaintiff, Tutecky also resisted producing documents in response to the University's subpoena.  The University thus moved to compel Tutecky's compliance, seeking an order from the U.S. District Court for the District of Massachusetts, requiring Tutecky to make a complete production.  Judge Leo T. Sorokin ordered that Tutecky make a full production and that several of his devices and accounts be forensically imaged and analyzed.  *See* Ex. 5 (ECF 11).  Judge Sorokin also ordered that Tutecky's devices remain in the United States, and that he "SHALL NOT tamper

with" a sealed box containing the images.  *See* Ex. 6  (ECF 23).  After navigating delays and challenges associated with the COVID-19 pandemic, the University forensically imaged Tutecky's devices and email accounts with the assistance of an e-discovery vendor, Stroz Friedberg ("Stroz").

In addition to obtaining these images and associated documents, the University also deposed former University tennis team members Morton and Sahoo.  On April 30, 2020, this Court vacated the University's prior Motion for Case-Terminating Sanctions and ordered that the University file a renewed Motion within 14 days of Tutecky's deposition.  *See* April 30, 2020 Minute Order.  Tutecky's deposition was held on October 21, 2020; this Motion followed.

## III.  RELEVANT FACTS

**A.**     **Plaintiff Bribes Wills Tutecky Into Providing A Favorable Witness Statement**

Plaintiff's communications with Tutecky reflect blatant attempts by Plaintiff to bribe Tutecky into providing Plaintiff with a favorable witness statement to advance his interests in this lawsuit.  After Tutecky sent Plaintiff a first draft of his statement, Plaintiff wrote to him on June 23, 2019: "Thank you bro for the document. I will look at tomorrow in it's [sic] entirety ***to make it juicer*** [sic]."  ECF 47-2, at line 6314 (emphasis added).  Tutecky conceded that he accepted direction from Plaintiff regarding his witness statement because ███████████████████████ ██████████████████████████████████████████████████████████ Ex. 4 at 317:14–18.

Plaintiff was pleased with Tutecky's efforts to assist him with this lawsuit, and promised him that in return: "***Trust when I'm successful you will. [b]E [sic] rewarded***."  ECF 47-2, at line 6468 (emphasis added).  On July 11, Tutecky texted Plaintiff and reported that, in speaking to Adam Kilgore of the *Washington Post*, he had "***exaggerated all the racism*** . . . ***Just like you said***."  *Id.* at lines 6499–6500 (emphasis added).  Plaintiff responded: "My brother . . . When I'm successful with this ***I got you with a weekend in New York everything paid for vip everything***."  *Id.* at lines 6502–6503 (emphasis added).  When questioned regarding this offer of a "VIP" trip,

Plaintiff testified that "basically I was saying . . . you've been a strong supporter of me overall, I appreciate . . . all the help that you've given to me in the case as well."  ECF 47-3 (Ex. B to the University's original Motion for Case-Terminating Sanctions), at 310:9–12.  Plaintiff said his instruction to Tutecky to "exaggerate the racism" applied both to Tutecky's *Washington Post* interview and his draft witness statement.  *See id.* at 317:10–20.

Plaintiff also promised Tutecky publicity and fame in exchange for his assistance, writing, "U remember when I said I'm gonna be big one day . . . I can get u big too."  ECF 47-2, at lines 6526–6527.  Plaintiff then told Tutecky he was planning on shooting a documentary, and that "[a]ll you need is exposure/ publicity."  *Id.* at lines 6543–6544.  Tutecky responded: "We gon be legends," to which Plaintiff replied "Ex. Higher ranking, lawsuit."  *Id.* at lines 6546–6547.

Plaintiff also offered Tutecky a bribe in exchange for his assistance in contacting Sahoo on Plaintiff's behalf.  On July 16, 2019, Plaintiff instructed Tutecky to tell Sahoo "your [sic] pissed and you're not gonna talk to him anymore if he doesn't contact me . . . I just neee [sic] this fuck to contact me . . . I need his fucking statement . . . That's all . . . I hate to use you as third party."  ECF 47-2 at lines 6658–6662.  After Tutecky told Plaintiff that he had followed his instructions and to expect a call from Sahoo regarding a witness statement, Plaintiff responded, "Thank u my guy!! . . . I told you ***when I get that bag . . . I split it with u***."  *Id.* at lines 6669, 6671–6672 (emphasis added).  Plaintiff admitted at his deposition that "that bag" referred to a bag of money. ECF 47-3 at 331:7–14.  He further testified that "along with everything that he's done for me, you know, I always wanted to sort of show my appreciation to him and, you know, keep it going."  *Id.* at 332:20–333:3.

On a number of occasions, Plaintiff and Tutecky expressed excitement about a possible future payout from this lawsuit.  For example, on August 20, 2019, Plaintiff wrote to Tutecky that

"the entire environment at GW was way worse than" that at another university he and Tutecky had been discussing, "[w]hich is why 💰 💰 💰 ." Ex. 2 at lines 433–434.  Tutecky responded to these money-bag emojis by writing, "the bag is gonna piss everyone off . . . That's the goal . . . We need to flex hard now."  *Id.* at lines 426–438.  Tutecky admitted at deposition that ███████ ███████████████████████████████████████████████████████████████████████████████ . *See* Ex. 4 at 475:1–6.  Three days later, Tutecky again told Plaintiff in reference to the bag of money, "we're gonna get this bag in the end . . . I gotcha . . . you and I against everyone . . . just like how it started."  Ex. 2  at lines 492–493.  Five days later, Plaintiff referred to the "clowning" that he and Tutecky would do "if I get the bag."  *Id.* at line 538.

**B.    Plaintiff And Tutecky Intimidate A Female Tennis Player In An Attempt To Procure Favorable Testimony**

Later, Plaintiff enlisted Tutecky in a scheme to get a member of the women's tennis team, ███████████████, to submit a statement in support of Plaintiff's case.  *See* Ex. 2 at lines 185–199.

On August 16, 2019, Plaintiff texted Tutecky: "I have an idea . . . I can't call . . . I can't say this on text."  Ex. 2 at lines 186, 189, 191.  Plaintiff then texted Tutecky two screenshots of conversations purportedly about ████████ amongst members of the tennis team and stated: "What if u showed to ██████ . . . She has beef with the team . . . Get her to testify to hostile environment[.]"  *Id.* at lines 194–197.  Tutecky responded:  "No she's cool with the women's team . . . We need to consider this[.]"  *Id.* at lines 198–199.  Plaintiff responded, simply: "Just send them to her[.]"  *Id.* at line 200.  Tutecky again expressed uncertainty:  "Damn!  Do you think this is a good idea . . . She's cool with the women's team[.]"  *Id.* at lines 204–205.  Plaintiff responded: "I think it's a great idea . . . she isn't cool with torrie [sic] [Browning, an African-American coach of the men's and women's teams] . . . Amlan was telling me she has beef with the staff . . . And she has beef with [former men's tennis player ████████████████"  *Id.* at lines 206–209.  Tutecky

asked Plaintiff what he should say in the message to ██████. *See id.* at lines 215–216.  Plaintiff

responded: "Say hey ████ just wanted to let you know the people that you thought liked you were

really talking about you behind your back . . . And then send her the phot[o]s . . . And say you

could be a great witness to Jabari's case to provide a statement[.]" *Id.* at lines 217–219.  Plaintiff

then remarked: "***Bro I'm trynna get you the bag*** . . . U gotta trust me in a brotha haha[.]" *Id.* at

lines 220–221 (emphasis added).  Shortly thereafter, Tutecky sent Plaintiff a draft message to

██████, which read:

> Hey ████ hope you've been well.  I am reaching out to you because I need your
> help with something.  I wanted to let you know that some of your male "friends" at
> GW were saying some terrible things about you behind your back.  I was wondering
> if you could be a witness in Jabari's case and provide a statement.  Let me know if
> you're interested[.]  I also have evidence of the things they said about you[.]

Ex. 2 at lines 244–245.  Plaintiff responded:

> Perfect but 2 things[.]  Don't say i am reaching f [sic] out to you because I need
> your help.  You want to play on her emotions not give her the power.  Secondly, at
> the end say, "you could definitely provide a good witness statement on the hostile
> environment at GW, I heard you had your problems with ██████████

*Id.* at lines 247–248.  Tutecky responded, "Ok I will . . . Let me send this now," to which Plaintiff

responded, "Say I ha[ve] photo evidence of the things they said . . . You want to get her angry[.]"

*Id.* at lines 249–253.  Plaintiff further instructed Tutecky: "Also say this at the end . . . '***If you***

***disclose any of this information to anyone, this could backfire on you heavily***[.]'" *Id.* at lines

266–267 (emphasis added).  Plaintiff further directed Tutecky to send the message on "Insta[gram]

. . . ***Cause you can delete***[.]" *Id.* at lines 270, 272 (emphasis added).  Plaintiff then remarked, "Yo

she's gonna be SHOOK[.]" *Id.* at line 282.

     After Tutecky sent the message to ██████, Plaintiff wrote, "***Bro the bag is looking***

***good***." Ex. 2 at lines 286–288 (emphasis added).  And when ██████ initially responded by

expressing reluctance to get involved, Plaintiff instructed Tutecky:

Dude send her the photos . . . It's time . . . She needs to get angry . . . If she gets angry she will talk . . . Send her the photos . . . Make her mad . . . The only way . . . Only way is to play on her emotions . . . She's thinking too much right now . . . She's getting tight[.]"

*Id.* at lines 315–328.  Ultimately, █████████ declined to get involved in the case.  *See id.* at line 337.  Plaintiff nevertheless texted Tutecky, "we just milked her good"—apparently referring to their manipulation of ████████ .  *See id.* lines 343, 346, 352–353.

## C.    Plaintiff and Tutecky Engage In "Blackmail" Of Amlan Sahoo

Plaintiff also intimidated Sahoo, who described himself at deposition as having been "reluctant" to give a statement and "pressured" by Plaintiff into doing so.  Sahoo Dep. 66:19–20; 242:24–243:1.  In Sahoo's own words, Plaintiff "***blackmailed***" him for purposes of this case.  *See* Ex. 1 at 273:3–275:10 (emphasis added); 275:19–22 (same); 310:3–12 (same); 330:7–18 (same) 335:1–17 (same); 347:18–348:4 (same); 349:4–14 (same); 432:8–23 (same).  Sahoo testified that Plaintiff's efforts to secure from him a witness statement and a release under the Family Educational Rights and Privacy Act ("FERPA")—which would allow Plaintiff to obtain certain of Sahoo's private University education records otherwise unavailable in discovery—made Sahoo feel "uncomfortable."   Ultimately, Sahoo said he gave Plaintiff a witness statement only "because [Plaintiff] wouldn't stop calling and texting" him.  *Id.* at 262:4–263:15; 317:1–4.

On June 14, 2019, Plaintiff told Sahoo: "please for love of everything and for the 100th time, stop being sneaky and stop lying to me about things that are going on.  We work well when we're in agreement with each other.  Just be 100 with me I don't care what comes up, I got you." ECF 47-2 at line 6299.  On June 20, Plaintiff texted Sahoo: "Formal statement by Sunday.  Essay format, professional."  *Id.* at line 6306.  On June 23, Plaintiff asked, "Yo is your statement ready?" *Id.* at line 6313.  On July 4, Plaintiff again followed up and wrote: "I expect your witness statement by this weekend."  *Id.* at line 6360.  The same day, he wrote: "I don't have time for a call, just

please do your statement by Saturday so I don't have to subpoena.  I've already sent a subpoena to [M]ike Lonergan [a former men's basketball coach]."  *Id.* at line 6365.  On July 7, Plaintiff contacted Sahoo again and wrote, "Ok dude I'm going to have to subpoena you.  I will have my lawyer find your address."  *Id.* at line 6379.  Plaintiff admitted that, at this time, he "didn't have a lawyer," since he did not engage Mr. Ross until July 18, 2019.  Instead, Plaintiff said, he was "probably referring to, you know, just myself, just people I was, you know, working with."  ECF 47-3 at 344:8–10.  Plaintiff then clarified he was referring to "a paralegal," i.e., Kevin Hall.  *Id.* at 344:15–19.

Sahoo eventually responded on July 7, noting that "I wasn't ignoring I will send it to you today."  ECF 47-2 at line 6383.  Plaintiff responded and said: "Just send me it and you won't have to hear anything else from me. . . . You looked me in the face you told me you would have it ready by yesterday . . . . So please send me it today (not rushed, a clear concise statement)."  *Id.* at lines 6384–6385.  Sahoo did not respond, and on July 8, Plaintiff texted him again, saying: "Actually never mind. Expect a subpoena . . . . ***I have evidence against you by the way***."  *Id.* at lines 6421–6422 (emphasis added).  Sahoo responded: "Sending it…."  *Id.* at line 6423.

Plaintiff also threatened and intimidated Sahoo via Tutecky.  On July 16, Plaintiff told Tutecky to "[m]essage Amlan . . . And say this . . . 'Why haven't you sent your statement to Jabari?'  Don't say anything else."  *Id.* at lines 6563–6566.  Tutecky proceeded to send this message in exactly the form in which Plaintiff instructed.  *See* Ex. 7 (Tutecky_000445); Ex. 4 at 383:15–18.  Plaintiff further directed Tutecky: "And when he responds don't respond to him just let me know."  ECF 47-2 at line 6568.  On July 16, Plaintiff texted Tutecky again with two additional messages to send to Sahoo, the first of which read, "'Amlan, you will be subpoenaed within the next few days or couple weeks.  Your story is also going to be in the WS along with

your name.'"  *Id.* at line 6585.[2]  Plaintiff testified that the "story" he would reveal to the

*Washington Post* included ███████████████████████████████ ECF 47-3

at 327:20.  ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████  In addition to instructing Tutecky to threaten Sahoo ███████████████

█████████████████, Plaintiff also drafted a second message for Tutecky to send, which read:

"'You should probably contact Jabari because he's trying to help you and to this [sic] the right

way.'"  ECF 47-2 at line 6587.  Tutecky followed Plaintiff's instructions by taking these messages,

copying them into a separate thread, and sending them to Sahoo.  *See* Ex. 7; Ex. 4 at 384:22–

386:20.  At his deposition, Sahoo testified that when Plaintiff threatened to release ███████████

██████████  to the *Washington Post*, he viewed it as a "tactic" that Plaintiff and Tutecky were

using "to get [him] to send the witness statement."  Ex. 1 at 248:19–20.

Plaintiff suggested to Tutecky that he was going to confront Sahoo in-person about his

unresponsiveness to texts regarding the witness statement, remarking, "I'm gonna go to college

park when I get back . . . And catch [Sahoo] when he's not expecting [i]t," to which Tutecky

responded "Catch a nigga slippin."  ECF 47-2 at lines 6604–6608.  Plaintiff instructed Tutecky to

tell Sahoo, "'Jabari has received over 20 pieces of key evidence from you. ██████████████████

███████████████████████████████████.  If you try to be untruthful, he will present that

information.'"  *Id.* at line 6622–6623.  Plaintiff testified that at the time he sent this text to Tutecky,

Sahoo "was not answering his phone" and "was still sort of talking to the opposition"—that is, the

---

[2]  At his deposition, Plaintiff testified that by "WS" he actually meant "*Washington Post*."  ECF
47-3 at 325:16–326:9.

University and its counsel.  ECF 47-3 at 327:11–14; 328:12–17.  For his part, Sahoo testified that he understood Plaintiff's threat regarding the "20 pieces of evidence" to mean that Plaintiff was "trying to basically find a way to get [Sahoo] to give [Plaintiff] the statement on that date."  Ex. 1 at 260:3–261:2.

On August 30, 2019, Plaintiff again enlisted Tutecky to try to intimidate Sahoo into providing something to Plaintiff that would assist him in this lawsuit—specifically, a FERPA release, which would allow Plaintiff to access Sahoo's private educational records that are otherwise protected from disclosure by federal law.  Plaintiff texted Tutecky "***Do you have any thing [sic] on Amlan that he wouldn't want to come out***.  Like a picture[,] video[,] or anything?"  Tutecky responded "[y]eah I got stuff on him," to which Plaintiff replied "[l]ike what . . . ***Gonna have to play it [r]ough now :(***."  Ex. 2 at lines 720–725 (emphasis added).  Sahoo testified that he considers this exchange proof that Plaintiff and Tutecky were attempting to blackmail him.  Ex. 1 at 273:3–275:22.  On September 1, 2019, after Sahoo read one of Plaintiff's messages without responding, Plaintiff said "Yo I'm trying to get in touch with you dude ***they found something horrible on you I think it might come out publicly***."  Ex. 3 at line 55 (emphasis added).  Plaintiff then sent a screenshot of the message to Tutecky, saying "***This is how I gotta get his attention lol***," to which Tutecky replied "If he doesn't respond to that… he's outta his mind."  Ex. 2 at lines 796–797, 800 (emphasis added).  Sahoo testified that Plaintiff's message "scared" him.  Ex. 1 at 336:1.  Three hours later, Plaintiff directed Tutecky to "text [Sahoo] the same thing [b]ut not like the same thing . . . Just say something like 'Dude did you see what they found on you? . . . ██████ ████████████████████████████████████'"  Ex. 2 at lines 810–813, 820; Ex. 4 at 339:7–341:5.  In other words, as Sahoo explained at deposition, it appears that Plaintiff and Tutecky were "making something up to scare [Sahoo] so that [he would] sign a FERPA release."  Ex. 1 at 342:11–16.

Tutecky likewise testified that ███████████████████████████████████

███   *See* Ex. 4 at 418:3–5.

In a further attempt to secure a FERPA release from Sahoo, Plaintiff and Tutecky again

engaged in what Sahoo considered to be "blackmail." Ex. 1 at 347:23.  Specifically, on September

1, 2019, Plaintiff texted Tutecky ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████   *Id.* at 346:12–15.   ███████████████

███████████████████████████████████████████████████   *Id.*

at 223:11–14.  Tutecky responded:  "Put this on Insta," Ex. 2 at line 828, to which Plaintiff

responded, "You thinking what I'm thinking ? . . . Insta," *id.* at lines 829, 832.  Plaintiff then told

Tutecky to "[c]heck" Instagram, *id.* at lines 834, 836; Plaintiff suggested that Tutecky reply ██

███████████████████████   and said: "This way only Amlan sees it."  *Id.* at lines 838–

845.  Tutecky stated, "Imma do it . . . Just replied back[.]"  *Id.* at lines 843, 847.  The following

day, Tutecky asked Plaintiff: "Bro did u delete the comments . . . Can't find them on his page," *id.*

at lines 856–857, to which Plaintiff replied, "Yeah," *id.* at line 858.

Sahoo testified he understood the purpose of Plaintiff's and Tutecky's posting and deleting

these comments on Instagram was to threaten Sahoo ████████████████████████

███████████████████████████████████████████████████████████

██████   if Sahoo did not sign a FERPA release. Ex. 1 at 347:5–17. Sahoo took the "blackmail"

seriously—████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████   ."  *Id.* at 426:14–16.

**D.      Forensic Analysis Of Tutecky's iPhone Reveals That All Of His July 2019 Text Messages With Plaintiff Are Missing**

Tutecky appears to have understood that his text messages with Plaintiff reflecting witness intimidation and bribery were incriminating.  Forensic analysis of Tutecky's iPhone, performed pursuant to an order by the U.S. District Court for the District of Massachusetts, *see* Ex. 8 (ECF 34), indicates that Tutecky's July 2019 communications with Plaintiff no longer exist on the device.  As a result of the University's motion to compel Tutecky's compliance with the University's November 2019 document subpoena, Tutecky was ordered to make his iPhone and other devices available to Stroz for imaging.  *See* Ex. 5 (ECF 11).  Stroz took a forensic image of Tutecky's iPhone on April 17, 2020.  Ex. 8 (ECF 34).  Stroz then used one of its proprietary digital forensics tools to perform a deletion analysis of the SMS, MMS, and iMessage database in the iPhone. Ex. 9 (Decl. of M. Green) ¶ 5.  The results of Stroz's deletion analysis reveal a significant spike in the July 2019 timeframe—a key period in which Plaintiff was offering bribes to Tutecky and soliciting his help in blackmailing and intimidating Sahoo.  *Id.* ¶ 7.  And, among all the data in Tutecky's iPhone at the time the forensic image was taken, Stroz identified ***not one text message*** between Plaintiff and Tutecky from the July 2019 period.  *Id.* ¶ 8.

**E.      Plaintiff Attempts To Ensure His Communications With Blake Morton Are Not Discoverable**

Plaintiff also appears to have understood that he should seek to avoid putting evidence of his witness tampering and intimidation in writing.  In seeking a witness statement from his former teammate Blake Morton for purposes of this case, Plaintiff texted Morton: "Send me your # ***we should talk over phone so there's no trail***."  ECF 47-2 at line 6247 (emphasis added).  Plaintiff explained that he was advised to avoid creating a "trail" by his father and Kevin Hall, the "paralegal" with whom he was working.  ECF 47-3 at 349:15–351:8.

**F.      Plaintiff And Mr. Stafford Behave Inappropriately At Mr. Stafford's Deposition**

On October 29, 2019, the University deposed Mr. Stafford.   Plaintiff attended Mr. Stafford's deposition and behaved disruptively throughout the proceedings.   When Mr. Stafford was asked whether Plaintiff missed the tennis team photo session because he had been late in returning to campus for the start of the school year, Plaintiff audibly said "that's not true."  ECF 47-5 (Ex. D) at Video 2 13:26:42–13:31:29.[3]  When Mr. Stafford was asked whether, as stated in Plaintiff's appeal of his academic suspension, Mr. Stafford and his wife had marital problems, Mr. Stafford became enraged, and Plaintiff rose from his seat, gestured with his arms, and told him to calm down.  Plaintiff and his father also laughed audibly at several points during the deposition—for example, when Mr. Stafford was asked whether Torrie Browning had been named the A-10's Coach of the Year.  ECF 47-5 at Video 2 13:25:07–13:26:42.  Plaintiff also laughed out loud when Plaintiff's father was asked whether he had conversations with Nicole Early in which he was "not totally accurate,"  *Id.* at Video 1 10:41:56–10:43:02; when Plaintiff's father stated that a former coach had asked Plaintiff's father, "What, do you want to bang my wife or something?"  *id.* at Video 1 11:04:04–11:05:30; and when Plaintiff's father referred to a University employee as a "gatekeeper," *id.* at Video 1 11:06:40–11:08:55.

Mr. Stafford himself also engaged in obstructionist and often obscene behavior during his deposition that by his own admission was "[n]ot at all" professional.  ECF 47-4 (Ex. C) at 273:13–16; ECF 47-5 at Video 3 16:17:17–16:18:14.  He screamed at counsel throughout the deposition, often cursing, mocking counsel and witnesses, and using obscenities.  *See, e.g.*, ECF 47-4 at 198:8–12 ("Didn't I just tell you it was a false statement that I never had any marital problems?  Didn't I

---

[3]  Cited excerpts of the video of Mr. Stafford's deposition are available on a DVD that the University filed with the Clerk's Office as Exhibit D to its original Memorandum of Points and Authorities in support of its original Motion.  *See* ECF 47-5. The University can provide additional copies of the video excerpts if the Court wishes.

just tell you that?  Can somebody get some hearing aides [sic] so this guy can hear."); *id.* at 199:5–7 ("What do you mean, why did I go there?  It's a fucking hotel and I needed a place to stay."); ECF 47-5 at Video 1 12:15:12–12:16:50 (testimony by Mr. Stafford including a mocking impression of Nicole Early).  He also deliberately refused to provide relevant information, often taunting counsel and lying in the process.  For example, off the record, Mr. Stafford stated that he had remembered the first name of a "Mr. Lightfoot."  When the University's counsel asked him to wait to provide the name until the deposition was back on the record, Mr. Stafford refused.  Once back on the record, the University's counsel asked Mr. Stafford to provide the name, and he testified falsely: "I don't remember."  Counsel for Plaintiff had to make a statement on the record about Mr. Lightfoot's first name.  ECF 47-4 at 107:17–108:8; ECF 47-5 at Video 2: 12:27:39–12:28:00.  When counsel asked about Mr. Stafford's bank statements showing a stay at the Four Seasons in Baltimore (which Plaintiff had produced as evidence of "damages"), Mr. Stafford replied, "What do you mean, why did I go there?  It's a fucking hotel and I needed a place to stay." ECF 47-4 at 199:5–7; ECF 47-5 at Video 3 14:38:30–14:39:50.  When asked whether he told Nicole Early that he thought Coach Browning was jealous of Plaintiff because he was "rich and good looking," Mr. Stafford engaged in an extended monologue, telling the University's counsel that "[y]ou are not going to get me to say some damaging bullshit so you can use it on me later on."  ECF 47-4 at 101:3–102:13; ECF 47-5 at Video 1 12:15:12–12:16:50.

When asked about payments he had made to "paralegal" Kevin Hall, Mr. Stafford initially denied that he had made any payments related to Mr. Hall's work on this case.  ECF 47-4 at 192:1–12.  When confronted with the fact that Mr. Hall had sent an email with the subject "Re: my pay

for work on GWU case" in which he referred to payment received from Mr. Stafford, Ex. 11

(Stafford000724), Mr. Stafford shouted:

> Who the hell do you think you are? . . . I am not going to answer your question.
> Because it's the same bullshit you've been trying to get out of me for the last five
> or ten minutes.  It's none of your business.  And you can put that in the record.

ECF 47-4 at 208:7–20; ECF 47-5 at Video 3 15:06:05–15:10:05.  In the same exchange, Mr.

Stafford referred to the University's counsel as a "chump."  ECF 47-4 at 209:16.  When asked

about the marital problems Plaintiff cited in his appeal of his academic suspension as a reason for

his poor academic performance, Plaintiff's father yelled, "You know, that's a slippery slope for

you.  That's something that you don't need to go down because that's personal."  ECF 47-4 at

196:20–22; ECF 47-5 at Video 3 14:35:27–14:38:26.  When asked a follow-up question about

whether he was involved in Plaintiff's academic appeal, Plaintiff's father shouted, "Let's not get

too involved in that kind of shit because that's my family and that is personal shit.  You are not

going to go down that road with me.  That ain't got nothing to do with a hostile environment.

Don't play those games with me, man."  ECF 47-4 at 197:7–13; ECF 47-5 at Video 3 14:35:27–

14:38:26.

**G.      Plaintiff And Mr. Stafford Behave Inappropriately At Plaintiff's Deposition**

Plaintiff's conduct at his own deposition was patently inappropriate.  He laughed at some

of the same questions that elicited laughter from his father, such as a question regarding a text

message in which Plaintiff referred to Sahoo as "this fuck" and said "I need his fucking statement."

ECF 47-3 (Ex. B) at 329:13–330:9.  Moreover, when Plaintiff was asked for the basis of his

statement that the entire GW Athletics Department knew about a former coach's supposed drug

and alcohol use, Plaintiff paused and looked at his father for direction.  ECF 47-3 at 33:12–16.

Mr. Stafford also conducted himself inappropriately at Plaintiff's deposition.  At the outset

of the deposition, the University's counsel noted the University's objection to Mr. Stafford's

presence at the deposition, to which Mr. Stafford responded by laughing audibly. The University's counsel had to ask Plaintiff's counsel to instruct Mr. Stafford not to make comments during the deposition. ECF 47-3 at 8:8–17. Mr. Stafford's behavior continued throughout the deposition, and included additional audible laughter in response to the University's counsel's lines of questioning. At one point, counsel for the University noted this for the record and asked Plaintiff's counsel to instruct Mr. Stafford to refrain from this behavior. Mr. Stafford responded by falsely claiming that he "was coughing." *Id.* at 213:22–214:6. Several of Mr. Stafford's outbursts came amid questioning about some of the most sensitive subjects and documents in this case. *See, e.g.*, *id.* at 329:13–330:9 (questions regarding text messages Plaintiff sent to Tutecky, stating that Plaintiff "nee[ded] this fuck [Sahoo] to contact me . . . . I need his fucking statement"); *id.* at 364:7–15 (questions regarding Plaintiff referring to a teammate on Facebook as a "pussy"). At another point in the proceedings, the University's counsel asked Plaintiff to state the source of certain information about which he had testified. Plaintiff paused and looked at Mr. Stafford for direction. When counsel for the University noted this on the record, Plaintiff's father audibly stated, "He wasn't looking at me," when this was patently untrue. *Id.* at 33:12–17.

On November 18, 2019, following the hearing on the University's original Motion for Case-Terminating Sanctions, this Court ordered that no non-parties other than counsel and their staff be allowed to attend depositions without leave of the Court, and that attendees refrain from speaking or engage in other disruptive behavior. *See* Nov. 18, 2019 Minute Order.

**H.      Plaintiff And His Counsel Violate This Court's No-Contact Order**

During the November 18, 2019 hearing on the University's original Motion for Case-Terminating Sanctions, the Court entered an oral no-contact order regarding Tutecky. *See* ECF 50 at 44:6–15. As the Court explained, "neither party shall have any contact with Mr. Tutecky absent leave of Court . . . . [e]xcept for logistics and scheduling." *Id.* When asked by Plaintiff's

counsel whether the order applied to counsel in addition to the parties themselves, the Court replied: "Yes." *Id.* 44:11–13. The Court's order came after University counsel expressed concern that further improper contact with Tutecky by Plaintiff and his counsel could "influence [Tutecky's] testimony at [his] deposition." *Id.* 43:19–20.

Notwithstanding the Court's clear Order, Tutecky and Plaintiff spoke in December 2019. *See* Ex. 4 (Tutecky Dep.) 482:2–11. In addition, WhatsApp messages between Tutecky and Plaintiff, which Tutecky produced in response to the University's subpoena, indicate that Plaintiff attempted to call Tutecky at least two other occasions. Ex. 10 (Tutecky_000855). Tutecky claimed that ███████████████████████████████████████████ Ex. 4 at 482:10–11. (But of course, the Court's no-contact order was not limited by subject matter, *see* ECF 50 at 44:6–15, and Plaintiff did not seek leave of the Court for other communications.)

Even more troublingly, on October 19, 2020—just two days before Tutecky's deposition—Plaintiff's counsel and Tutecky participated in a 40-minute telephone conference that was designed ████████████████████████████████████ Ex. 4 at 497:25–498:1. Tutecky's own attorney participated in the telephone call as well, but according to Tutecky, ████████████████████████████ *Id.* at 501:8–9. Plaintiff's counsel asked Tutecky about, among other things ████████████████████████████████ *Id.* at 498:8–10. In other words, ███████████ ██████████████████████████████████ *See id.* at 499:24–500:1. By way of example, Tutecky testified ██████████████████████ ████████████████████████████████████████ ███████████████████████ *Id.* 498:17–21. This was a direct and blatant violation of the Court's Order.

## IV.  ARGUMENT

Courts have inherent power to impose sanctions for abusive litigation practices undertaken in bad faith, based on "'the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"  *Chambers v. NASCO, Inc*., 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)).  This power includes the power to dismiss a case where there is clear and convincing evidence that "fraudulent or bad faith misconduct occurred" and "a lesser sanction 'would not sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits.'"  *Young v. Office of U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 65 (D.D.C. 2003) (quoting *Shepherd v. Am. Broad. Cos*., 62 F.3d 1469, 1472 (D.C. Cir. 1995)).  Where a "party's 'entire course of conduct throughout the lawsuit evidence[s] bad faith and an attempt to perpetrate a fraud on the court,' the conduct is sanctionable under the inherent power of the court."  *Young*, 217 F.R.D. at 66 (citing *Chambers*, 501 U.S. at 50–51); *see also Milke v. City of Phoenix*, No. CV-15-00462-PHX-ROS, 2020 WL 6383252, at *15 (D. Ariz. Oct. 30, 2020) ("[I]t is the entirety of [plaintiff's] conduct that supports the drastic sanction of dismissal.").  A court also has inherent authority to sanction parties for the spoliation of evidence.  *See Clarke v. Wash. Metro. Area Transit Auth.*, 904 F. Supp. 2d 11, 21 (D.D.C. 2012).

The D.C. Circuit has identified three "possible (although not mandatory) justifications for dismissal as a sanction for misconduct."  *Young*, 217 F.R.D. at 65 (citing *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998)).  Dismissal sanctions are appropriate where "(1) the other party has been 'so prejudiced by the misconduct that it would be unfair to require [the party] to proceed further in the case,' (2) the party's misconduct has put 'an intolerable burden' on the court  . . . or (3) the court finds it necessary 'to sanction conduct that is disrespectful to the court and to deter similar misconduct in the future.'"  *Young*, 217 F.R.D. at 65–66 (quoting *Webb*,

146 F.3d at 971).  Here, case-terminating sanctions are warranted based on (1) Plaintiff's and his attorney's violations of the Court's no-contact order; (2) Plaintiff's demonstrated witness tampering; (3) Plaintiff's and Tutecky's spoliation of evidence; and (4) Plaintiff and his father's disruptive and offensive conduct at depositions in this case.

## A.     This Case Must Be Dismissed Given Plaintiff's And His Attorney's Flagrant Violations Of This Court's No-Contact Order

This Court's November 18, 2019 no-contact Order could not have been clearer:  The parties were instructed not to contact Tutecky except to discuss deposition logistics and scheduling unless leave of the Court was obtained.  The purpose of the Order was equally clear: to prevent undue influence over Tutecky's deposition testimony.  And yet Plaintiff and his counsel proceeded to violate the Order—in the case of counsel, by holding a conference call with Tutecky and his counsel two days before Tutecky's deposition █████████████████████████████ ██████████████████████████ Ex. 4 at 497:25–498:1.  Unsurprisingly, having held this call, Plaintiff's counsel proceeded to build his examination of Tutecky on the same questions that the two had rehearsed in advance.  *See id.* at 502:23–503:██████████████████████ ████████████████████████████████████████████████████████ ███████████████ Plaintiff's own violation of the Order was just as egregious:  After attending the November 18, 2019 hearing and receiving a stern admonition from this Court regarding the "paramount" nature of the "integrity of [the judicial] process," Plaintiff proceeded to contact Tutecky the very next month.  ECF 50 at 41:21–42:6; Ex. 10.

These violations of the Court's Order by themselves merit dismissal of this lawsuit.  Violation of a court order plainly constitutes conduct "disrespectful to the court," *Young*, 217 F.R.D. at 65–66 (quoting *Webb*, 146 F.3d at 971), and such disrespect is even more pronounced where, as here, the violation of the order squarely implicates the purpose for which the order was

entered.  For example, in *Young*, the court had entered two orders "requiring [the plaintiff] to comply with discovery requests," which the plaintiff "directly violated . . . by her failure to provide relevant medical records and directing her psychiatrist not to provide the records."  *Young*, 217 F.R.D. at 67.  The plaintiff's conduct "precluded defendant from preparing for and taking plaintiff's deposition, required the unnecessary expenditure of judicial resources and threatened the integrity of the judicial process"—and, accordingly, "the sanction of dismissal [was] warranted on this ground."  *Id.*  Here, Plaintiff's and his attorney's conduct has not simply resulted in a failure to disclose relevant information; rather, it has raised a distinct possibility that information that has been disclosed in deposition is untrustworthy and was obtained through undue influence—which is precisely what the Court's no-contact Order sought to avoid in the first place.

**B.      Dismissal Also Is Warranted Because Plaintiff Bribed and Intimidated Witnesses**

Witness tampering also justifies case-terminating sanctions.  *See Young*, 217 F.R.D. at 67–69.  In *Young*, the court determined that the plaintiff's brother offered bribes to one potential witness to testify on the plaintiff's behalf, and that the plaintiff herself asked another witness to offer testimony regarding events of which he had no personal knowledge.  *Id.*  The court deemed this conduct sufficiently egregious to merit dismissal of the case, concluding that the plaintiff's "attempt to influence a witness to fabricate testimony, coupled with [the plaintiff's] complicity in the attempted bribe of another witness, warrants the most serious sanction of dismissal."  *Id.* at 69.

Other courts agree that witness tampering is serious misconduct justifying terminating sanctions.  For example, in *Ramirez v. T&H LeMont, Inc.*, 845 F.3d 772 (7th Cir. 2016), the court affirmed the imposition of case-terminating sanctions against the plaintiff for bribing a witness.  *Id.* at 781–82.  As the Seventh Circuit has explained, "'witness tampering is among the most grave abuses of the judicial process.'"  *Emerson v. Dart*, 900 F.3d 469, 473 (7th Cir. 2018) (affirming the imposition of case-terminating sanctions for witness tampering, and explaining that the party's

threat "was a bald effort to 'keep witnesses from testifying'") (citation omitted); *see also, e.g.*, *Lee v. Sass*, No. 04-70550, 2006 WL 799176 at *2 (E.D. Mich. Mar. 29, 2006) (granting case-terminating sanctions, and explaining that "[i]t is difficult to contemplate a clearer or more abhorrent example of a litigant's attempt to abuse and subvert the integrity of the judicial process than an effort to suborn perjury from a material witness").

Here, Plaintiff bribed Tutecky, directed the intimidation of ▇▇▇▇▇▇, and "blackmailed" Sahoo, all in an effort to obtain statements that Plaintiff believed would bolster his case.

In order to obtain a favorable statement from Tutecky, Plaintiff made numerous promises to Tutecky regarding the rewards he would receive for helping Plaintiff. Plaintiff told Tutecky he could "trust" that when Plaintiff was "successful," Tutecky would be "rewarded." Ex. A at line 6468. Plaintiff promised Tutecky a "VIP" trip to New York when Plaintiff was "successful with this" litigation. ECF 47-2 at line 6503. And Plaintiff promised Tutecky that the two of them would split "that bag," referring to a bag of money, to be obtained from this litigation. *Id.* at lines 6671–6672. Plaintiff admitted during his deposition that he had spoken with Tutecky about the possibility of giving him a position on Plaintiff's tennis team in light of "all the support" Tutecky provided Plaintiff, "and especially when he sent me that statement." ECF 47-3 at 316:11–20. In conjunction with these bald offers of bribes to Tutecky, Plaintiff reviewed drafts of Tutecky's statement and overtly directed Tutecky as to the statement's contents. He instructed Tutecky to "exaggerate" the racism he had supposedly experienced. ECF 47-2 at lines 6499–6500. At another point, Plaintiff said he would review Tutecky's draft to "make it juicer [sic]" and to ensure that this Court would not "find [Tutecky's statements] 'frivolous.'" *Id.* at lines 6314, 6408.

Later, prompted by further instructions from Plaintiff and a reiterated promise of a share in "the bag," Tutecky attempted to strong-arm ▇▇▇▇▇▇ into writing a statement for purposes of

this case, which culminated in his gloating with Plaintiff about having "milked her good."  Ex. 2 at lines 343, 346, 352–353.  Tutecky also made statements suggesting he was, indeed, motivated by Plaintiff's corrupt promises.  Tutecky proactively referred to "the bag" that Plaintiff had promised, stating it was going to "piss everyone off" and that he and Plaintiff would get the bag "in the end . . . You and I against everyone . . . just like how it started."  *Id.* at lines 436, 492–493.

Plaintiff's conduct concerning Sahoo was just as egregious as his conduct vis-à-vis Tutecky.  Plaintiff, both directly and through Tutecky, intimidated Sahoo into providing a statement favorable to Plaintiff in advance of the July 31, 2019 scheduling conference.  For example, Plaintiff instructed Tutecky to contact Sahoo, to tell him "your [sic] pissed," to threaten that "you're not gonna talk to him anymore if he doesn't contact me," and to threaten that Plaintiff would reveal to the *Washington Post* ███████████████████████████████ ██████████████████████████ if Sahoo did not send Plaintiff a statement (instructions that, as before, Tutecky followed).  ECF 47-2 at lines 6585, 6658; ECF 47-3 at 327:20.  Plaintiff and Tutecky also used Instagram to intimidate Sahoo into signing a FERPA release, by posting and then deleting comments threatening ████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████ Ex. 1 at 346:12–15.

Plaintiff repeatedly threatened Sahoo by telling him that Plaintiff had "evidence against" him.  ECF 47-2 at line 6422.  And Plaintiff admitted at deposition that he did not want Sahoo to provide assistance to the "opposition"—*i.e.*, the University and its counsel.  ECF 47-3 at 327:10–328:17.  This Court need not guess at the significance of these events—Sahoo himself testified that he considered Plaintiff's conduct "blackmail," and that he sent Plaintiff a statement because Plaintiff "wouldn't stop calling and texting" him.  Ex. 1 at 262:4–263:15; 317:1–4; 426:20–25.  Plaintiff's

texts with Morton also reveal Plaintiff's awareness that he was engaged in illicit activity, as Plaintiff told Morton they "should talk over phone so there's no trail," ECF 47-2 at line 6247.[4]

Plaintiff's misconduct toward Tutecky, Sahoo, and ███████ is as severe, if not more so, than the misconduct the *Young* and *Emerson* courts determined warranted case-terminating sanctions. The plaintiff in *Young* attempted "to influence a witness to fabricate testimony" and was complicit "in the attempted bribe of another witness." *Young*, 217 F.R.D. at 69. The court in *Emerson* recognized that "bald efforts" at witness tampering merit case-terminating sanctions because they are "among the most grave abuses of the judicial process." 900 F.3d at 473 (citation and internal quotation marks removed). Here, Plaintiff offered bribes to one witness, "blackmailed" and harassed another witness, and intimidated a third. Plaintiff's conduct, and the testimony concerning it, amount to clear and convincing evidence that he engaged in witness tampering in an effort to bolster his position before this Court. Indeed, the reliability of the statements that Tutecky and Sahoo provided to Plaintiff and the testimony they have offered is dubious at best in light of Plaintiff's egregious behavior. Plaintiff's conduct constitutes a blatant obstruction of the truth-seeking function of discovery, makes it impossible for the University to receive a fair trial, is "disrespectful to the court," and must be deterred through the imposition of case-terminating sanctions. *Young*, 217 F.R.D. at 65–66. Such an outcome is well within this Court's inherent powers to order remedies for conduct undertaken in bad faith—as Plaintiff's conduct here so clearly was. *See Chambers*, 501 U.S. at 43; *Young*, 217 F.R.D. at 65.

Any attempt by Plaintiff to downplay his conduct concerning these witnesses must fall flat in light of Plaintiff's own deposition testimony. Far from providing credible alternate explanations

---

[4] Plaintiff exhibited a similar consciousness of guilt when, prior to suggesting to Tutecky that they should intimidate ███████ into providing a witness statement, Plaintiff noted, "I can't say this on text." Ex. 2 at line 191.

for the relevant text messages, Plaintiff essentially admitted that he was trying to convince Tutecky, Sahoo and others to provide information favorable to his case.  Regarding Tutecky in particular, Plaintiff admitted that Tutecky's assistance with the statement was, at the very least, one of the reasons for which Plaintiff planned to reward him.  ECF 47-3 at 316:7–20.  With regard to Sahoo, Plaintiff admitted that he had pressured Sahoo to provide a statement for fear that Sahoo was feeding information to "the opposition."  *Id.* at 327:10–328:17.  In short, Plaintiff obstructed the truth-seeking function of discovery and admitted that he intended to influence the judicial process through his promises and threats.  Information that Plaintiff has gathered from Tutecky and Sahoo, and any testimony those individuals might give in this case, have been irreversibly tainted by Plaintiff's actions.  The only remedy commensurate with this sullying of the judicial process is dismissal of this case with prejudice.

## C.      Dismissal Also Is Warranted Because Plaintiff And Tutecky Engaged In Spoliation

Numerous messages between Plaintiff, Tutecky, and other witnesses—all of which post-date the filing of this case—also reflect a keen focus by Plaintiff on the ability to conceal information.  For example, Plaintiff was interested in posting messages on Instagram "cause you can delete" there, and he often spoke with witnesses via telephone "so there's no trail."  Ex. 2 at lines 270, 272; ECF 47-2 at line 6247.  And Plaintiff and Tutecky did not merely talk about deleting potentially incriminating evidence of their misconduct—they ***did so.***  "To state the obvious, in civil litigation a party plainly cannot destroy material evidence."  *Milke*, 2020 WL 6383252, at *14.

After sending Tutecky a screenshot of ████████████████████████████ ████████████████████████████████████████ Plaintiff told Tutecky to post a comment on Sahoo's Instagram page saying ████████████████ Ex. 2 at lines 827–847.  The next day, when Tutecky asked Plaintiff if he had "delete[d] the comments" on

Sahoo's Instagram page, Plaintiff confirmed that he had.  *Id.* at lines 856–858.  Sahoo testified that

Plaintiff and Tutecky had commented on—and then deleted the comments from—a "random

picture" on Sahoo's Instagram ███████████████████████████████████████████████

███████████████████████████ and thereby "blackmail" him into signing a FERPA release.

Sahoo Dep. 347:5–348:4.  In other words, nearly a year after filing his case—and after the parties

were engaged in discovery[5]—Plaintiff deleted information that not only was relevant to this case,

but itself was evidence of Plaintiff's intimidation of Sahoo.  Plaintiff's conduct in this regard

represents a further attempt to corrupt the judicial process that itself warrants case-terminating

sanctions.  *See Milke*, 2020 WL 6383252, at *28 (granting case-terminating sanctions where third

party who "always followed" plaintiff's instructions had deleted evidence from social media sites);

*see also, e.g.*, *Leon v. IDX Systems Corp.*, 464 F.3d 951 (9th Cir. 2006) (affirming case-terminating

sanctions in addition to monetary sanctions where plaintiff engaged in willful spoliation of

electronic data); *see also generally Adorno v. Port Auth.*, 258 F.R.D. 217, 227 (S.D.N.Y. 2009)

("[D]etermining the proper sanction to impose for spoliation is confined to the sound discretion of

the trial judge, . . . and is assessed on a case-by-case basis.") (internal quotation marks omitted);

*Borum v. Brentwood Village, LLC*, 332 F.R.D. 38, 43 (D.D.C. 2019) ("[C]ourts have the inherent

power to impose sanctions for abusive litigation practices . . . One such inherent power is the

authority to impose sanctions for the . . . spoliation of evidence.").  And given Plaintiff's and

Tutecky's documented efforts to delete incriminating information, it is unsurprising that Tutecky's

iPhone is missing all his July 2019 text messages with Plaintiff.  *See* Ex. 9 (Green Decl.) ¶ 8.

---

[5]  The University served its first sets of interrogatories and requests for production of documents
on July 19, 2019.

**D.      Plaintiff And Plaintiff's Father Engaged In Disruptive Behavior At Their Depositions, Which Weighs Further In Favor Of Case-Terminating Sanctions**

Because a "party's 'entire course of conduct throughout the lawsuit'" is relevant to determining if it "'evidence[s] bad faith and an attempt to perpetrate a fraud on the court,'" courts also consider other types of conduct when determining whether to impose case-terminating sanctions. *Young*, 217 F.R.D. at 66 (quoting *Chambers*, 501 U.S. at 50–51).  Courts have found unruly or obstructionist conduct at a deposition to warrant case-terminating sanctions. *See, e.g.*, *Sprint Sols., Inc. v. Fils-Amie*, 83 F. Supp. 3d 1290, 1297 (S.D. Fla. 2015) (citing misconduct at depositions as support for granting motion for case-terminating sanctions).  In *Sprint Solutions*, the court noted that the defendant took a "disruptive approach" to his deposition, first by "fail[ing] to appear for his first scheduled deposition" and then by being "purposefully evasive" when the deposition did take place. *Id.* at 1296.  The defendant "responded that he did not recall or did not know the answers to an enormous number of questions, even when the questions referred to recent events or when such responses made no sense," and he "engaged in dilatory antics to sandbag [the plaintiff's] attorneys and run out the time for his deposition"—including "refus[ing] to look at certain exhibits." *Id.*  The defendant also "lied during his deposition." *Id.*  The court concluded that the defendant's behavior at his deposition contributed to a "finding of bad faith" sufficient to merit case-terminating sanctions. *Id.* at 1298.

Here, both Plaintiff and his father engaged in disruptive, evasive, and improper conduct at their depositions.  Plaintiff's conduct at Mr. Stafford's deposition involved numerous attempts to coach Mr. Stafford and influence his testimony.  For example, when the University's counsel asked Mr. Stafford whether Plaintiff returned to campus late on two separate occasions and therefore missed the tennis team photo session, Plaintiff audibly said "that's not true." ECF 47-5 at Video 2 13:26:42–13:31:29.  When Mr. Stafford was asked whether, as stated in Plaintiff's appeal of his

academic suspension, Mr. Stafford and his wife had experienced marital problems, Mr. Stafford became enraged, and Plaintiff rose from his seat, gestured with his arms, and told Mr. Stafford to calm down.  Plaintiff also laughed audibly at several points during his father's deposition.  *See, e.g.*, *id.* at Video 2 13:25:07–13:26:42; *id.* at Video 1 10:41:56–10:43:02; *id.* at Video 1 11:04:04–11:05:30; *id.* at Video 1 11:06:40–11:08:55.  Plaintiff's conduct at his own deposition was equally objectionable, and included a blatant attempt to seek coaching from his father on how to answer what he apparently found to be a particularly difficult question.  *See* ECF 47-3 at 33:12–16.

Much like the defendant in *Sprint Solutions* who engaged in disruptive and evasive conduct during his deposition, Plaintiff here sought to disrupt and obstruct the truth-seeking function of *both* his and his father's depositions.  Particularly when taken together with Plaintiff's bribery, intimidation, and coaching of witnesses, Plaintiff's conduct warrants case-terminating sanctions.

Mr. Stafford's deposition conduct was also appalling.  By his own admission, Mr. Stafford's conduct at his deposition was "[n]ot at all" professional.  ECF 47-4 at 273:13–16.  He repeatedly yelled and shouted obscenities at counsel for the University throughout the deposition, and he combatively refused to answer counsel's questions.  For example, while the parties were off the record, Mr. Stafford stated that he had remembered the first name of a "Mr. Lightfoot" regarding whom he had testified.  When counsel for the University asked Mr. Stafford to wait to provide the name until the parties were back on the record in a few minutes, Mr. Stafford refused to do so.  When the parties were back on the record, counsel for the University asked for the name, and Mr. Stafford testified that he did not remember.  Plaintiff's counsel had to make a statement on the record providing the name.  *Id.* at 107:17–108:8; ECF 47-5 at Video 2: 12:27:39–12:28:00.  Other examples of Mr. Stafford's patently inappropriate behavior abound throughout the record of the proceedings.  *See, e.g.*, ECF 47-4 at 199:5–7, ECF 47-5 at Video 3 14:38:30–

14:39:50 (shouting and using an obscenity in response to a simple question about a bank statement reflecting a stay at the Four Seasons Hotel in Baltimore); ECF 47-4 at 208:7-20, ECF 47-5 at Video 3 15:06:05–15:10:05 (shouting obscenities and combatively refusing to answer a question by counsel for the University regarding Mr. Stafford's payments to "paralegal" Kevin Hall). Mr. Stafford's conduct at Plaintiff's deposition was likewise egregious and included false statements, inappropriate laughter and outbursts, and an apparent attempt to coach his son regarding a question about a former coach. Plaintiff is complicit in Mr. Stafford's conduct at both of their depositions, for he took no steps to prevent it and, if anything, enabled it with his own improper conduct. Mr. Stafford's conduct only compounds the pattern of obstructionist actions that Plaintiff himself has committed, and as such supports the imposition of case-terminating sanctions.[6]

Although this Court addressed Plaintiff's and Mr. Stafford's deposition conduct via its November 18, 2019 Minute Order, such conduct is one facet of Plaintiff's pattern of disrespect for the judicial process, the cumulative effective of which merits case-terminating sanctions.

**E.    A Lesser Sanction Will Not Sufficiently Punish Plaintiff And Deter Him from Engaging In Similar Misconduct In The Future**

"Coercing or seeking to obtain or manufacture false testimony 'strikes at the heart of the judicial system.'" *Young*, 217 F.R.D. at 71 (citation omitted). This Court must, accordingly, exercise the full extent of its inherent powers and dismiss this case.

Any sanction short of dismissal would fail to fully remedy Plaintiff's misconduct and prevent it from recurring and would unfairly prejudice the University, which has been denied its

---

[6]  Plaintiff further subverted the judicial system by authorizing Mr. Hall—whom Plaintiff referred to as "my lawyer" as late as July 7, 2019, *see* ECF 47-3 at 344:2-19—to engage in what may have been the unauthorized practice of law while Plaintiff represented to this Court that he was proceeding *pro se*. ECF 47-4 at 205:22–206:20. And Mr. Stafford appears to have lied about making his payments to Mr. Hall for his work before ultimately shouting at counsel, "I am not going to answer your question. . . . It's none of your business." *Id.* at 208:15–19.

right to a fair proceeding.  Not only did Plaintiff interfere with witnesses and depositions, he also discouraged witnesses from cooperating with the University, *see* ECF 47-3 at 327:10–328:17, and violated an Order of this Court designed to prevent undue influence over Tutecky, *see* Ex. 4 at 497–501.  Monetary sanctions would be "inherently inadequate to remedy the harm to the public interest in preserving the integrity of the courts and in deterring future misconduct."  *Young*, 217 F.R.D. at 70 (citing *Derzack v. Cty. of Allegheny*, 173 F.R.D. 400, 417 (W.D. Pa. 1996)).  Moreover, monetary sanctions would permit Plaintiff to treat the consequences of his actions merely as a cost of doing business.  As the *Young* court recognized, "the imposition of monetary sanctions alone would suggest that money could cure litigation misconduct . . . including witness tampering and suborning perjury" and that "[t]o impose only a monetary sanction would be 'an open invitation to abuse the judicial process.'"  *Young*, 217 F.R.D. at 70 (citation omitted).  Here, Plaintiff already has flagrantly abused the judicial process by bribing and intimidating witnesses.  And while the Court initially expressed some sympathy toward Plaintiff in light of his *pro se* status, *see* ECF 50 at 40:16–21, Plaintiff's abuses of the judicial process have continued unabated since his July 2019 retention of counsel.  Since that date, Plaintiff attempted to strong-arm ███████ into providing a witness statement; he "blackmailed" Sahoo; he engaged in improper conduct at his deposition and permitted his father to engage in similar deposition conduct, and—most recently—his own counsel violated an Order of this Court.  Accordingly, this is no longer "a situation where a pro se litigant with no knowledge regarding discovery procedures was attempting to navigate the discovery process." *Milke*, 2020 WL 6383252, at *18 (granting case-terminating sanctions).  With his egregious conduct, Plaintiff has attempted to subordinate the truth-gathering function of the discovery process to Plaintiff's own desire to win this lawsuit.  Monetary sanctions would only encourage further abuses by Plaintiff by signaling to him that obstructive conduct will

carry few real consequences so long as he can foot the bill.[7]

A protective order likewise would be both ineffective and inadequate.  Plaintiff and his counsel have demonstrated utter disregard for this Court's no-contact Order concerning Tutecky, which the Court imposed after Plaintiff had already shown a lack of respect for the judicial process. Another protective order would beget another violation.  *See Young*, 217 F.R.D. at 70 (protective order inadequate where party who engaged in discovery misconduct acted in a way that made it "extremely unlikely that [she] would obey a protective order").  And even if Plaintiff were to comply with another protective order, it would be an inadequate remedy, because it would not sufficiently punish Plaintiff for the misconduct in which he and his counsel have already engaged. *See id.*  Where "substantial harm already has resulted from plaintiff's misconduct . . . to the institutional integrity of the judicial process," a protective order is insufficient to remedy such discovery violations.  *Id.*  A protective order cannot cure the taint that Plaintiff's conduct already has injected into this case, particularly because Tutecky's deposition already has occurred.

Issue-related sanctions—such as adverse evidentiary rulings or the taking of certain facts as established—would be inadequate here for similar reasons.  *See Young*, 217 F.R.D. at 70 (rejecting issue-related sanctions and finding that "dismissal is the appropriate sanction where a party manufactures evidence which purports to corroborate its substantive claims" (citation and internal quotation marks omitted)).  Although an adverse evidentiary ruling could address concerns about the use of the tainted witness statements, it would not remedy the inherent untrustworthiness

---

[7] This risk is all too real given Plaintiff's father's assertion of his wealth during his deposition testimony.  *See* ECF 47-4 at 201:6–13 ("I can care less what kind of money that Jabari makes in tennis because I got my own paper. . . . Do you want to know what paper means? . . . Money.").

of the deposition testimony given by Tutecky and Sahoo, nor would it sufficiently punish Plaintiff for his grave misconduct.

The ability to cross-examine Tutecky and Sahoo at trial, as well as Plaintiff and Mr. Stafford, similarly is insufficient to address Plaintiff's misconduct.   Allowing Plaintiff to potentially create a genuine dispute of material fact and survive summary judgment using testimony obtained through bribery and intimidation would reward, rather than deter, misconduct.

**F.      If The Court Does Not Dismiss This Case, It Should Sanction Plaintiff In Several Other Respects.**

For the reasons set forth above, case-terminating sanctions are the most appropriate remedy for Plaintiff's misconduct in this case.  Should this Court disagree, however, it still should issue a protective order pursuant to its authority under Federal Rule of Civil Procedure 26(c)(1) and its inherent powers, and an order *in limine* pursuant to its authority under Federal Rule of Evidence 403.  Should the Court issue these orders, the University respectfully requests that the orders bar Plaintiff from introducing (either in summary judgment briefing or at trial) any testimony, information, or documents obtained from Tutecky and Sahoo.  Plaintiff's misconduct is such that this Court can have little confidence in the trustworthiness of the information that Plaintiff has elicited from these witnesses.  A protective order and an order *in limine* would at least reduce the risk that Plaintiff's blatant efforts to damage the integrity of the judicial system will unfairly skew the outcome of this case.  *See Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1325 (D. Utah 2016) (granting protective order excluding certain evidence that was "improperly obtained," on the basis that the use of that evidence would prejudice the moving party).  For similar reasons, the University respectfully requests that any protective order and order *in limine* this Court issues also bar Plaintiff from introducing the deposition testimony of Plaintiff and his father in seeking or opposing summary judgment, or at trial.  In addition, the Court should draw an adverse inference

against Plaintiff if he seeks or opposes summary judgment (or, at trial, instruct the jury to do so) with respect to the testimony from Sahoo and Tutecky, and it should grant the University permission to use the evidence of Plaintiff's misconduct to cross-examine Plaintiff in order to impeach his credibility.  Finally, the University respectfully requests that Plaintiff be ordered to pay the University's costs associated with investigating Plaintiff's witness tampering and briefing the University's two Motions for Case-Terminating Sanctions.

## V.  CONCLUSION

For the foregoing reasons, the University respectfully requests that this Court impose case-terminating sanctions and dismiss Plaintiff's Second Amended Complaint with prejudice.  In the alternative, the University respectfully requests that the Court issue a protective order and an order *in limine* barring Plaintiff from introducing (either in summary judgment briefing or at trial) documents or testimony from Tutecky and Sahoo.  The University further requests that the Court issue a protective order and an order *in limine* barring Plaintiff from introducing the deposition testimony of Plaintiff and Mr. Stafford in seeking or opposing summary judgment, or at trial.  The University further requests that the Court issue an order drawing an adverse inference against Plaintiff with respect to the testimony from Sahoo and Tutecky if Plaintiff seeks or opposes summary judgment (or, at trial, directing the jury to do so), and that the Court grant the University permission to cross-examine Plaintiff using the evidence of his misconduct in order to impeach his credibility.  The University further requests that the Court order Plaintiff to pay the attorneys' fees and costs incurred by Defendant in connection with its Motions for Case-Terminating Sanctions.

Dated: November 4, 2020

Respectfully submitted,

/s/ *Jason C. Schwartz*
Jason C. Schwartz (DC Bar No. 465837)
Molly T. Senger (DC Bar No. 995975)
Michael R. Dziuban (DC Bar No. 1034156)
Matthew P. Sappington (DC Bar No. 1616305)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:  202.955.8500
Facsimile:  202.530.9522
jschwartz@gibsondunn.com
msenger@gibsondunn.com
mdziuban@gibsondunn.com
msappington@gibsondunn.com

*Attorneys for Defendant*